IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------------x

| | |
|---|---|
| CVS PHARMACY, INC.<br>One CVS Drive<br>Woonsocket, Rhode Island 02895<br><br>RITE AID CORPORATION,<br>30 Hunter Lane<br>Camp Hill, Pennsylvania 17011<br><br>and<br><br>RITE AID HDQTRS. CORP.<br>30 Hunter Lane<br>Camp Hill, Pennsylvania 17011<br><br>          Plaintiffs,<br><br>          v.<br><br>WARNER CHILCOTT HOLDINGS<br>COMPANY III, LTD., WARNER<br>CHILCOTT CORPORATION, WARNER<br>CHILCOTT (US) INC., WARNER<br>CHILCOTT COMPANY, INC., and<br>BARR PHARMACEUTICALS, INC.,<br><br>          Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:   CIVIL ACTION NO.<br>:<br>:<br>:   JURY TRIAL DEMANDED<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

---------------------------------------------------------------x

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs CVS Pharmacy, Inc., Rite Aid Corporation and Rite Aid Hdqtrs. Corp. bring this civil action against Defendants Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Warner Chilcott Company, Inc. (collectively "Warner Chilcott"), and Barr Pharmaceuticals, Inc. ("Barr"), and for their Complaint allege as follows:

## Nature of the Action

1.     This is a civil antitrust action seeking treble damages and other relief arising out of an unlawful horizontal agreement between Warner Chilcott and Barr, two competing sellers of an oral contraceptive marketed by Warner Chilcott under the brand name Ovcon 35 ("Ovcon"). Barr is the only company approved by the United States Food and Drug Administration ("FDA") to sell a generic version of Ovcon in competition with Warner Chilcott in the United States. Defendants have unlawfully conspired to prevent and suppress that competition. Defendants' unlawful conspiracy has deprived Plaintiffs and other Ovcon purchasers of the benefits of generic competition from approximately April 2004 to the present.

## Parties

2.     Plaintiff CVS Pharmacy, Inc. ("CVS") is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Woonsocket, Rhode Island. CVS purchases substantial quantities of pharmaceutical products and other goods for resale to the public through more than 5,400 drugstores operated by its affiliates. During the relevant period of time, CVS has purchased Ovcon from wholesaler Cardinal Health, Inc. Cardinal purchases Ovcon directly from Defendants and has assigned to CVS its antitrust claims with respect to Ovcon that was subsequently resold to CVS. CVS brings this action in its own right and as the assignee of Cardinal.

3.     Plaintiff Rite Aid Corporation and Rite Aid Hdqtrs. Corp. (collectively "Rite Aid") are corporations organized and existing under the laws of the State of Delaware with a principal place of business in Camp Hill, Pennsylvania. Rite Aid

2

purchases substantial quantities of pharmaceutical products and other goods for resale to the public through approximately 3,350 drugstores owned and operated by its affiliates. During the relevant period of time, Rite Aid has purchased Ovcon from wholesaler McKesson Corporation. McKesson purchases Ovcon directly from Defendants and has assigned to Rite Aid its antitrust claims with respect to Ovcon that was subsequently resold to Rite Aid. Rite Aid brings this action in its own right and as the assignee of McKesson.

4. Defendant Warner Chilcott Holdings Company III, Ltd. is a privately-owned for-profit company organized and existing under the laws of Bermuda, with its principal place of business in Rockaway, New Jersey. Warner Chilcott Holdings Company III Ltd., through its direct and indirect subsidiaries, is engaged in the discovery, development, manufacture and distribution of pharmaceutical products, including Ovcon, in the United States.

5. Defendant Warner Chilcott Corporation is an indirect wholly-owned subsidiary of Warner Chilcott Holdings Company III, Ltd. and is the direct parent of Warner Chilcott (US) Inc. Warner Chilcott Corporation is a Delaware corporation with its principal place of business in Rockaway, New Jersey.

6. Defendant Warner Chilcott (US) Inc. is a wholly-owned subsidiary of Warner Chilcott Corporation. Warner Chilcott (US) Inc. is a Delaware corporation with its principal place of business in Rockaway, New Jersey.

7. Defendants Warner Chilcott Company, Inc. is a wholly-owned subsidiary of Warner Chilcott Holdings Company III, Ltd. Warner Chilcott Company, Inc. is organized and exists under the laws of the Commonwealth of Puerto Rico.

8. Defendant Barr is a Delaware corporation with its principal place of business in Pomona, New York. Barr is engaged in the business of developing, manufacturing, marketing and distributing generic pharmaceutical products, including generic oral contraceptives.

## Jurisdiction and Venue

9. This action arises under section 1 of the Sherman Act, 15 U.S.C. §1, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

10. Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. §22, because each Defendant is an inhabitant of this District or is found or transacts business here.

## Trade and Commerce

11. The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

## Factual Background

A. **Federal Regulations**

12. Under the federal Food, Drug and Cosmetic Act, 21 U.S.C. §301 *et seq.*, approval by the Food and Drug Administration ("FDA") is required before a new drug may be sold in interstate commerce. Premarket approval for a new drug must be sought by filing a new drug application with the FDA, under either section 355(b) or section 355(j) of the Act, demonstrating that the drug is safe and effective for its intended use.

13. In 1984, Congress amended the Food, Drug and Cosmetic Act by enacting the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Amendments or the Hatch-Waxman Act. The Hatch-Waxman Act simplified the regulatory hurdles for prospective generic drug manufacturers by eliminating the need for generic companies to file lengthy and costly New Drug Applications ("NDAs") in order to obtain FDA approval. Instead, such companies are permitted to file Abbreviated New Drug Applications ("ANDAs") and to rely on the safety and effectiveness data already supplied to the FDA by the brand-name manufacturer. The Hatch-Waxman Act also added a number of patent-related provisions to the statutory scheme. Congress's principal purpose in enacting the Hatch-Waxman Act was "to bring generic drugs onto the market as rapidly as possible." *Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

14. Generic drugs are drugs that the FDA has found to be bioequivalent to their brand-name drug counterparts. When the FDA finds that a generic drug is both bioequivalent and equivalent in all other respects to a brand-name drug, it assigns the generic drug an "AB" rating. Retail pharmacies are permitted (and in some states required) to dispense an AB-rated generic drug in place of the corresponding brand-name drug unless the physician expressly dictates otherwise.

15. The first generic competitor to enter a market typically does so at a price at least 30% lower than the price of the equivalent brand-name drug and quickly takes a substantial amount of market share away from the brand-name manufacturer. As additional generic competitors come to market, the price of the generics continues to fall, and their combined market share continues to grow. In some cases, generic competitors

sell products equivalent to brand-name prescription drugs for as little as 10% of the price of the brand-name drug, and have captured as much as 90% of the brand-name drug's pre-generic sales.

16. The price competition engendered by generic drug manufacturers benefits all purchasers of the drug, who are able to buy the same chemical substance at much lower prices. Retail pharmacies, such as those owned and operated by Plaintiffs, substitute generic drugs for brand-name drugs wherever possible in order to lower their own costs and those of their customers.

**B. Warner Chilcott's Ovcon Oral Contraceptive**

17. Ovcon was originally approved by the FDA in 1976, and it is not subject to patent protection. Warner Chilcott acquired Ovcon from Bristol-Myers Squibb Company on January 26, 2000. As part of the acquisition, Bristol-Myers Squibb Company agreed to supply (and has supplied) Ovcon to Warner Chilcott.

18. Ovcon's net dollar sales have more than doubled since 2000, even as Warner Chilcott has raised Ovcon's price.

19. Ovcon is, and has been, one of Warner Chilcott's highest revenue-producing products.

20. Warner Chilcott sells Ovcon at a price substantially above its cost.

21. Ovcon is highly profitable for Warner Chilcott. For twelve months ending September 30, 2004, Warner Chilcott's net sales of Ovcon were approximately $71.5 million. For the same time period, Warner Chilcott's gross margin on net sales of all its products was approximately 89%.

C.  **The Threat Posed by Generic Ovcon**

22. In September 2001, Barr filed an ANDA with the FDA for approval to manufacture and sell an AB-rated generic version of Ovcon in the United States.

23. In January 2003, Barr publicly announced it intention to market generic Ovcon by the end of that year.

24. Barr planned to price generic Ovcon at approximately 30 percent less than the price that Warner Chilcott charges for branded Ovcon.

25. Barr projected that its generic Ovcon would capture approximately 50 percent of Warner Chilcott's branded Ovcon sales within the first year of introduction.

26. Warner Chilcott expected that Barr would price its generic Ovcon at approximately 30 percent less than the price Warner Chilcott charges for branded Ovcon.

27. Warner Chilcott projected that generic Ovcon would capture at least 50 percent of Ovcon's new prescriptions within the first year of introduction. Warner Chilcott calculated that, as a result of these lost prescriptions, its net revenues from the sale of branded Ovcon would decline by at least $100 million over a three-year period.

28. Warner Chilcott had planned to protect its Ovcon revenues from generic competition by introducing a chewable form of the product (Ovcon Chewable) before generic Ovcon entry occurred. Warner Chilcott's strategy was to convert its Ovcon customers to Ovcon Chewable and to stop selling Ovcon.

29. Prescriptions for Ovcon Chewable could not be filled at the pharmacy with generic Ovcon because any generic version of Ovcon would not be AB-rated to Ovcon Chewable.

30. By mid-2003, however, Warner Chilcott's "switch" strategy was in jeopardy. Entry of generic Ovcon appeared imminent, and Ovcon Chewable had not yet obtained FDA approval.

31. In May 2003, Warner Chilcott's chief financial officer warned the company's Board of Directors that generic Ovcon entry was the "biggest risk to the company."

**D.     Defendants' Horizontal Agreement Not to Compete**

32. In August 2003, Warner Chilcott and Barr discussed a possible business arrangement under which Barr would agree to refrain from competing in the United States with its generic Ovcon product.

33. On September 10, 2003, Warner Chilcott and Barr executed a letter of intent. Under the parties' agreement as described in the letter of intent, Warner Chilcott would pay Barr $20 million and Barr would not enter the market and compete in the United States for five years with its generic Ovcon product once Barr received final FDA approval. Instead of entering and competing, Barr would agree to be available as a second supplier of Ovcon to Warner Chilcott if Warner Chilcott so requested.

34. On March 24, 2004, Defendants signed their Final Agreement implementing the letter of intent. Warner Chilcott paid Barr $1 million upon signing the Final Agreement.

35. Under the Final Agreement, within 45 days after the FDA approved Barr's generic Ovcon ANDA, Warner Chilcott could elect to pay the remaining $19 million to secure Barr's agreement to refrain from marketing generic Ovcon in the United States, either by itself or through a licensee, for five years. The Final Agreement referred to this

arrangement as Warner Chilcott's option to an exclusive license to Barr's ANDA for generic Ovcon.

36. In addition, the Final Agreement gave Warner Chilcott the ability to purchase Ovcon supply from Barr, pursuant to specified payment terms. The ability to purchase supply from Barr would arise, however, only after Barr received final FDA approval for its generic Ovcon. Both Warner Chilcott and Barr understood that if, upon receiving FDA approval, Barr went ahead and entered the market with its generic Ovcon product, Warner Chilcott's Ovcon supply needs would immediately be drastically reduced.

37. On April 22, 2004, the FDA approved Barr's ANDA to produce and market generic Ovcon.

38. Upon receiving final FDA approval for its generic Ovcon ANDA, Barr had the capability to market generic Ovcon in the United States and, but for the illegal agreement, would have done so.

39. On April 23, 2004, Barr publicly announced its intention to market generic Ovcon if Warner Chilcott chose not to exercise its exclusive license option.

40. On May 6, 2004, Warner Chilcott exercised the exclusive license option under the Final Agreement by paying Barr $19 million.

41. Under the terms of the Final Agreement, Barr cannot sell generic Ovcon in the United States for five years, or until approximately May 2009. Absent its illegal agreement not to compete with Warner Chilcott, Barr would have started selling generic Ovcon shortly after receiving final FDA approval in April 2004.

42. Entry of Barr's generic Ovcon into the United States would have quickly and significantly reduced the sales of Warner Chilcott's branded Ovcon and led to a significant reduction in the average price Plaintiffs and other purchasers paid for Ovcon products. By paying Barr not to compete, Warner Chilcott was able to avoid the loss of its monopoly profits and to maintain inflated supracompetitive prices for the drug.

43. Barr has abided by its agreement not to sell generic Ovcon in the United States.

44. As of the date of this Complaint, Barr remains the only company that has received approval from the FDA to make and sell an AB-rated generic version of Ovcon.

### Antitrust Violation (Section 1 of the Sherman Act)

45. Plaintiffs incorporate by reference all preceding allegations.

46. Since approximately September 10, 2003, when Defendants executed their letter of intent, Defendants have engaged in a continuing horizontal agreement, combination or conspiracy, the purpose and effect of which have been to allocate to Warner Chilcott the market for the sale of Ovcon and its generic equivalents in the United States and to eliminate competition between Warner Chilcott and Barr in the sale of Ovcon and its generic equivalents in the United States.

47. Defendants' illegal agreement is a conspiracy in restraint of trade and a *per se* violation of section 1 of the Sherman Act.

48. In the alternative, Defendants' agreement has had a substantially adverse effect on competition in the relevant market – the sale of Ovcon and its generic equivalents in the United States – and is illegal under the Rule of Reason.

49. But for Defendants' illegal agreement, Barr would have entered the market with generic Ovcon in or about April 2004. Barr's entry would have allowed Plaintiffs and other purchasers to substitute a lower-priced generic Ovcon for the higher-priced branded Ovcon for a substantial portion of their Ovcon purchases.

50. Plaintiffs (or their assignors) have been injured in their business and property by reason of Defendants' unlawful conspiracy in restraint of trade. Plaintiffs' injury consists of paying higher prices for Ovcon and its generic equivalents than would have been paid in the absence of Defendants' illegal conduct. Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

51. Defendants' violations threaten continuing loss and injury to Plaintiffs unless enjoined by this Court.

WHEREFORE, Plaintiffs pray for judgment against Defendants and for the following relief:

A. A judgment for three times the damages actually sustained by Plaintiffs, as determined by a jury;

B. A declaration that Defendants have violated the antitrust laws in the ways described above;

C. Permanent injunctive relief, which enjoins Defendants from continuing their illegal conduct and requires them to take affirmative steps to dissipate the effects of their prior violations;

D. The costs of this suit, including a reasonable attorneys' fee; and

E. Such other and further relief as the Court deems just and proper.

## Jury Demand

Plaintiffs demand trial by jury of all issues so triable.

Respectfully submitted,

*/s/ Robert D.W. Landon III*

Robert D.W. Landon III
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861

OF COUNSEL:

Steve D. Shadowen
Monica L. Rebuck
HANGLEY ARONCHICK SEGAL & PUDLIN
30 North Third Street, Suite 700
Harrisburg, PA 17101-1713
Telephone: (717) 364-1030
Telecopy: (717) 364-1020