## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CVS PHARMACY, INC.**, One CVS Drive,
**Woonsocket, Rhode Island  02895,**

**RITE AID CORPORATION**, 30 Hunter Lane,
**Camp Hill, Pennsylvania  17011,**

**RITE AID HDQTRS. CORP.**, 30 Hunter Lane,
**Camp Hill, Pennsylvania  17011,**

                              **Plaintiffs,**

       **v.**

**WARNER CHILCOTT HOLDINGS
COMPANY III, LTD., WARNER CHILCOTT
CORPORATION, WARNER CHILCOTT (US)
INC., WARNER CHILCOTT COMPANY,
INC., and BARR PHARMACEUTICALS, INC.,**

                           **Defendants.**

Civ. Action No.: 1:06-CV-00795-CKK

Judge Colleen Kollar-Kotelly

**JURY TRIAL DEMANDED**

## BARR PHARMACEUTICALS, INC.'S
## ANSWER TO PLAINTIFFS' COMPLAINT

Defendant BARR PHARMACEUTICALS, INC. ("Barr") hereby responds to the allegations of Plaintiffs CVS PHARMACY, INC., RITE AID CORPORATION and RITE AID HDQTRS. CORP. (collectively, "Plaintiffs") in their Complaint ("Complaint").  Barr denies it has engaged or is engaging in any unlawful or unfair methods of competition in or affecting commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.  Barr further responds to each paragraph of the Complaint as set forth below.  Any allegation in the Complaint not specifically addressed below is hereby denied.

1.    This is a civil antitrust action seeking treble damages and other relief arising out of an unlawful horizontal agreement between Warner Chilcott and Barr, two competing sellers of an oral contraceptive marketed by Warner Chilcott under the brand name Ovcon 35 ("Ovcon"). Barr is the only company approved by the United States Food and Drug Administration ("FDA") to sell a generic version of Ovcon in competition with Warner Chilcott in the United States. Defendants have unlawfully conspired to prevent and suppress that competition. Defendants' unlawful conspiracy has deprived Plaintiffs and other Ovcon purchasers of the benefits of generic competition from approximately April 2004 to the present.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 1 of the Complaint. Barr denies the remaining allegations contained in Paragraph 1 of the Complaint, and specifically denies that it has engaged in any unlawful activity whatsoever.

2.    Plaintiff CVS Pharmacy, Inc. ("CVS") is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Woonsocket, Rhode Island. CVS purchases substantial quantities of pharmaceutical products and other goods for resale to the public through more than 5,400 drugstores operated by its affiliates. During the relevant period of time, CVS has purchased Ovcon from wholesaler Cardinal Health, Inc. Cardinal purchases Ovcon directly from Defendants and has assigned to CVS its antitrust claims with respect to Ovcon that was subsequently resold to CVS. CVS brings this action in its own right and as the assignee of Cardinal.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 2 of the Complaint.

3.    Plaintiff Rite Aid Corporation and Rite Aid Hdqtrs. Corp. (collectively "Rite Aid") are corporations organized and existing under the laws of the State of Delaware with a principal place of business in Camp Hill, Pennsylvania. Rite Aid purchases substantial quantities of pharmaceutical products and other goods for resale to the public through approximately 3,350 drugstores owned and operated by its affiliates. During the relevant period of time, Rite Aid has purchased Ovcon from wholesaler McKesson Corporation. McKesson purchases Ovcon directly from Defendants and has assigned to Rite Aid its antitrust claims with respect to Ovcon that was subsequently resold to Rite Aid. Rite Aid brings this action in its own right and as the assignee of McKesson.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 3 of the Complaint.

4.    Defendant Warner Chilcott Holdings Company III, Ltd. is a privately-owned for-profit company organized and existing under the laws of Bermuda, with its principal place of

business in Rockaway, New Jersey. Warner Chilcott Holdings Company III, Ltd., through its direct and indirect subsidiaries, is engaged in the discovery, development, manufacture and distribution of pharmaceutical products, including Ovcon, in the United States.

   **ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the

truth of each and every allegation contained in Paragraph 4 of the Complaint.


   5.    Defendant Warner Chilcott Corporation is an indirect wholly-owned subsidiary of Warner Chilcott Holdings Company III, Ltd. and is the direct parent of Warner Chilcott (U.S.) Inc. Warner Chilcott Corporation is a Delaware corporation with its principal place of business in Rockaway, New Jersey.

   **ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the

truth of each and every allegation contained in Paragraph 5 of the Complaint.


   6.    Defendant Warner Chilcott (U.S.) Inc. is a wholly-owned subsidiary of Warner Chilcott Corporation. Warner Chilcott (U.S.) Inc. is a Delaware corporation with its principal place of business in Rockaway, New Jersey.

   **ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the

truth of each and every allegation contained in Paragraph 6 of the Complaint.


   7.    Defendants Warner Chilcott Company, Inc. is a wholly-owned subsidiary of Warner Chilcott Holdings Company III, Ltd. Warner Chilcott Company, Inc. is organized and exists under the laws of the Commonwealth of Puerto Rico.

   **ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the

truth of each and every allegation contained in Paragraph 7 of the Complaint.


   8.    Defendant Barr is a Delaware corporation with its principal place of business in Pomona, New York. Barr is engaged in the business of developing, manufacturing, marketing and distributing generic pharmaceutical products, including generic oral contraceptives.

   **ANSWER:**    Barr admits that it is a corporation organized under the laws of the state of

Delaware. Barr further admits that its regular business activities include the development,

manufacture, and marketing of various pharmaceutical products. Barr denies the remaining

allegations contained in Paragraph 8 of the Complaint.

9.    This action arises under section 1 of the Sherman Act, 15 U.S.C. § 1, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

**ANSWER:**    Paragraph 9 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Barr denies each and every allegation contained in Paragraph 9 of the Complaint.

10.    Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, because each Defendant is an inhabitant of this District or is found or transacts business here.

**ANSWER:**    Paragraph 10 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 10 of the Complaint.

11.    The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

**ANSWER:**    Paragraph 11 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 11 of the Complaint, but denies it has engaged in any unlawful activity that has had a substantial effect upon interstate commerce.

12.    The Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq*., approval by the Food and Drug Administration ("FDA") is required before a new drug may be sold in interstate commerce.  Premarket approval for a new drug must be sought by filing a new drug application with the FDA, under either section 355(b) or section 355(j) of the Act, demonstrating that the drug is safe and effective for its intended use.

**ANSWER:**    Paragraph 12 of the Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Barr admits that, among other things,

4

a drug manufacturer must obtain approval from the FDA before a manufacturer may lawfully

introduce a new drug in the United States.  Barr further admits that, among other things, a drug

manufacturer must file a New Drug Application with the FDA and demonstrate that a new drug

is safe and effective for its intended use.  Barr lacks knowledge or information sufficient to form

a belief as to the truth of the remaining allegations contained in Paragraph 12 of the Complaint.

13.     In 1984, Congress amended the Food, Drug and Cosmetic Act by enacting Drug
Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman
Amendments or the Hatch-Waxman Act.  The Hatch-Waxman Act simplified the regulatory
hurdles for prospective generic drug manufacturers by eliminating the need for generic
companies to file lengthy and costly New Drug Applications ("NDAs") in order to obtain FDA
approval.  Instead, such companies are permitted to file Abbreviated New Drug Applications
("ANDAs") and to rely on the safety and effectiveness data already supplied to the FDA by the
brand-name manufacturer.  The Hatch-Waxman Act also added a number of patent-related
provisions to the statutory scheme.  Congress's principal purpose in enacting the Hatch-Waxman
Act was "to bring generic drugs onto the market as rapidly as possible."  *Mova Pharmaceuticals
Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

**ANSWER:**     Paragraph 13 of the Complaint contains legal conclusions to which no

response is required.  To the extent a response is required, Barr admits that the Hatch-Waxman

Act established certain procedures relating to generic pharmaceuticals.  Barr lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

Paragraph 13 of the Complaint.

14.     Generic drugs are drugs that the FDA has found to be bioequivalent to their
brand-name drug counterparts.  When the FDA finds that a generic drug is both bioequivalent
and equivalent in all other respects to a brand-name drug, it assigns the generic drug an "AB"
rating.  Retail pharmacies are permitted (and in some states required) to dispense an AB-rated
generic drug in place of the corresponding brand-name drug unless the physician expressly
dictates otherwise.

**ANSWER:**     Paragraph 14 of the Complaint contains legal conclusions to which no

response is required.  To the extent a response is required, Barr admits that in some states and

under certain circumstances a pharmacist may dispense an AB-rated generic drug when

presented with a prescription for its branded equivalent, but lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 14 of the Complaint.

15.    The first generic competitor to enter a market typically does so at a price at least 30% lower than the price of the equivalent brand-name drug and quickly takes a substantial amount of market share away from the brand-name manufacturer.  As additional generic competitors come to market, the price of the generics continues to fall, and their combined market share continues to grow.  In some cases, generic competitors sell products equivalent to brand-name prescription drugs for as little as 10% of the price of the brand-name drug, and have captured as much as 90% of the brand-name drug's pre-generic sales.

**ANSWER:**    Barr admits that generic drugs can cost less than bioequivalent branded drugs, but that each drug must be considered individually to observe pricing behavior.  Barr lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 15 of the Complaint.

16.    The price competition engendered by generic drug manufacturers benefits all purchasers of the drug, who are able to buy the same chemical substance at much lower prices. Retail pharmacies, such as those owned and operated by Plaintiffs, substitute generic drugs for brand-name drugs wherever possible in order to lower their own costs and those of their customers.

**ANSWER:**    Barr admits that generic drugs can cost less than bioequivalent branded drugs, but that each drug must be considered individually to observe pricing behavior.  Barr further admits that in some states and under certain circumstances a pharmacist may dispense an AB-rated generic drug when presented with a prescription for its branded equivalent, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 16 of the Complaint.

17.    Ovcon was originally approved by the FDA in 1976, and it is not subject to patent protection.  Warner Chilcott acquired Ovcon from Bristol-Myers Squibb Company on January 26, 2000.  As part of the acquisition, Bristol-Myers Squibb Company agreed to supply (and has supplied) Ovcon to Warner Chilcott.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 17 of the Complaint.

6

18.     Ovcon's net dollar sales have more than doubled since 2000, even as Warner Chilcott has raised Ovcon's price.

**ANSWER:**     Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 18 of the Complaint.

19.     Ovcon is, and has been, one of Warner Chilcott's highest revenue-producing products.

**ANSWER:**     Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 19 of the Complaint.

20.     Warner Chilcott sells Ovcon at a price substantially above its cost.

**ANSWER:**     Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 20 of the Complaint.

21.     Ovcon is highly profitable for Warner Chilcott.  For twelve months ending September 30, 2004, Warner Chilcott's net sales of Ovcon were approximately $71.5 million. For the same time period, Warner Chilcott's gross margin on net sales of all its products was approximately 89%.

**ANSWER:**     Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 21 of the Complaint.

22.     In September 2001, Barr filed an ANDA with the FDA for approval to manufacture and sell an AB-rated generic version of Ovcon in the United States.

**ANSWER:**     Barr admits that it filed an ANDA with the FDA for approval to manufacture and sell an AB-rated generic version of Ovcon.  Barr denies the remaining allegations contained in Paragraph 22 of the Complaint.

23.     In January 2003, Barr publicly announced its intention to market generic Ovcon by the end of that year.

**ANSWER:**     Barr denies the allegations contained in Paragraph 23 of the Complaint, except admits that in April 2004 it publicly contemplated launching a generic version of Ovcon

if Warner Chilcott did not exercise its option, subject to certain risks and uncertainties in making

a generic Ovcon commercially available.

24.    Barr planned to price generic Ovcon at approximately 30 percent less than the price that Warner Chilcott charges for branded Ovcon.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 24 of the

Complaint.

25.    Barr projected that its generic Ovcon would capture approximately 50 percent of Warner Chilcott's branded Ovcon sales within the first year of introduction.

**ANSWER:**    Barr admits that it made projections regarding the sales of a generic Ovcon

product.  Barr denies the remaining allegations contained in Paragraph 25 of the Complaint.

26.    Warner Chilcott expected that Barr would price its generic Ovcon at approximately 30 percent less than the price Warner Chilcott charges for branded Ovcon.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the

truth of each and every allegation contained in Paragraph 26 of the Complaint.

27.    Warner Chilcott projected that generic Ovcon would capture at least 50 percent of Ovcon's new prescriptions within the first year of introduction.  Warner Chilcott calculated that, as a result of these lost prescriptions, its net revenues from the sale of branded Ovcon would decline by at least $100 million over a three-year period.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the

truth of each and every allegation contained in Paragraph 27 of the Complaint.

28.    Warner Chilcott had planned to protect its Ovcon revenues from generic competition by introducing a chewable form of the product (Ovcon Chewable) before generic Ovcon entry occurred.  Warner Chilcott's strategy was to convert its Ovcon customers to Ovcon Chewable and to stop selling Ovcon.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the

truth of each and every allegation contained in Paragraph 28 of the Complaint.

29.    Prescriptions for Ovcon Chewable could not be filled at the pharmacy with generic Ovcon because any generic version of Ovcon would not be AB-rated to Ovcon Chewable.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 29 of the Complaint.

30.    By mid-2003, however, Warner Chilcott's "switch" strategy was in jeopardy. Entry of generic Ovcon appeared imminent, and Ovcon Chewable had not yet obtained FDA approval.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 30 of the Complaint.

31.    In May 2003, Warner Chilcott's chief financial officer warned the company's Board of Directors that generic Ovcon entry was the "biggest risk to the company."

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 31 of the Complaint.

32.    In August 2003, Warner Chilcott and Barr discussed a possible business arrangement under which Barr would agree to refrain from competing in the United States with its generic Ovcon product.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 32 of the Complaint, except admits that in August 2003 representatives of Barr and Warner Chilcott discussed a number of possible business transactions.

33.    On September 10, 2003, Warner Chilcott and Barr executed a letter of intent. Under the parties' agreement as described in the letter of intent, Warner Chilcott would pay Barr $20 million and Barr would not enter the market and compete in the United States for five years with its generic Ovcon product once Barr received final FDA approval.  Instead of entering and competing, Barr would agree to be available as a second supplier of Ovcon to Warner Chilcott if Warner Chilcott so requested.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 33 of the Complaint, except admits that on September 10, 2006, Barr and Warner Chilcott executed a letter of intent to enter into an agreement that would give Warner Chilcott an option to enter into a five year exclusive license to Barr's Ovcon ANDA and a related supply agreement.

34.    On March 24, 2004, Defendants signed their Final Agreement implementing the letter of intent.  Warner Chilcott paid Barr $1 million upon signing the Final Agreement.

**ANSWER:**    Barr admits that on March 24, 2004, Barr and Warner Chilcott executed an option agreement implementing the terms of the parties' letter of intent, and further admits that Barr was paid $1 million in consideration for the option by Warner Chilcott.

35.    Under the Final Agreement, within 45 days after the FDA approved Barr's generic Ovcon ANDA, Warner Chilcott could elect to pay the remaining $19 million to secure Barr's agreement to refrain from marketing generic Ovcon in the United States, either by itself or through a licensee, for five years.  The Final Agreement referred to this arrangement as Warner Chilcott's option to an exclusive license to Barr's ANDA for generic Ovcon.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 35 of the Complaint, except admits that Warner Chilcott exercised its option to a five-year exclusive license to Barr's Ovcon ANDA in May 2004.

36.    In addition, the Final Agreement gave Warner Chilcott the ability to purchase Ovcon supply from Barr, pursuant to specified payment terms.  The ability to purchase supply from Barr would arise, however, only after Barr received final FDA approval for its generic Ovcon.  Both Warner Chilcott and Barr understood that if, upon receiving FDA approval, Barr went ahead and entered the market with its generic Ovcon product, Warner Chilcott's Ovcon supply needs would immediately be drastically reduced.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 36 of the Complaint, except admits that Barr and Warner Chilcott entered into a supply agreement with specified payment terms, and further admits that Barr could not supply Warner Chilcott with generic Ovcon under its ANDA prior to receiving FDA approval.

37.    On April 22, 2004, the FDA approved Barr's ANDA to produce and market generic Ovcon.

**ANSWER:**    Barr admits the allegations contained in Paragraph 37 of the Complaint.

38.    Upon receiving final FDA approval for its generic Ovcon ANDA, Barr had the capability to market generic Ovcon in the United States and, but for the illegal agreement, would have done so.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 38 of the Complaint.

39.     On April 23, 2004, Barr publicly announced its intention to market generic Ovcon if Warner Chilcott chose not to exercise its exclusive license option.

**ANSWER:**    Barr admits that in April 2004 it publicly contemplated launching a generic version of Ovcon if Warner Chilcott did not exercise its option, subject to certain risks and uncertainties in making a generic Ovcon commercially available.

40.     On May 6, 2004, Warner Chilcott exercised the exclusive license option under the Final Agreement by paying Barr $19 million.

**ANSWER:**    Barr admits that on or about May 6, 2004, Warner Chilcott exercised the option for an exclusive license and supply, and further admits that Warner Chilcott paid Barr $19 million under the Final Agreement.

41.     Under the terms of the Final Agreement, Barr cannot sell generic Ovcon in the United States for five years, or until approximately May 2009.  Absent its illegal agreement not to compete with Warner Chilcott, Barr would have started selling generic Ovcon shortly after receiving final FDA approval in April 2004.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 41 of the Complaint, except admits that until approximately May 2009 Barr is obligated to supply Warner Chilcott exclusively with product produced under Barr's ANDA on generic Ovcon.

42.     Entry of Barr's generic Ovcon into the United States would have quickly and significantly reduced the sales of Warner Chilcott's branded Ovcon and led to a significant reduction in the average price Plaintiffs and other purchasers paid for Ovcon products.  By paying Barr not to compete, Warner Chilcott was able to avoid the loss of its monopoly profits and to maintain inflated supracompetitive prices for the drug.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 42 of the Complaint.

43.     Barr has abided by its agreement not to sell generic Ovcon in the United States.

**ANSWER:**    Barr admits that it has not sold generic Ovcon in the United States.  Barr denies the remaining allegations contained in Paragraph 43 of the Complaint.

44.     As of the date of this Complaint, Barr remains the only company that has received approval from the FDA to make and sell an AB-rated generic version of Ovcon.

**ANSWER:**    Barr lacks knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 44 of the Complaint.

45.     Plaintiffs incorporate by reference all preceding allegations.

**ANSWER:**    Barr incorporates by reference each and all preceding matters set forth in its Answers.

46.     Since approximately September 10, 2003, when Defendants executed their letter of intent, Defendants have engaged in a continuing horizontal agreement, combination or conspiracy, the purpose and effect of which have been to allocate to Warner Chilcott the market for the sale of Ovcon and its generic equivalents in the United States and to eliminate competition between Warner Chilcott and Barr in the sale of Ovcon and its generic equivalents in the United States.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 46 of the Complaint.

47.     Defendants' illegal agreement is a conspiracy in restraint of trade and a *per se* violation of section 1 of the Sherman Act.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 47 of the Complaint and specifically denies that it has engaged in any illegal activity whatsoever.

48.     In the alternative, Defendants' agreement has had a substantially adverse effect on competition in the relevant market – the sale of Ovcon and its generic equivalents in the United States – and is illegal under the Rule of Reason.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 48 of the Complaint and specifically denies that it has engaged in any illegal activity whatsoever.

49.     But for Defendants' illegal agreement, Barr would have entered the market with generic Ovcon in or about April 2004.  Barr's entry would have allowed Plaintiffs and other purchasers to substitute a lower-priced generic Ovcon for the higher-priced branded Ovcon for a substantial portion of their Ovcon purchases.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 49 of the Complaint and specifically denies that it has engaged in any illegal activity whatsoever.

50.    Plaintiffs (or their assignors) have been injured in their business and property by reason of Defendants' unlawful conspiracy in restraint of trade. Plaintiffs' injury consists of paying higher prices for Ovcon and its generic equivalents than would have been paid in the absence of Defendants' illegal conduct. Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 50 of the Complaint and specifically denies that Plaintiffs have suffered any injury whatsoever.

51.    Defendants' violations threaten continuing loss and injury to Plaintiffs unless enjoined by this Court.

**ANSWER:**    Barr denies each and every allegation contained in Paragraph 51 of the Complaint and specifically denies that Plaintiffs have suffered any injury whatsoever.

## DEFENSES

In addition to the foregoing responses, Barr asserts the following defenses to the claims alleged in Plaintiffs' Complaint. Barr does not assume the burden of proof of these defenses except where the applicable substantive law provides otherwise.

### First Affirmative Defense

1.    The Complaint fails to state a claim against Barr upon which relief can be granted.

### Second Affirmative Defense

2.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

### Third Affirmative Defense

3.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

### Fourth Affirmative Defense

4.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

### Fifth Affirmative Defense

5.      Plaintiffs' claims are barred, in whole or in part, because any conduct engaged in by Barr has been reasonable, based upon independent and legitimate business and economic justifications, and was taken without the purpose or effect of injuring competition.

### Sixth Affirmative Defense

6.      Plaintiffs' claims are barred, in whole or in part, because any conduct engaged in by Barr was reasonable in relation to the development and preservation of its business.

### Seventh Affirmative Defense

7.      Plaintiffs' claims are barred, in whole or in part, because none of Barr's actions have injured competition in any relevant market.

### Eighth Affirmative Defense

8.      Plaintiffs' claims are barred, in whole or in part, because Barr's actions have pro-competitive effects that benefit competition as a whole in any relevant market.

### Ninth Affirmative Defense

9.      Plaintiffs' claims are barred, in whole or in part, because none of Barr's alleged actions have harmed competition and/or consumers.

### Tenth Affirmative Defense

10.      Plaintiffs' claims are barred, in whole or in part, because Barr had no knowledge, intention, notice, or belief that Barr's actions might illegally restrain trade.  Further, Barr could not have known that its actions might illegally restrain trade.

### Eleventh Affirmative Defense

11.     Plaintiffs' claims are barred, in whole or in part, because Barr did not engage in any willful or flagrant act.

### Twelfth Affirmative Defense

12.     Plaintiffs' claims are barred, in whole or in part, because Barr relied in good faith on the actions and statements of the Federal Trade Commission.

### Thirteenth Affirmative Defense

13.     Plaintiffs' claims are barred, in whole or in part, because Barr did not conceal any of its actions.

### Fourteenth Affirmative Defense

14.     Plaintiffs' claims are barred, in whole or in part, because Barr did not engage in any pattern or practice of illegal activity.

### Fifteenth Affirmative Defense

15.     Plaintiffs' claims are barred, in whole or in part, because Barr's actions were a result of bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error.

### Sixteenth Affirmative Defense

16.     Plaintiffs' claims are barred, in whole or in part, because Barr's actions did not cause harm to Plaintiffs.

### Seventeenth Affirmative Defense

17.     Plaintiffs' claims are barred, in whole or in part, because Barr did not engage in any unfair or deceptive act or practice.

### Eighteenth Affirmative Defense

18.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not properly alleged either a relevant product market or a relevant geographic market.

### Nineteenth Affirmative Defense

19.     Plaintiffs' claims are barred, in whole or in part, because Barr has and had no market power and Plaintiffs have failed to allege any market power.

### Twentieth Affirmative Defense

20.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs do not have standing.

### Twenty-First Affirmative Defense

21.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered antitrust injury.

### Twenty-Second Affirmative Defense

22.     Plaintiffs' claims are barred, in whole or in part, because Barr has acted at all times in conformity with all applicable laws, statutes, ordinances, and decrees with respect to Plaintiffs.

### Twenty-Third Affirmative Defense

23.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have failed to plead a proper party.

### Twenty-Fourth Affirmative Defense

24.     Plaintiffs' claims are barred, in whole or in part, because Barr's actions were not the proximate cause in fact of Plaintiffs' alleged damages.

16

**Twenty-Fifth Affirmative Defense**

25.    To the extent that Plaintiffs have failed to mitigate, minimize, or avoid any loss or damage referred to in the Complaint, any recovery must be reduced by that amount.

**Twenty-Sixth Affirmative Defense**

26.    Barr reserves the right to assert and rely on other applicable defenses as may become available or apparent, to amend its answers and/or defenses, and/or delete defenses that it determines to be inapplicable.

**JURY DEMAND**

Barr hereby demands trial by jury on all claims so triable.

**PRAYER FOR RELIEF**

Wherefore, Barr prays as follows:

1.    That the Court enter judgment for Barr;

2.    That the Court award Barr reasonable costs and expenses, including, but not limited to, attorneys' fees and costs of suit, and such other and further relief as may be appropriate.

Date:   July 11, 2006                       Respectfully submitted,

                                            /s/ Karen N. Walker
                                            _____
                                            Karen N. Walker (D.C. Bar # 412137)
                                            Mark L. Kovner (D.C. Bar # 430431)
                                            Chong S. Park (D.C. Bar # 463050)

                                            KIRKLAND & ELLIS LLP
                                            655 Fifteenth Street, N.W.
                                            Washington, D.C.  20005
                                            (202) 879-5000
                                            (202) 879-5200

                                            *Attorneys for Defendant Barr*
                                            *Pharmaceuticals, Inc.*