# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ———————————————————— ) | | |
| STATE OF COLORADO, *et al.*, ) | | |
| ) | | |
| Plaintiffs, ) | | |
| ) | | |
| v. ) | Civil Action No. 1:05-cv-2182-CKK | |
| ) | | |
| WARNER CHILCOTT HOLDINGS COMPANY ) | | |
| III, LTD., *et al.*, ) | | |
| ) | | |
| Defendants. ) | | |
| ———————————————————— ) | | |
| ) | | |
| MEIJER, INC., *et al.*, ) | | |
| ) | | |
| Plaintiffs, ) | | |
| v. ) | Civil Action No. 1:05-cv-2195-CKK | |
| ) | | |
| WARNER CHILCOTT HOLDINGS COMPANY ) | | |
| III, LTD., *et al.*, ) | | |
| ) | | |
| Defendants. ) | | |
| ———————————————————— ) | | |
| ) | | |
| WALGREEN CO., *et al.*, ) | | |
| ) | | |
| Plaintiffs, ) | | |
| ) | | |
| v. ) | Civil Action No. 1:06-cv-494-CKK | |
| ) | | |
| WARNER CHILCOTT HOLDINGS COMPANY ) | | |
| III, LTD., *et al.*, ) | | |
| ) | | |
| Defendants. ) | | |
| ———————————————————— ) | | |

CVS PHARMACY, INC., *et al.*,          )
                                       )
          Plaintiffs,                  )
                                       )
     v.                                )          Civil Action No. 1:06-cv-795-CKK
                                       )
WARNER CHILCOTT HOLDINGS COMPANY       )
III, LTD., *et al.*,                   )
                                       )
          Defendants.                  )
                                       )
_____ )


## JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT AND DIRECT PURCHASER PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Devin M. Laiho
Assistant Attorney General
Consumer Protection Section
1525 Sherman Street, 5th Floor
Denver, Colorado 80203

Elinor R. Hoffmann
Margaret D. Martin
Assistant Attorneys General
Antitrust Bureau
New York State Office of the
     Attorney General
120 Broadway, 26th Floor
New York, New York 10271

Linda P. Nussbaum
Kaplan Fox & Kilsheimer LLP
805 Third Avenue
New York, New York 10022

Eric L. Cramer
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103

Scott E. Perwin
Kenny Nachwalter P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131

Steve D. Shadowen
Monica L. Rebuck
Hangley Aronchick Segal & Pudlin
30 North Third Street, Suite 700
Harrisburg, Pennsylvania 17101

[Additional counsel listed on signature pages]

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................... 2

STATEMENT OF UNDISPUTED FACTS ....................................... 3

ARGUMENT ................................................................. 7

I.   SUMMARY JUDGMENT IS APPROPRIATE BECAUSE
     THERE ARE NO DISPUTES OF MATERIAL FACT ........................ 7

II.  DEFENDANTS' AGREEMENT WAS A *PER SE*
     UNREASONABLE RESTRAINT OF TRADE IN
     VIOLATION OF THE SHERMAN ACT ................................... 7

     A.   Horizontal Market-Allocation Agreements Are *Per Se*
          Violations of the Antitrust Laws .................................. 9

     B.   Defendants' Agreement to Allocate Sales of Ovcon to
          Warner Chilcott Constitutes a Horizontal Market-Allocation
          Agreement and is Illegal *Per Se* ................................ 11

CONCLUSION .............................................................. 14

i

# TABLE OF AUTHORITIES

<u>Page</u>

Cases

*Addyston Pipe & Steel Co. v. United States,*
    85 F. 271 (6th Cir. 1898) ........................................................... 9, 10

*Addyston Pipe & Steel Co. v. United States,*
    175 U.S. 211 (1899) ................................................................... 9

*Arizona v. Maricopa County Medical Society,*
    457 U.S. 332 (1982) ................................................................... 7, 8

*Blue Cross & Blue Shield v. Marshfield Clinic,*
    65 F.3d 1406 (7th Cir. 1995) .................................................... 10

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
    504 U.S. 451 (1992) ................................................................... 13

*Engine Specialities, Inc. v. Bombardier Limited,*
    605 F.2d 1 (1st Cir. 1979) ........................................................ 10, 14

*Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n,*
    493 U.S. 411 (1990) ................................................................... 8

*Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United,*
    1993-1 Trade Cas. ¶ 70,235 (N.D. Ill. 1993) .......................... 11

*General Leaseways, Inc. v. National Truck Leasing Ass'n,*
    744 F.2d 588 (7th Cir. 1984) .................................................. 8

*In re Cardizem CD Antitrust Litigation,*
    332 F.2d 896 (6th Cir. 2003) .................................................. *passim*

*In re Terazosin Hydrochloride Antitrust Litigation,*
    352 F. Supp. 2d 1279, 1316 (S.D. Fla. 2005) .......................... 7, 13

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
    127 S. Ct. 2705 (2007) .............................................................. 8, 10

*National Collegiate Athletic Ass'n v. Board of Regents,*
    468 U.S. 85 (1984) ..................................................................... 7, 8

*National Society of Professional Engineers v. United States*,
    435 U.S. 679 (1978) ............................................................... 8

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990) ............................................................... *passim*

*Spitzer v. St. Francis Hospital*,
    94 F. Supp. 2d 399 (S.D.N.Y. 2000) ....................................... 10

*United States v. Rochester Gas & Elec. Corp.*,
    4 F. Supp. 2d 172 (W.D.N.Y. 1998) ........................................ 14

*United States v. Sealy, Inc.*,
    388 U.S. 350 (1967) ............................................................... 10

*United States v. Topco Associates, Inc.*,
    405 U.S. 596 (1972) ............................................................... 10, 12

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
    344 F.3d 1294 (11th Cir. 2003) ............................................... 12, 13


Statutes

15 U.S.C. § 1  .................................................................................... 7

These lawsuits are about Barr's agreement with Warner Chilcott not to compete. Discovery is now closed. There are no genuine issues of material fact as to the existence of an antitrust violation. It is undisputed that:

➢ Barr and Warner Chilcott entered into an Agreement whereby Warner Chilcott paid Barr $1 million and received an option for exclusive rights to Barr's AB-rated generic version of Warner Chilcott's popular branded oral contraceptive, Ovcon 35. The option, if exercised, would preclude Barr from launching a generic form of Ovcon for five years.

➢ Following FDA approval of Barr's generic, and anticipating an imminent launch of the generic, Warner Chilcott exercised the option in the Agreement and paid Barr an additional $19 million, for a total of $20 million.

➢ By exercising the option, Warner Chilcott blocked Barr from marketing a generic version of Ovcon in the United States for five years.

➢ One month after Warner Chilcott waived the exclusivity provision in the license agreement, Barr launched a lower-priced generic form of Ovcon and promptly captured approximately 80% of Ovcon's pre-generic sales.

Plaintiff States in the *Colorado* case[1] and Direct Purchaser Plaintiffs in the *Meijer*, *Walgreen* and *CVS Pharmacy* cases respectfully request a ruling that Defendants have committed a violation of section 1 of the Sherman Act.[2] The facts giving rise to that violation are not in dispute, and Plaintiffs are entitled to judgment as a matter of law.

---

[1]     The Plaintiff States are Colorado, Virginia, Maryland, Alaska, Arizona, Arkansas, California, Delaware, Florida, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont and the District of Columbia, by and through their Attorneys General.

[2]     In this brief, Plaintiff States and Direct Purchaser Plaintiffs argue that Defendants' conduct is *per se* unlawful, i.e., it is conclusively presumed to be illegal. However, Plaintiffs maintain that the Court would reach the same result using any test of illegality, and reserve the right, in the alternative, to prosecute the case using all other applicable legal theories.

1

## INTRODUCTION

The core of Defendants' illegal conduct is the March 24, 2004 written agreement[3] (the "Agreement") between Barr[4] and Warner Chilcott[5] eliminating competition for sales of Ovcon 35 ("Ovcon"), a popular Warner Chilcott branded oral contraceptive. Ovcon was one of Warner Chilcott's best-selling products at the time, and its top seller in 2005, but was no longer protected by a patent and was thus vulnerable to generic competition. Warner Chilcott understood that if a generic version of Ovcon entered the market, Warner Chilcott quickly would lose most of its sales to the less expensive generic.

Under the Agreement, Barr gave Warner Chilcott an exclusive option to license rights in Barr's generic version of Ovcon such that Barr could neither compete, nor license any other firm to compete, with Warner Chilcott in the United States for five years. That option was exercisable only if Barr received final FDA approval—which it was then pursuing—for its generic version of Ovcon. The parties also agreed that Barr would manufacture Ovcon for Warner Chilcott, at twice Barr's fully-loaded manufacturing cost, and would do so on an exclusive basis. Barr's generic was approved by the FDA in April 2004, and Warner Chilcott timely exercised the option. In exchange

---

[3] There were actually two separate written agreements—an Option and License Agreement, and a Finished Product Supply Agreement. The two agreements were executed simultaneously, and each refers to the other. For convenience, we will refer to them as a single agreement (the "Agreement").

[4] "Barr" as used in this brief refers to Defendant Barr Pharmaceuticals, Inc.

[5] "Warner Chilcott" as used in this brief refers to any or all of the Warner Chilcott defendants in this action, including Warner Chilcott Holdings Company III, Limited, Warner Chilcott Corporation, Warner Chilcott (US), Inc., Warner Chilcott Company, Inc.

2

for the exclusive license, Warner Chilcott paid Barr a total of $20 million.[6]

The Federal Trade Commission ("FTC") and the Plaintiff States filed complaints challenging Defendants' Agreement in November 2005. Direct Purchaser Plaintiffs filed complaints under the Sherman and Clayton Acts in late 2005 and early 2006. In September 2006, facing an FTC motion for a preliminary injunction, and with the introduction of its long-planned product line extension (a patented chewable Ovcon) imminent, Warner Chilcott waived the exclusivity provisions in its Agreement with Barr. Within a month, Barr had launched its lower-priced generic version of Ovcon, called Balziva. Warner Chilcott promptly contracted with a third company, Watson Pharmaceuticals, Inc. ("Watson"), to sell an authorized generic version of Ovcon, and Watson launched its generic under the name Zenchent in late January 2007.

As a result of these events, purchasers of Ovcon suddenly had three Ovcon products to choose from rather than one. But for Defendants' unlawful agreement, purchasers would have enjoyed the benefits of competition—and paid lower prices—some two and a half years earlier.

## STATEMENT OF UNDISPUTED FACTS[7]

1. Warner Chilcott is a pharmaceutical company that develops, manufactures, markets and distributes proprietary women's healthcare and dermatological pharmaceutical products.

---

[6] Warner Chilcott's motive, explained in its contemporaneous documents, was to delay generic entry and protect Ovcon. Since 2001, Warner Chilcott had been developing a chewable version of Ovcon that would be patent-protected. It planned to switch patients to the chewable version prior to generic entry, preserving its Ovcon revenues. Commercialization of the chewable product was delayed, however, and Warner Chilcott was faced with the threat that Ovcon sales would be lost to Barr's lower-priced generic before chewable Ovcon could be launched.

[7] Plaintiffs' Statement of Undisputed Facts has been filed as a separate pleading, as required by the Local Rules. It is reproduced here for the Court's convenience.

Warner Answer (*Colorado*) ¶ 2 (Ex. 1).[8]  Warner Chilcott markets Ovcon, a branded oral contraceptive, in the United States.  *Id.* ¶ 4.  Ovcon was approved by the Food and Drug Administration in 1976 and is not subject to patent protection.  Warner Answer (*Meijer*) ¶ 32 (Ex. 2).  Prior to Barr's launch of generic Ovcon, Ovcon was one of Warner Chilcott's highest revenue-producing products.  *Id.* ¶ 36.

2.     Barr is a pharmaceutical company that develops, manufactures, markets and distributes pharmaceutical products.  Barr Answer (*Walgreen*) ¶ 14 (Ex. 3).  In or about September 2001, Barr filed an Abbreviated New Drug Application (ANDA) with the FDA seeking approval to market an AB-rated generic version of Ovcon.  *Id.* ¶ 28.

3.     On September 10, 2003, Warner Chilcott and Barr signed a Letter of Intent to enter into an agreement whereby Warner Chilcott would have the option to pay Barr $20 million and obtain, among other things, Barr's agreement not to launch its generic version of Ovcon for five years following FDA approval.  *Id.* ¶ 38.  On March 24, 2004, Warner Chilcott and Barr signed the agreements contemplated by the Letter of Intent and Warner Chilcott made an initial payment to Barr of $1 million.  *Id.* ¶ 39.  Under the terms of their Agreement, Warner Chilcott obtained an option that could be exercised by paying Barr an additional $19 million within 45 days of Barr's receipt of FDA approval to market its generic version of Ovcon.  March 24, 2004 Option and License Agreement §§ 2.4 - 2.6 (Barr-29-00015) (Ex. 4).

4.     On April 22, 2004, the FDA granted final approval of Barr's ANDA for generic Ovcon.  Barr Answer (*Walgreen*) ¶ 42.  The next day, on April 23, 2004, Barr announced its intent to begin immediately marketing generic Ovcon under the trade name Balziva if Warner Chilcott

---

[8]     Copies of the Exhibits are contained in the accompanying Appendix.

⌜REDACTED⌝

chose not to exercise its option under the Agreement. News Release, *Barr's Generic Ovcon-35 Tablets Approved* (April 23, 2004) (Ex. 5). On May 6, 2004, Warner Chilcott exercised its option and paid Barr the remainder of the promised $20 million payment. Barr Answer (*Walgreen*) ¶ 45.

5.    Upon receiving the remaining $19 million from Warner Chilcott, Barr was obligated to sell its approved generic Ovcon product exclusively to Warner Chilcott and was prohibited from marketing the product in competition with Warner Chilcott for five years in the United States. Barr Answer (*Walgreen*) ¶ 46; March 24, 2004 Option and License Agreement § 3.3 (during the five-year term, "neither Barr nor its Affiliates shall . . . market, commercialize, distribute or sell [generic Ovcon] in [the United States]") (Barr-29-00016); March 24, 2004 Finished Product Supply Agreement § 2.1 ("neither Barr nor any of its Affiliates shall have the right to manufacture or supply [generic Ovcon] for or to any other Person [than Warner Chilcott]") (Barr-29-00043) (Ex. 6).

6.    Prior to entering into their Agreement, both Barr and Warner Chilcott anticipated that the less expensive Barr generic product would capture the bulk of Ovcon's sales. Barr had predicted that more than half of branded Ovcon purchases would shift to the generic within twelve months. Barr-00-0226; Barr-12-1729 (62%) (Ex. 7). Warner Chilcott predicted that ███████████ ████████████████████████████████████████████████ ██████████████████████████████████ Boissonneault dep. 201:5 - 202:2 (Ex. 8). Minutes from a Warner Chilcott directors' meeting stated that ███ ████████████████████████████ WC00140658 (Ex. 9). According to Warner Chilcott's January 2003 company projections, ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████ WC00125915 (Ex. 10).

7.     In November 2005, the Plaintiff States and the FTC separately filed Complaints against Warner Chilcott and Barr, alleging that their Agreement constituted an antitrust violation. On September 25, 2006, the FTC filed a motion for preliminary injunction to prevent Warner Chilcott from withdrawing Ovcon 35 from the marketplace as it prepared to introduce Ovcon Chewable.   On the same day, Warner Chilcott signed a waiver that terminated the exclusivity provisions of the Agreement.  As a result of that waiver, Barr was free to market its FDA-approved generic version of Ovcon in the United States and, indeed, Barr promptly did launch its product under the trade name Balziva.  News Release, *Barr Announces Warner Chilcott Waives Exclusive License for Ovcon 35* (Sept. 26, 2006) (Ex. 11).

8.     Barr launched Balziva at approximately a 30% discount to the price of branded Ovcon 35.  Warner Chilcott Price Increase Notice dated March 1, 2006 (KGR 0003) (Ex. 12); Barr Laboratories Letter to Brooks/Eckerd dated October 17, 2006 (BRK 000086-87) (Ex. 13).

9.     The introduction to the market of Barr's lower-priced generic competitor to branded Ovcon resulted in a rapid and substantial shift in sales from branded Ovcon to the generic alternative.  Warner Chilcott reported losing more than 80% of its branded Ovcon sales to the less expensive generic product in a matter of months.  News Release, *Warner Chilcott Reports Operating Results for the Quarter Ended March 31, 2007 and Raises 2007 Full Year Guidance*, p.2 (May 11, 2007) ("The decline in Ovcon revenue was due to the introduction of a generic version of Ovcon 35 in late October 2006, which led to an 80.4% decline in filled prescriptions for Ovcon 35 compared to the same quarter last year") (Ex. 14).

10.     The commerce at issue in this case is interstate commerce.   Warner Answer (*Walgreen*) ¶ 17; Barr website, www.barrlabs.com ("Barr Pharmaceuticals is a global specialty pharmaceutical company that operates in more than 30 countries worldwide").

## **ARGUMENT**

## I.    SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THERE ARE NO DISPUTES OF MATERIAL FACT

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there are no genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). Where the existence and terms of an agreement are not in dispute, determining whether that agreement is *per se* illegal raises only questions of law and is properly decided on summary judgment.  *See Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 336 (1982) (written agreement among competing physicians setting maximum prices was illegal *per se*); *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 907-08 (6th Cir. 2003) (written agreement between branded drug company and generic competitor whereby branded company paid generic company not to compete was illegal *per se*); *In re Terazosin Hydrochloride Antitrust Litigation*, 352 F. Supp. 2d 1279, 1313-15 (S.D. Fla. 2005) (same).

## II.    DEFENDANTS' AGREEMENT WAS A *PER SE* UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT

Section 1 of the Sherman Act provides that "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, . . . is declared to be illegal."  15 U.S.C. §1.  The Supreme Court has limited the prohibition created by section 1 to "unreasonable restraints of trade."  *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 98 (1984).

Historically, a restraint challenged as unreasonable under section 1 has been analyzed under one of two frameworks.  A *per se* rule has been applied to restraints so pernicious that they are conclusively presumed to be illegal; such agreements, including horizontal price-fixing and horizontal market allocation, have been condemned by the courts without consideration of any

asserted procompetitive justifications. *See, e.g., Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50

(1990). *See also Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 127 S. Ct. 2705 (2007)

(distinguishing between restraints deemed unlawful *per se*, including horizontal agreements to

divide markets such as the Agreement here, and those subject to a rule of reason inquiry). As the

Supreme Court has explained, the likelihood that such a restraint will enhance competition is so low,

and the burdens of litigating the issue are so high, that a rule of facial invalidity is applied. *See*

*Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 432-46 (1990); *NCAA*,

468 U.S. at 103-04 ("[*p*]*er se* rules are invoked when surrounding circumstances make the likelihood

of anticompetitive conduct so great as to render unjustified further examination of the challenged

conduct"); *Maricopa County*, 457 U.S. at 351. Those restraints not falling within the scope of a *per*

*se* rule are examined under the "rule of reason" to determine whether they are likely to have

anticompetitive effects and, if so, whether those effects outweigh their procompetitive benefits.

*National Society of Professional Engineers v. United States*, 435 U.S. 679, 691-92 (1978).

While antitrust defendants invariably attempt to present procompetitive justifications in order

to avoid application of a *per se* rule, an antitrust court does not attempt to determine whether the

effects of a challenged restraint are anticompetitive or procompetitive in order to determine whether

the restraint is unlawful *per se*. Calling for such an inquiry "indicates a misunderstanding of the *per*

*se* concept." *Maricopa County*, 457 U.S. at 351. *Accord, General Leaseways, Inc. v. National*

*Truck Leasing Ass'n*, 744 F.2d 588, 595 (7th Cir. 1984) ("The per se rule would collapse if every

claim of economies from restricting competition, however implausible, could be used to move a

horizontal agreement not to compete from the per se to the Rule of Reason category"). As the Sixth

Circuit explained in *Cardizem CD*, the advantage of *per se* analysis "is that it allows courts to

presume that certain behaviors <u>as a class</u> are anticompetitive without expending judicial resources

to evaluate the actual anticompetitive effects or procompetitive justifications in a particular case."
*Cardizem CD*, 332 F.3d at 909 (emphasis added). The *per se* rule fosters savings in judicial administration and the likelihood of greater compliance that flows from clearly defined rules. If a court were required to determine and then balance the anticompetitive effects and procompetitive justifications for a particular restraint before applying the *per se* rule, the purpose of *per se* analysis would be defeated. Instead, the court's inquiry is limited to identifying the class of restraint at issue. If, as here, the restraint falls into a class that is *per se* illegal—a horizontal market allocation agreement—then the court's inquiry is complete.

## A.   Horizontal Market-Allocation Agreements Are *Per Se* Violations of the Antitrust Laws

This is a simple case. Two potential competitors entered into an agreement whereby one of them (Barr) agreed not to compete with the other (Warner Chilcott) in a particular territory (the United States) for five years.[9] In exchange, Warner Chilcott paid Barr $20 million, a share of the excess profits it earned as a result of the Agreement. Such agreements have been illegal *per se* for well over 100 years.

Less than ten years after the Sherman Act was enacted, the Sixth Circuit and the Supreme Court summarily condemned a horizontal conspiracy among manufacturers of cast-iron pipe to allocate territories among themselves in order to eliminate competition. *Addyston Pipe & Steel Co. v. United States*, 85 F. 271, 293-94 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899). Under the challenged agreement, one manufacturer would be selected in advance to win each request for a bid on cast-iron pipe. 85 F. at 294. Requests received from a customer in a manufacturer's local geographic area

---

[9]      Section 3.3 of the Option and License Agreement prohibited Barr from marketing, commercializing, distributing or selling generic Ovcon in the "Territory," which is defined to mean the United States and its states, territories, and possessions. Option and License Agreement § 3.3.

were reserved for that manufacturer, who would then pay the other manufacturers a bonus. *Id.* Requests for bids outside of those areas were assigned to the conspirator who agreed to pay the other conspirators the largest bonus. *Id.* The result of this scheme was that purchasers were forced to buy pipe at monopoly prices from a single manufacturer, who then passed along a part of its monopoly profits to the manufacturers that had agreed not to compete. *Id.* at 294-95.

The Supreme Court in *Addyston Pipe* had no difficulty finding that this horizontal market-allocation agreement violated the recently-enacted Sherman Act, and the principle that such agreements are unlawful *per se* has been settled ever since. *See Palmer*, 498 U.S. at 49-50 (market allocation by bar exam review courses); *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972) (market allocation by supermarkets for private label products); *United States v. Sealy, Inc.*, 388 U.S. 350 (1967) (market allocation by licensees of Sealy trademark); *Blue Cross & Blue Shield v. Marshfield Clinic,* 65 F. 3d 1406, 1415 (7th Cir. 1995) ("[i]t would be a strange interpretation of antitrust law that forbade competitors to agree on what price to charge, thus eliminating price competition among them, but allowed them to divide markets, thus eliminating all competition among them"); *Spitzer v. St. Francis Hospital*, 94 F. Supp. 2d 399, 414-16 (S.D.N.Y. 2000) (granting summary judgment to plaintiff on claim that hospitals' allocation of services was *per se* unlawful).[10]

Moreover, horizontal market-allocation agreements are illegal *per se* whether the parties to the agreement are actual or merely potential competitors. *See Palmer*, 498 U.S. at 49-50; *Cardizem CD*, 332 F.3d at 908 n.14; *Engine Specialties, Inc. v. Bombardier Limited*, 605 F.2d 1, 9 (1st Cir.

---

[10]  *See also Leegin*, 127 S. Ct. at 2723 ("[t]he same legal standard (*per se* unlawfulness) applies to horizontal market division and horizontal price fixing because both have similar economic effect").

10

1979).  In *Palmer*, the Supreme Court held illegal *per se* a horizontal agreement analogous to the Agreement.  Two potential competitors in the market for bar review courses, BRG of Georgia and Harcourt Brave Jovanovich ("HBJ"), entered into an agreement that gave BRG an exclusive license to use HBJ's course preparation materials and trade name in Georgia.  As part of their license agreement, the parties agreed that HBJ would not compete with BRG in Georgia, and that BRG would not compete with HBJ in the rest of the United States.  The Supreme Court held that the agreement was "unlawful on its face," noting that horizontal agreements of this kind "are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."  *Id.* at 49-50.[11]

### B.  Defendants' Agreement to Allocate Sales of Ovcon to Warner Chilcott Constitutes a Horizontal Market-Allocation Agreement and is Illegal *Per Se*

The Agreement between Barr and Warner Chilcott is a straightforward horizontal market allocation agreement.  Under the Agreement, Barr received $20 million and agreed not to compete with Warner Chilcott in the United States for five years, and Warner Chilcott acquired the right to sell Ovcon free of generic competition from Barr for the same period of time.  As a result of the Agreement, customers were forced to purchase the drug only from Warner Chilcott, and Warner Chilcott earned artificially inflated profits from sales of Ovcon that it would not have made in the absence of the Agreement.

The *per se* rule against horizontal market-allocation agreements has been applied to

---

[11]     Of course, it is equally irrelevant that, instead of receiving a separate market of its own, Barr received cash and a favorable price for supplying Warner Chilcott.  There is no requirement that the conspirators be paid in kind rather than in cash.  *See Cardizem CD*, 332 F.3d at 907-08; *Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United*, 1993-1 Trade Cas. ¶ 70,235 (N.D. Ill. 1993) (rejecting the argument that there was no market-allocation agreement because only one party received a market).

agreements between branded and generic pharmaceutical companies in circumstances that created

purported justifications not available here. In *Cardizem*, for example, the district court and the Sixth

Circuit considered an interim patent settlement between Hoechst Marion Roussel, the manufacturer

of branded Cardizem CD, and Andrx, an applicant to sell generic Cardizem CD, whereby Hoechst

paid Andrx millions of dollars not to sell its FDA-approved generic drug until the conclusion of their

pending patent litigation. Rejecting the defendants' proffered patent defense, both courts held the

agreement illegal *per se*. The Sixth Circuit explained: "There is simply no escaping the conclusion

that the Agreement, all of its other conditions and provisions notwithstanding, was, at its core, a

horizontal agreement to eliminate competition in the market for Cardizem CD throughout the entire

United States, a classic example of a *per se* illegal restraint of trade." 332 F.3d at 908.

The same result ultimately was reached in a similar case from the Eleventh Circuit, *Valley*

*Drug Co. v. Geneva Pharmaceuticals, Inc.*, 344 F.3d 1294 (11th Cir. 2003). In *Valley Drug*, the

Court of Appeals reviewed an order granting the plaintiffs' motion for partial summary judgment

in an action challenging patent settlements between Abbott Laboratories and two of its potential

generic competitors whereby Abbott paid the competitors to delay the launch of their competing

generic drugs. While the Eleventh Circuit concluded that the district court had given insufficient

attention to Abbott's alleged patent rights, it made clear that, in the absence of patent rights, such

agreements are illegal *per se*:

> An agreement between competitors to allocate markets is, as the
> district court noted, clearly anticompetitive. Such an agreement has
> the obvious tendency to diminish output and raise prices. When a
> firm pays its only potential competitor not to compete in return for a
> share of the profits that firm can obtain by being a monopolist,
> competition is reduced. *See, e.g., Palmer v. BRG of Georgia, Inc.*,
> 498 U.S. 46, 49-50 (1990) (per curiam) (agreements not to compete
> within certain territorial limits are obviously anticompetitive); *United
> States v. Topco Assocs.*, 405 U.S. 596, 608 (1972) (observing that an

12

agreement between competitors to allocate territories is a "classic example" of a per se violation of the Sherman Act, with no purpose other than reducing competition).

344 F.3d at 1304.

The *Valley Drug* court stated expressly that rule-of-reason analysis would be unnecessary and inappropriate in cases involving exclusion of generic drugs because "the anticompetitive effects of exclusion [of generics] cannot seriously be debated." *Id.* at 1311 n.27. On remand, the district court determined that the agreement went beyond the scope of Abbott's (eventually invalidated) patent and, following the guidance of *Valley Drug*, quickly found the agreements illegal *per se*. *See In re Terazosin Hydrochloride Antitrust Litigation*, 352 F. Supp. 2d 1279 (S.D. Fla. 2005).

In this case, of course, Warner Chilcott has no patent rights of any kind in Ovcon. Therefore, the Barr/Warner Chilcott Agreement lacks even the questionable justification proffered in *Cardizem CD* and *Valley Drug*. In both cases, the defendants argued strenuously that the agreement was simply a means of maintaining the status quo while the parties litigated the issue of whether the generic manufacturers had a right under the patent laws to sell their generic drugs. In contrast, there is no issue as to whether Barr had a right under the patent laws to sell its less expensive, FDA-approved generic version of Ovcon.

It is equally irrelevant that Barr and Warner Chilcott disguised their illegal agreement as an exclusive license agreement. The Supreme Court has had no difficulty in finding exclusive license agreements between competitors to be illegal *per se*. *See Palmer*, 498 U.S. at 47 ("exclusive license" between competing bar review firms was illegal *per se*). As the Court has made clear, antitrust law looks to the substance of the agreement rather than the label attached to it. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 466-67 (1992) (legal analysis based "on formalistic distinctions rather than actual market realities [is] generally disfavored in

13

antitrust law").

Moreover, an agreement that forecloses competition does not avoid application of the *per se* rule simply because it establishes a supply relationship between the parties. In *Engine Specialties, Inc. v. Bombardier Limited*, 605 F.2d 1 (1ˢᵗ Cir. 1979), the First Circuit affirmed application of the *per se* rule to an agreement between an Italian manufacturer of minicycles, Agrati, and a Canadian manufacturer of snowmobiles, Bombardier, which prohibited Bombardier from entering the minicycle market and competing with Agrati. Bombardier was not manufacturing minicycles at the time of the agreement, but had developed a prototype "and had indicated to Agrati that, if an agreement could not be worked out between them, Bombardier would press ahead with a product of its own." *Id.* at 9. Under the agreement, Bombardier was appointed Agrati's exclusive sales agent in North America and agreed not to enter the minicycle market. Applying the principle that "[a]greements not to compete among potential competitors as well as among actual competitors are forbidden," *id.*, the First Circuit concluded that the parties' agreement "constituted a territorial allocation of markets such as to bring it within the ambit of the per se prohibition." *Id.* at 11. *See also United States v. Rochester Gas and Electric Corp.*, 4 F. Supp. 2d 172 (W.D.N.Y. 1998) (applying *per se* rule to an agreement whereby a hospital received a payment from the local utility to stop developing its own power plant).

Simply put, the Agreement reduced the number of competitors selling an Ovcon product from an imminent two to one. The horizontal Agreement between Barr and Warner Chilcott should be held illegal *per se*.

## CONCLUSION

For the reasons stated above, Plaintiff States' motion for summary judgment and Direct Purchaser Plaintiffs' motion for partial summary judgment should be granted.

Respectfully submitted,

/s/ Devin M. Laiho
Devin M. Laiho
Assistant Attorney General
Consumer Protection Section
State of Colorado
1525 Sherman Street, 5th Floor
Denver, Colorado 80203
Telephone: (303) 866-5079

Elinor R. Hoffmann
Margaret D. Martin
Assistant Attorneys General
Antitrust Bureau
New York State Office of the Attorney
    General
120 Broadway, 26th Floor
New York, New York 10271
Telephone: (212) 416-8288

*Lead Counsel for the Plaintiff States*

/s/ Scott E. Perwin
Scott E. Perwin
Lauren C. Ravkind
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 373-1000

*Counsel for Walgreen Plaintiffs*

/s/ Steve D. Shadowen
Steve D. Shadowen
Monica L. Rebuck
HANGLEY ARONCHICK SEGAL
    & PUDLIN
30 North Third Street, Suite 700
Harrisburg, Pennsylvania 17101
Telephone: (717) 364-1010

*Counsel for Plaintiffs Rite Aid Corp. and Rite Aid Hdqtrs. Corp.*

/s/ Linda P. Nussbaum
Linda P. Nussbaum (D.C. Bar No. 483254)
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, New York 10022
Telephone: (212) 687-1980

William Isaacson (D.C. Bar No. 414788)
Tanya Chutkan (D.C. Bar No. 420478)
BOIES SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Suite 800
Washington, D.C. 20015
Telephone: (202) 237-2727

Richard B. Drubel (D.C. Bar No. 334359)
Kimberly H. Schultz
BOIES SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, New Hampshire 03755
Telephone: (603) 643-9090

Daniel Berger
Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3000

Bruce E. Gerstein
Kevin S. Landau
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, New York 10011
Telephone: (212) 398-0055

Dianne M. Nast
RODA NAST P.C.
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000

Thomas M. Sobol
David S. Nalven
HAGENS BERMAN SOBOL
        & SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700

*Executive Committee for the Direct Purchaser Class*