**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEIJER, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civ. Action No. 1:05-CV-02195-CKK |
| v. | ) |
| | ) |
| WARNER CHILCOTT HOLDINGS | ) |
| COMPANY III, LTD., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| WALGREEN CO., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Civ. Action No. 1:06-CV-00494-CKK |
| | ) |
| v. | ) Judge Colleen Kollar-Kotelly |
| | ) |
| WARNER CHILCOTT HOLDINGS | ) **REDACTED PURSUANT TO** |
| COMPANY III, LTD., *et al.*, | ) **PROTECTIVE ORDER DATED** |
| | ) **APRIL 4, 2006** |
| Defendants. | ) |

[caption continued on following page]

**BARR PHARMACEUTICALS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO
STATE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DIRECT
PURCHASER PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

|  |  |
|---|---|
| CVS PHARMACY, INC., *et al.*,<br><br>     Plaintiffs,<br><br>     v.<br><br>WARNER CHILCOTT HOLDINGS<br>COMPANY III, LTD., *et al.*,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civ. Action No. 1:06-CV-00795-CKK |
| STATE OF COLORADO, *et al.*,<br><br>     Plaintiffs,<br><br>     v.<br><br>WARNER CHILCOTT HOLDINGS<br>COMPANY III, LTD., *et al.*,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civ. Action No. 1:05-CV-02182-CKK |

Dated: December 19, 2007

Karen N. Walker (D.C. Bar # 412137)
Mark L. Kovner (D.C. Bar # 430431)
Patrick M. Bryan (D.C. Bar # 490177)
Eunnice H. Eun (D.C. Bar # 500203)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, D.C.  20005
Tel.  (202) 879-5000
Fax  (202) 879-5200

*Counsel for Barr Pharmaceuticals, Inc.*

**TABLE OF CONTENTS**

Page

INTRODUCTION ...............................................................................................1

BACKGROUND ................................................................................................5

    A.    The Barr-Warner Chilcott Agreement Is Not A Market Allocation Agreement But A Legitimate License And Supply Agreement. .................5

    B.    Defendants' License And Supply Agreement Cannot Be Considered *Per Se* Illegal Given That Barr Submitted The Agreement In Advance To The FTC And The FTC Neither Blocked The Transaction Nor Took Any Action For Two Years While Studying It. ..................................................................................7

    C.    Defendants' License And Supply Agreement Cannot Be Viewed As *Always* Restricting Competition Given The Reasonably Interchangeable Nature Of Oral Contraceptives. ..........................................9

    D.    Defendants' License And Supply Agreement Cannot Be Condemned As *Per Se* Anti-Competitive Given The Nature Of Competition Within The Oral Contraceptive Market. ...............................11

    E.    Defendants' License And Supply Agreement Cannot Be Deemed *Per Se* Illegal Given The Numerous Pro-Competitive Benefits Evident From The Record. ........................................................................13

ARGUMENT ....................................................................................................17

I.    THE SUPREME COURT HAS LONG HELD THAT THE APPROPRIATE FRAMEWORK FOR ANALYZING CONDUCT UNDER THE ANTITRUST LAWS IS THE RULE OF REASON, NOT THE *PER SE* RULE. ...............................................................................18

    A.    The Rule Of Reason Is The Presumptive Standard For Evaluating Whether A Particular Practice Violates Sherman Act § 1. .........................19

    B.    The *Per Se* Rule Is An Exception To The Presumptive Rule And Is Reserved For A Narrow Class Of "Manifestly Anticompetitive" Restraints. ...............................................................................................20

II.    DEFENDANTS' AGREEMENT CANNOT BE FOUND UNLAWFUL *PER SE* BECAUSE IT MUST BE ANALYZED UNDER THE RULE OF REASON. .....................................................................................................22

    A.    Plaintiffs' Conclusory Assertion That Defendants' Conduct Was A "Horizontal Market Allocation" Does Not Warrant Application Of The *Per Se* Rule. ..............................................................................23

B.      Defendants' License And Supply Agreement Was Not "Manifestly Anti-Competitive" Or Lacking Any Redeeming Virtue. ...........................25

III.   THE *PER SE* RULE IS NOT TO BE APPLIED TO CASES LIKE THIS WHERE THERE IS PLAUSIBLE EVIDENCE OF PRO-COMPETITIVE BENEFITS OR WHERE THE AGREEMENT AT ISSUE IS A MIXED VERTICAL-HORIZONTAL ARRANGEMENT. ...............................................31

A.      Because Barr Has Offered Plausible Evidence Of The Pro-Competitive Effects Of Defendants' Agreement, *Per Se* Treatment Is Inappropriate. ...................................................................................31

B.      Mixed Vertical And Horizontal Commercial Arrangements Are Ill-Suited For *Per Se* Treatment. ..................................................................34

IV.    THE CASES THAT PLAINTIFFS CITE TO SUPPORT THEIR "MARKET ALLOCATION" ARGUMENT ARE FACTUALLY AND LEGALLY DISTINGUISHABLE. ......................................................................36

CONCLUSION .................................................................................................................43

# TABLE OF AUTHORITIES

**Cases**

*Abadir & Co. v. First Miss. Corp.,*
651 F.2d 422 (5th Cir. 1981) .......................................................................................... 34

*Addamax Corp. v. Open Software Found., Inc.,*
152 F.3d 48 (1st Cir. 1998)............................................................................................ 35

*Anesthesia Advantage, Inc. v. Metz Group,*
759 F. Supp. 638 (D. Colo. 1991).................................................................................. 27

*Augusta News Co. v. Hudson News Co.,*
269 F.3d 42 (1st Cir. 2001)............................................................................... 24, 35, 37

*Bd. of Trade of Chicago v. United States,*
246 U.S. 231 (1918).................................................................................................. 18, 20

*Broadcast Music, Inc. v. CBS, Inc.,*
441 U.S. 1 (1979)....................................................................................................... 21, 23, 24

*Business Elecs. Corp. v. Sharp Elecs. Corp.,*
485 U.S. 717 (1988)................................................................................................... 19, 21

*Cal. Dental Ass'n v. FTC,*
526 U.S. 756 (1999).............................................................................................. passim

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,*
996 F.2d 537 (2d Cir. 1993).......................................................................................... 28

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
433 U.S. 36 (1977).................................................................................................. 20, 23, 34

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984)....................................................................................................... 20

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.,*
663 F.2d 405 (2d Cir. 1981).......................................................................................... 34

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 45 (1992)......................................................................................................... 24

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.,*
129 F.3d 240 (2d Cir. 1997).......................................................................................... 27

*FTC v. Ind. Fed'n of Dentists,*
476 U.S. 447 (1986)....................................................................................................... 35

*Generac Corp. v. Caterpillar Inc.,*
   172 F.3d 971 (7th Cir. 1999) .............................................................. 27, 34, 37

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.,*
   201 F. Supp. 2d 236 (S.D.N.Y. 2002)......................................................... 3, 26

*Graphic Prods. Distribs., Inc. v. ITEK Corp.,*
   717 F.2d 1560 (11th Cir. 1983) .................................................................. 34

*Greenbrier Cinemas, Inc. v. Attorney Gen. of United States,*
   511 F. Supp. 1046 (W.D. Va. 1981) ............................................................ 27

*Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.,*
   889 F.2d 751 (7th Cir. 1989) ..................................................................... 34

*In re Cardizem CD Antitrust Litig.,*
   332 F.3d 896 (6th Cir. 2003) ..................................................................... 38

*In re Ciprofloxacin Hydrochloride Antitrust Litig.,*
   261 F. Supp. 2d 188 (E.D.N.Y. 2003) ...................................................... 28, 40

*In re Ciprofloxacin Hydrochloride Antitrust Litig.,*
   363 F. Supp. 2d 514 (E.D.N.Y. 2005) ...................................................... 27, 28

*In re Tamoxifen Citrate Antitrust Litig.,*
   466 F.3d 187 (2d Cir. 2006)...................................................................... 40

*In re Terazosin Hydrochloride Antitrust Litig.,*
   164 F. Supp. 2d 1340 (S.D. Fla. 2000) ....................................................... 38

*In re Terazosin Hydrochloride Antitrust Litig.,*
   352 F. Supp. 2d 1279 (S.D. Fla. 2005) ....................................................... 39

*Int'l Logistics Group, Ltd. v. Chrysler Corp.,*
   884 F.2d 904 (6th Cir. 1989) ..................................................................... 34

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
   466 U.S. 2 (1984)................................................................................... 26

*Krehl v. Baskin-Robbins Ice Cream Co.,*
   664 F.2d 1348 (9th Cir. 1982) ................................................................... 34

*Leegin Creative Leather Prods. v. PSKS, Inc.,*
   127 S. Ct. 2705 (2007)...................................................................... passim

*Los Angeles Mem'l. Coliseum Comm'n v. NFL,*
   468 F. Supp. 154 (C.D. Cal. 1979) ............................................................ 27

*Microbix Biosystems, Inc. v. Biowhittaker, Inc.,*
    172 F. Supp. 2d 680 (D. Md. 2000) ............................................................... 34

*Midwestern Waffles, Inc. v. Waffle House, Inc.,*
    734 F.2d 705 (11th Cir. 1984) ...................................................................... 34

*Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.,*
    208 F.3d 655 (8th Cir. 2000) ....................................................................... 27

*N. Pac. Ry. Co. v. United States,*
    356 U.S. 1 (1958) ........................................................................................ 20

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
    435 U.S. 679 (1978) .................................................................................... 19

*Oetiker v. Jurid Werke,*
    556 F.2d 1 (D.C. Cir. 1977) ........................................................................ 23

*Palmer v. BRG of Ga., Inc.,*
    498 U.S. 46 (1990) ...................................................................................... 37

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,*
    637 F.2d 1001 (5th Cir. 1981) .................................................................... 34

*Roland Mach. Co. v. Dresser Indus., Inc.,*
    749 F.2d 380 (7th Cir. 1984) ...................................................................... 27

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
    792 F.2d 210 (D.C. Cir. 1986) .................................................................... 35

*Rozema v. Marshfield Clinic,*
    977 F. Supp. 1362 (W.D. Wis. 1997) ......................................................... 36

*Ryko Mfg. Co. v. Eden Servs.,*
    823 F.2d 1215 (8th Cir. 1987) .................................................................... 34

*Satellite T.V. & Assoc. Res., Inc. v. Cont'l Cablevision of Va., Inc.,*
    714 F.2d 351 (4th Cir. 1983) ...................................................................... 26

*Sewell Plastics, Inc. v. Coca-Cola Co.,*
    720 F. Supp. 1196 (W.D.N.C. 1989) .......................................................... 27

*Smalley & Co. v. Emerson & Cuming, Inc.,*
    13 F.3d 366 (10th Cir. 1993) ...................................................................... 34

*Standard Oil Co. of Cal. v. United States,*
    337 U.S. 293 (1949) .................................................................................... 26

*Standard Oil Co. of N.J. v. United States,*
    221 U.S. 1 (1911)..................................................................................................... 19

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,*
    373 F.3d 57 (1st Cir. 2004)..................................................................................... 26

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006)............................................................................................ passim

*U.S. Healthcare, Inc. v. Healthsource, Inc.,*
    986 F.2d 589 (1st Cir. 1993)................................................................................... 21

*United States v. Addyston Pipe & Steel Co.,*
    85 F. 271 (6th Cir. 1898) ....................................................................................... 36

*United States v. Topco Assocs., Inc.,*
    405 U.S. 596 (1972)............................................................................................... 37

*Valley Drug Co. v. Geneva Pharm., Inc.,*
    344 F.3d 1294 (11th Cir. 2003) ........................................................................ 35, 39

*Williamson v. Sacred Heart Hosp.,*
    No. 89-30084-RV, 1993 WL 543002 (N.D. Fla. 1993)................................................ 26

**Statutes**

15 U.S.C. § 1 ............................................................................................................... 18

**INTRODUCTION**

Plaintiffs have filed a conclusory motion for summary judgment,[1] asking this Court to declare — as a matter of law — that the exclusive supply agreement between Barr and Warner Chilcott was "*per se*" illegal, with no examination of the facts of this case. Plaintiffs would have this Court ignore the considerable record developed in this case and summarily conclude that the agreement is illegal without any analysis of the relevant competitive issues whatsoever. Plaintiffs' motion first erroneously characterizes the supply agreement presented here as a horizontal market allocation agreement. Then, it cites authority for the proposition that naked horizontal market allocations are *per se* illegal. Finally, having set up this "straw man," Plaintiffs conclude that this agreement is *per se* illegal.

The flaw in Plaintiffs' argument is that each of the three steps in their simplistic syllogism is wrong. *First*, the exclusive license and supply agreement between Barr and Warner Chilcott (whereby Barr replaced Warner Chilcott's prior, inadequate supplier) is not a horizontal market allocation agreement. *Second*, the case law is clear that exclusive supply agreements are *not* subject to the *per se* rule, may be pro-competitive, and are therefore not *per se* illegal. *Third*, since the license and supply agreement here had numerous plausible (and actual) pro-competitive benefits, it is not *per se* illegal. In fact,      **REDACTED**      (as discussed below).

Never has a court determined that an agreement is *per se* illegal, where, as here:

- The agreement was                                **REDACTED**

---

[1] Direct Purchaser Plaintiffs have moved for "partial summary judgment" regarding Barr's alleged violation of Section 1 of the Sherman Act, but not on the issues of causation and damages, which they wish will "remain to be determined at trial." (*See* Direct Purchaser Pls.' Mot. for Partial Summary J., D.E. # 95.)

1

- Plaintiffs' own expert                                                admits that

## REDACTED

- Barr has introduced plausible evidence showing that defendants' agreement had significant pro-competitive benefits.

- The agreement ensured a safe, stable, and reliable supply of Ovcon 35 for consumers.

- The agreement ensured continued (and substantial) free sampling of Ovcon 35 by Warner Chilcott, resulting in lower net prices to consumers.

- The agreement enabled Ovcon 35 to aggressively compete against the numerous other hormonal contraceptives in the marketplace.

- The agreement enabled Barr to produce Ovcon 35 in the face of a possible line extension contemplated by Warner Chilcott that would have moved patients away from Ovcon 35 products (both brand and generic) that Barr was able to produce.

- The agreement removed the potential that Ovcon 35 would exit the market altogether.

- The agreement resulted in an overall increase in market share for Ovcon, resulting in higher output for Ovcon 35 products.

These are genuine issues of material fact that Plaintiffs have not (and cannot) rebut, precluding them from obtaining judgment "as a matter of law" on their "*per se*" motion.

But Plaintiffs' motion must fail for a more direct reason; that is, the *per se* rule simply has no application here. *First*, the Supreme Court has long held that the appropriate framework for analyzing conduct under the antitrust laws is the Rule of Reason, not the *per se* rule. *See infra* I.A. Indeed, as the Court recently stressed, "[t]he rule of reason is the accepted standard for

---

2    For the convenience of the Court, all tab references herein refer to Barr's Amended Appendix of Exhibits ("Am. App.") submitted in connection with Barr's Motion for Summary Judgment on State and Direct Purchasers' Federal Claims on Nov. 14, 2007.

3    Unless otherwise indicated, all *emphasis* is added and internal quotation marks and citations are omitted.

2

testing whether a practice restrains trade in violation of § 1," *Leegin Creative Leather Prods. v. PSKS, Inc.*, 127 S. Ct. 2705, 2712 (2007), and should be "presumptively applie[d]" in antitrust cases by the courts, *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). In contrast, the *per se* rule — an *exception* to the Rule of Reason — is reserved for a narrow class of "manifestly anti-competitive" restraints, not present here. *See infra* I.B.

*Second*, notwithstanding Plaintiffs' conclusory effort to condemn defendants' agreement as a "market allocation agreement," the type of license and supply agreement presented here has never been characterized as such a clearly naked restraint, lacking any "redeeming virtue." *See infra* II.A. To the contrary, and as is clear from Supreme Court precedent limiting the classes of conduct that may be deemed *per se* unlawful, as well as the economic analysis of Plaintiffs' own experts, the license and supply agreement at issue in this case does not remotely constitute conduct that "always or almost always" reduces competition. *See infra* II.B.

As an initial matter, any contention that defendants' license and supply agreement is facially anti-competitive or lacking any "redeeming virtue" and thus subject to *per se* treatment is belied by the undisputed fact that the FTC — the agency charged with enforcing the antitrust laws — had notice of defendants' agreement nearly two years before filing suit. (*See* FTC Am. Compl. ¶ 45.) In fact,                **REDACTED**

Had the FTC believed defendants' agreement was a "naked restraint" or "facially" anti-competitive, surely the FTC would not have sat idle for nearly two years before taking any action.

In any event, such supply agreements are not facially anti-competitive. Rather, courts routinely recognize that there are pro-competitive aspects of exclusive supply agreements. *See, e.g., Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 274 (S.D.N.Y. 2002)

("Exclusive supply contracts have been recognized as having procompetitive benefits and thereby serving legitimate business objectives."). And, notably, Plaintiffs' own expert agrees that

**REDACTED**

Indeed, as Plaintiffs' own expert concedes,

**REDACTED**

The undisputed record shows that the Ovcon 35 supply agreement expanded output and preserved substantial sampling of Ovcon 35 — the antithesis of anti-competitive harm. Specifically, the supply agreement ensured Warner Chilcott's continued distribution of free products to consumers thereby reducing the costs of Ovcon 35 to consumers. *See infra* II.B. Because the supply agreement here is not "manifestly anti-competitive," the *per se* rule simply has no application.

*Third*, regardless of whether there is any dispute regarding the actual pro-competitive benefits, where, as here, defendants have presented evidence of "plausible" pro-competitive benefits arising from the challenged conduct, a Rule of Reason, not *per se*, analysis is required as a matter of law. *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 775 (1999). Here, it is clear that Barr has offered plausible pro-competitive benefits which defeat *per se* treatment. *See infra* III.A. For example, as noted above, the agreement ensured continued and substantial free sampling of Ovcon 35 by Warner Chilcott, resulting in lower net prices to consumers, and expanding output. For this reason alone, *per se* treatment is inappropriate. In addition, agreements that have horizontal and vertical attributes, as here, have never been viewed as

4

proper for *per se* treatment. *See infra* III.B. Rather, the competitive impact of such mixed agreements must be viewed under the — presumptive — Rule of Reason.

*Finally,* the cases that Plaintiffs cite to support their "market allocation" argument are factually and legally distinguishable. *See infra* IV. In short, Plaintiffs fail to meet their heavy burden of demonstrating that the narrow exception to the Rule of Reason applies here. Because Plaintiffs have not properly proven a *per se* violation of the antitrust laws, Plaintiffs' motion should be denied.

## BACKGROUND

A.    **The Barr-Warner Chilcott Agreement Is Not A Market Allocation Agreement But A Legitimate License And Supply Agreement.**

Barr and Warner Chilcott entered into their agreement because, until recently, Warner Chilcott, a specialty pharmaceutical company that markets and sells women's health products, including Ovcon 35, did not manufacture, or have the ability to manufacture, any of the products it sold. For that reason, it was wholly reliant on third parties for supply, including its supply of Ovcon 35, which Warner Chilcott purchased from Bristol-Myers Squibb ("BMS") in February 2000. **REDACTED**    At the time of purchase, Ovcon had been off-patent

**REDACTED**

Because Warner Chilcott lacked manufacturing capabilities of its own, it simultaneously entered into a supply agreement with BMS to manufacture Ovcon.

From the outset, BMS was unable to adequately supply Warner Chilcott with Ovcon. For example, as Plaintiffs' own expert concedes,

**REDACTED**

**REDACTED**                          Furthermore,

**REDACTED**

Unable to obtain reliable supply from BMS (and, at the time, unable to manufacture Ovcon 35 on its own) Warner Chilcott sought an alternative source of supply — from Barr. As Plaintiffs' own expert described,                          **REDACTED**

Further, Barr had previously filed an ANDA with the Food and Drug Administration seeking approval to produce a generic version of Ovcon 35 and demonstrating that its generic drug was bioequivalent to the branded version. (State Pls.' 2d Am. Compl. ¶ 35.) Therefore, Barr had already established that it had the manufacturing capability to produce Ovcon 35.

Thus, seeking to alleviate the significant and continuous supply problems Warner Chilcott had been experiencing with BMS, Warner Chilcott approached Barr regarding manufacturing Ovcon 35. In September 2003, Warner Chilcott and Barr negotiated a letter of intent which outlined an agreement under which Barr would manufacture and supply Ovcon 35 for Warner Chilcott. Specifically, the letter of intent contemplated that Barr would grant Warner Chilcott an option to acquire a five-year exclusive license to its Ovcon 35 ANDA as well as a supply of that product. This letter of intent was publicized in a press release. (*See* Sept. 11, 2003 Barr Press Release, *Galen to Receive Option to License Generic Ovcon® Oral Contraceptive*, WC00109052-54 (Am. App. Tab 82).)

After                          **REDACTED**

Barr and Warner Chilcott entered into a definitive license and

supply agreement in March 2004. In April 2004, Barr announced that it had received FDA approval for its Ovcon ANDA. And, as Warner Chilcott's supply problems with BMS had not ceased, Warner Chilcott exercised the option to acquire the exclusive rights to Barr's Ovcon ANDA in May 2004.[4]

      **B.**    **Defendants' License And Supply Agreement Cannot Be Considered *Per Se* Illegal Given That Defendants Submitted The Agreement In Advance To The FTC And The FTC Neither Blocked The Transaction Nor Took Any Action For Two Years While Studying It.**

Before Barr and Warner Chilcott entered into a definitive supply agreement,

REDACTED

In addition,

REDACTED

                                 In short, before executing the exclusive license and supply agreement, Barr and Warner Chilcott       **REDACTED**

    In addition to     **REDACTED**     Barr issued a public news release which explained in detail the terms of the contemplated agreement:

> Under the terms of the exclusive option agreement, Barr would grant Galen [the predecessor company of Warner Chilcott] an option to acquire an exclusive license under Barr's ANDA for Ovcon® 35, which is currently

---

4   *See, e.g.,*

REDACTED

7

pending at the U.S. Food & Drug Administration (FDA). Within 30 days of FDA approval of Barr's ANDA for Ovcon®, Galen would have the right to exercise its option. If Galen chooses to exercise the option, it would be granted a five-year exclusive license under Barr's ANDA to sell the product. At the end of the five-year term, Barr would grant Galen a non-exclusive license to continue selling the product. In consideration of this transaction, Galen would make a $1 million payment to Barr at the time of the grant of the option and a $19 million payment to Barr at the time the exclusive license agreement is signed.

(See Sept. 11, 2003 Barr Press Release, *Galen to Receive Option to License Generic Ovcon® Oral Contraceptive*, WC00109052-54.)

Defendants' letter of intent

**REDACTED**

The outcome of                          was not surprising: Ovcon 35 is one of over *80* oral

contraceptive products available on the market today.

**REDACTED**

Moreover, as discussed below, Ovcon 35 is readily interchangeable with virtually any other oral

contraceptive on the market. Therefore,

**REDACTED**

**REDACTED**                          Certainly there was no indication that the agreement was

an obvious or "naked restraint of trade" such that it was viewed by the FTC as *per se* or

"manifestly" unlawful.

Shortly before Barr and Warner Chilcott finalized their license and supply agreement in February 2004, an office of the FTC informed Warner Chilcott and Barr that it intended not to condemn, but merely to re-review and re-investigate, the parties' license and supply agreement. (*See* FTC Am. Compl. ¶ 45.)  The FTC's investigation consisted of at least seven depositions (all of which have been re-taken in this litigation), numerous witness interviews, and the consideration of expert evidence.  In November 2005, after conducting an extensive factual investigation (spanning nearly two years), the FTC determined that it would file suit to enjoin the exclusivity provision of Barr's ANDA license to Warner Chilcott.[5]  Shortly thereafter, thirty-four State Attorneys General, various drug wholesalers, and retailers filed separate suits alleging violations of Section 1 of the Sherman Act.  Certainly if the agreement was obviously, or *per se,* illegal under the antitrust laws, it would not have taken the FTC and the States *two years* to investigate and conclude that the agreement was potentially anti-competitive.  By definition, an agreement that requires two years of intense analysis and investigation to reach an (incorrect) opinion regarding its competitive effects cannot possibly be so obviously anti-competitive that it warrants *per se* treatment.

### C.    Defendants' License And Supply Agreement Cannot Be Viewed As *Always* Restricting Competition Given The Reasonably Interchangeable Nature Of Oral Contraceptives.

According to the Food and Drug Administration as well as Plaintiffs' own experts, all oral contraceptives are equally effective.

**REDACTED**

---

[5]    Warner Chilcott and Barr have both since settled with the FTC.  In addition, in September 2006, Warner Chilcott waived the exclusivity provision of its license agreement with Barr.  As a result, in October 2006, Barr launched a generic version of Ovcon 35, Balziva®.

REDACTED

Furthermore, oral contraceptives are equally safe when used properly.

REDACTED

Because virtually all oral contraceptives are equally safe and effective, oral contraceptives are — as Plaintiffs' own experts concede —

(See,

e.g.,

REDACTED

Ovcon 35, moreover, is not unique. Several other branded and generic oral contraceptive products (including Aranelle, Leena, Modicon, Brevicon, Necon .5/35, Necon 1/35, Necon 10/11, Necon 7/7/7, Norinyl 1/35, Nortrel 0.5/35, Nortrel 1/35, Nortrel 7/7/7, Ortho Novum 1/35,

---

[6]   *See also* Robert A. Hatcher, *et al.*, *Contraceptive Technology* 423 (18th ed. 2007) (Am. App. Tab 58) ("All combined [oral contraceptive] pills with less than 50 [mg] of estrogen are effective and safe.").

[7]   *See also*

REDACTED

Ortho Novum 7/7/7, and Tri-Norinyl) contain active ingredients *identical* to Ovcon 35's.  (*See* CVS Pls.' RFA Resp. (Am. App. Tab 24) at 108-15; Meijer Pls.' RFA Resp. (Am. App. Tab 25) at 125-32; Walgreen Pls.' RFA Resp. (Am. App. Tab 26) at 70-74; *see also*

**REDACTED**

Therefore, Ovcon 35 is, as Plaintiffs' own experts concede,

**REDACTED**

D.    **Defendants' License And Supply Agreement Cannot Be Condemned As *Per Se* Anti-Competitive Given The Nature Of Competition Within The Oral Contraceptive Market.**

Because oral contraceptives, including Ovcon 35, are reasonably interchangeable for the same purpose (*i.e.*, to prevent pregnancy), manufacturers must look for ways to stand out within the crowded market and encourage physicians to choose their products over those of their competitors.  This competition takes two forms:  price and promotion.

As Plaintiffs' own experts concede, the overwhelming evidence demonstrates that

(*See*

**REDACTED**

This competition constrains the price of Ovcon

11

35 and other brand name oral contraceptives.  (*See, e.g.,*

**REDACTED**

Thus, Warner Chilcott (like other oral contraceptive manufacturers) looks to the prices of oral contraceptive products of its competitors to determine the price at which it sells its oral contraceptive products, including Ovcon 35.  (*See*

**REDACTED**

Furthermore, brand name oral contraceptives marketers, like Warner Chilcott, compete through promotional efforts that attempt to     **REDACTED** as well as create product awareness.  (*See*

**REDACTED**

Because oral contraceptive products are                          sales or output are driven primarily by these promotional efforts of the manufacturer.

**REDACTED**                          If promotion is curtailed, sales fall, and often fall dramatically.     **REDACTED**

**REDACTED**     This is especially true for Ovcon 35, a product with no patent protection.

---

[8]    *See also*

**REDACTED**

12

For this reason, Warner Chilcott invested heavily in promotional efforts to compete with the numerous other brand name oral contraceptives available on the market. It did so primarily by distributing free samples of Ovcon 35 to physicians, who, in turn, distributed the free products to consumers. Indeed, as Plaintiffs' own experts acknowledge,

**REDACTED**

The reason for Warner Chilcott's "extreme" sampling is clear:

**REDACTED**

In other words, sampling is the means by which Warner Chilcott competes with other brand name oral contraceptive manufacturers to encourage physicians to write prescriptions for Ovcon 35 instead of its competitors' products.

E.     **Defendants' License And Supply Agreement Cannot Be Deemed *Per Se* Illegal Given The Numerous Pro-Competitive Benefits Evident From The Record.**

Plaintiffs allege that they and consumers were "overcharged" for Ovcon 35 products as a result of defendants' agreement, and contend that the agreement constitutes a "naked restraint of trade" that is a "*per se* violation" of the Sherman Act.[9] (*See, e.g.,* State Pls.' 2d Am. Compl.

---

[9]   Importantly, Plaintiffs' contention that consumers were "overcharged" — a fundamental premise of their motion — is a material fact in dispute. Indeed, defendants have offered extensive evidence demonstrating that consumers paid less for Ovcon 35 than they paid for its generic alternatives, including Balziva®. (*See*

**REDACTED**

13

Walgreen Compl. ¶ 51.) However, the undisputed evidence shows that the agreement in fact had no "adverse effect on competition" — a prerequisite to any finding that the agreement was unlawful — because defendants' license and supply agreement actually increased output of Ovcon 35 products and preserved substantial discounting. In addition, once Warner Chilcott waived the exclusivity provision of its license and supply agreement with Barr, within weeks, Barr launched a competing generic version of Ovcon 35 with the trade name Balziva®. Consequently, Barr captured more of the market than would have existed absent the intervening exclusive supply arrangement, which permitted Warner Chilcott to "grow" the market.

Plaintiffs allege that defendants' license and supply agreement harmed competition because, absent the agreement, Barr would have launched a generic version of Ovcon 35 in 2004. However, as Plaintiffs concede, had Barr launched a generic version of Ovcon 35 in 2004 — the "but for world" Plaintiffs posit — Warner Chilcott would have immediately stopped distributing free samples. (*See* CVS Pls.' RFA Resp. at 107; Meijer Pls.' RFA Resp. at 123; Walgreen Pls.' RFA Resp. at 68;

**REDACTED**

.10    Thus, had Barr launched a generic version of Ovcon 35 in 2004, as Plaintiffs theorize in their complaints, consumers would no longer have received the benefits of free samples of Ovcon 35.

---

10    Notably, generic oral contraceptive manufacturers, including Barr, do not distribute free samples of their generic oral contraceptive products. (*See* CVS Pls.' RFA Resp. at 107-08; Meijer Pls.' RFA Resp. at 124-25; Walgreen Pls.' RFA Resp. at 70; *see also*
**REDACTED**

As a result, and as Plaintiffs' own experts admit,

**REDACTED**

**REDACTED**

;[11]   Thus, in

Plaintiffs' "but for" world, output of Ovcon 35 products (brand and generic) would rapidly

decline.

Events subsequent to Warner Chilcott's waiver of the exclusivity provision of its license

and Barr's launch of a generic version of Ovcon 35, Balziva®, in October 2006 confirm this.

Upon Barr's launch of Balziva®, Warner Chilcott immediately stopped distributing free samples,

ending a form of substantial discounting. (*See* CVS Pls.' RFA Resp. at 107; *see also*

**REDACTED**                    This, in turn, resulted in a rapid (and

undisputed) decline in combined output of Ovcon 35 products. (*See*

**REDACTED**

---

[11]   *See also*                    **REDACTED**

Because consumers would switch to other (interchangeable) oral contraceptives, total output of
Ovcon 35 products (*i.e.*, Ovcon 35 plus any generic version of Ovcon 35) would rapidly decline; indeed,

**REDACTED**

**REDACTED**

Thus, the supply agreement here promoted competition by increasing output and preserving discounting. As Plaintiffs acknowledge, conduct is

**REDACTED**

Here, it is undisputed that absent defendants' allegedly unlawful agreement, output of Ovcon 35 products (brand plus its generics) would have declined. (*See*

**REDACTED**

In other words, defendants' conduct — conduct that Plaintiffs wish to condemn as *per se* unlawful — did not reduce output, but actually preserved and expanded it.

Moreover, it is undisputed that defendants' license and supply agreement preserved Warner Chilcott's substantial free sampling of Ovcon 35. (*See* CVS Pls.' RFA Resp. at 106; Meijer Pls.' RFA Resp. at 123; Walgreen Pls.' RFA Resp. at 68; As Plaintiffs' own experts acknowledge,

**REDACTED**

In fact, as Plaintiffs' experts admit,

**REDACTED**

**REDACTED**


**REDACTED**


Plaintiffs ask this Court to ignore the foregoing facts (which are taken overwhelmingly from Plaintiffs' and their experts' sworn testimony as well as the sworn testimony of neutral third parties) and to condemn as *per se* an agreement that indisputably preserved substantial discounting to consumers, increased output, and invigorated interbrand competition. Plaintiffs' motion thus seeks to turn the antitrust laws on their head and condemn conduct which benefited competition and consumers. But, as the foregoing clearly demonstrates, defendants' license and supply agreement was not a naked restraint, and did not have an actual adverse effect on the relevant market. Simply put, defendants' exclusive supply agreement is not a "manifestly anti-competitive" restraint of trade that can be condemned as a matter of law.

## ARGUMENT

Plaintiffs' conclusory effort to condemn defendants' conduct as a "market allocation agreement" that is *per se* illegal under the antitrust laws must be rejected. *First*, the Supreme Court has long held that the Rule of Reason is the presumptive standard to apply in antitrust

cases, and has reserved the *per se* exception for only narrow forms of "manifestly anti-competitive" conduct. *See infra* I. ***Second***, notwithstanding Plaintiffs' (conclusory) labeling of defendants' conduct as a "horizontal market allocation," defendants' conduct does not fall within the narrow categories of conduct the Supreme Court has determined to warrant *per se* treatment. *See infra* II.A. Rather, the undisputed facts — taken overwhelmingly from the testimony of Plaintiffs' own experts, witnesses, and neutral third parties — show that the license and supply agreement cannot be classified as a *per se* illegal arrangement. *See infra* II.B. ***Third***, Barr has offered "plausible" evidence of the procompetitive benefits of defendants' exclusive supply agreement. *See infra* III.A. In addition, where, as here, an alleged allocation of territory or customers is made specifically in the context of a relationship between a manufacturer and a marketer, courts should apply the Rule of Reason. *See infra* III.B. ***Finally***, the authorities cited by Plaintiffs in an attempt to invoke the *per se* rule are inapposite. *See infra* IV.

Because the record shows that the agreement between Warner Chilcott and Barr was not "manifestly anti-competitive," application of the *per se* rule is not warranted. Accordingly, Plaintiffs' motion must be denied.

## I.     THE SUPREME COURT HAS LONG HELD THAT THE APPROPRIATE FRAMEWORK FOR ANALYZING CONDUCT UNDER THE ANTITRUST LAWS IS THE RULE OF REASON, NOT THE *PER SE* RULE.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ." 15 U.S.C. § 1. Read literally, Sherman Act § 1 would proscribe all contracts. But the Supreme Court has recognized that "the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains." *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918). The Court therefore has interpreted Sherman Act § 1 to prohibit only those agreements

which ***unreasonably*** restrain trade. *See, e.g., Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 58 (1911) (stating that in enacting the Sherman Act, Congress intended to proscribe only those "contracts or acts which were unreasonably restrictive of competitive conditions").

The inquiry under Sherman Act § 1 focuses on the "impact [of the challenged practice] on competitive conditions," *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 690 (1978), and the function of the court is "to form a judgment about the competitive significance of the restraint." *Id.* at 692. Thus, an "unreasonable restraint" is one that raises prices, reduces output, or otherwise reduces interbrand competition. *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 127 S. Ct. 2705, 2718 (2007) ("[T]he antitrust laws are designed primarily to protect interbrand competition"). To determine whether a particular practice constitutes an unreasonable restraint of trade, courts traditionally have applied one of two approaches — the Rule of Reason or the *per se* approach.

### A.   The Rule Of Reason Is The Presumptive Standard For Evaluating Whether A Particular Practice Violates Sherman Act § 1.

Tracing at least as far back as the Supreme Court's landmark decision in *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1 (1911), the preferred approach for analyzing conduct under the antitrust laws has been the Rule of Reason. *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) ("Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason . . . ."). Indeed, in two recent decisions, the Court stressed that "[t]he rule of reason is the ***accepted standard*** for testing whether a practice restrains trade in violation of § 1," *Leegin*, 127 S. Ct. at 2712, and should be "***presumptively applie[d]***" in antitrust cases by the courts, *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

19

Under the presumptive Rule of Reason approach, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977); *see also Bd. of Trade of Chicago*, 246 U.S. at 238 ("[T]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."). Relevant factors in this analysis include "specific information about the relevant business and the restraint's history, nature, and effect." *Leegin*, 127 S. Ct. at 2712. "Whether the businesses involved have market power is a further, significant consideration." *Leegin*, 127 S. Ct. at 2712; *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (equating the Rule of Reason with "an inquiry into market power and market structure designed to assess [the practice's] actual effect"). Under the Rule of Reason, only those agreements that have an actual adverse effect on competition as a whole are condemned as unlawful. *See, e.g., Bd. of Trade of Chicago*, 246 U.S. at 238. Thus, "[i]n its design and function the [Rule of Reason] distinguishes between restraints with anti-competitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin*, 127 S. Ct. at 2713.

**B.      The *Per Se* Rule Is An Exception To The Presumptive Rule And Is Reserved For A Narrow Class Of "Manifestly Anticompetitive" Restraints.**

To be sure, the Supreme Court has crafted an exception to the presumptive Rule of Reason standard. However, this narrow exception — the *per se* rule — governs only certain conduct or practices that, by their very nature, may be "conclusively presumed to be unreasonable and therefore illegal." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958).

To find a *per se* violation of Sherman Act Section 1, the court must determine that "the practice facially appears to be one that would *always or almost always* tend to restrict

competition and decrease output." *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 19-20 (1979) ("*BMI*"). Specifically, the Supreme Court defined *per se* illegality under Section 1 of the Sherman Act as conduct constituting a "naked restraint of trade with no purpose except stifling of competition," *id.* at 20, or having a "pernicious effect on competition and lack[ing] any redeeming virtue," *N. Pac. Ry.*, 356 U.S. at 5. In other words, as the Supreme Court has repeatedly held, the "*per se* rules are appropriate only for conduct that is manifestly anti-competitive." *Business Elecs.*, 485 U.S. at 723; *BMI*, 441 U.S. at 20.

Although certain activities, including horizontal price-fixing and some types of horizontal market division, have been subject to *per se* treatment, the Supreme Court has made clear that the conduct that falls into these categories is limited and that these exceptions to the presumptive Rule of Reason approach should be applied carefully, narrowly, and infrequently. As the Supreme Court warned in *Business Electronics*, "we have been slow . . . to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Business Elecs.*, 485 U.S. at 723; *see also U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir. 1993) (noting the increasing "difficulty of squeezing a [particular] practice into the ever narrowing per se niche"). Thus, "agreements are *per se* illegal only if their nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Business Elecs.*, 485 U.S. at 724. As the Court recently explained, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue . . . and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason . . . ." *Leegin*, 127 S. Ct. at 2713; *see also Dagher*, 547 U.S. at 5 ("*Per*

*se* liability is reserved for only those agreements that are so plainly anti-competitive that no elaborate study of the industry is needed to establish their illegality.").

These cases all reflect a common theme: the *per se* rule should not be applied unless a court is certain that the conduct in question falls within a category which experience demonstrates will always restrict competition or decrease output. As next discussed, defendants' exclusive supply arrangement cannot remotely be characterized as "manifestly anti-competitive" warranting application of the *per se* exception.

## II.    DEFENDANTS' AGREEMENT CANNOT BE FOUND UNLAWFUL *PER SE* BECAUSE IT MUST BE ANALYZED UNDER THE RULE OF REASON.

As noted above, for nearly a century the Supreme Court has held that the presumptive approach for analyzing conduct under the antitrust laws has been the Rule of Reason. Faced with the Supreme Court's overwhelming presumption ***against*** the application of *per se* treatment, Plaintiffs offer nothing more than conclusory assertions that defendants' exclusive supply agreement constitutes a "horizontal market division," and that all "horizontal market divisions" are *per se* unlawful. As a matter of law (and — as will be discussed below — as a matter of fact), that is simply not the case. Simply put, the type of license and supply agreement presented here has never been characterized as such a clearly naked restraint, lacking any "redeeming virtue" and serving no purpose but the "stifling of competition." To the contrary, as is clear from Supreme Court precedent limiting the classes of conduct that may be deemed *per se* unlawful, as well as the economic analysis of Plaintiffs' own experts, the license and supply agreement at issue in this case does not remotely constitute conduct that "always or almost always" reduces competition. Thus, defendants' conduct cannot be condemned as *per se* unlawful.

22

A.    **Plaintiffs' Conclusory Assertion That Defendants' Conduct Was A "Horizontal Market Allocation" Does Not Warrant Application Of The *Per Se* Rule.**

As an initial matter, Plaintiffs' conclusory description of defendants' exclusive supply agreement as a "horizontal market allocation" neither makes it so, nor justifies application of the *per se* rule.    Rather, "a departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Leegin*, 127 S. Ct. at 2713. *See also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 775 n.12 (1999) (cautioning that in assessing the competitive impact of alleged unlawful conduct "assumption alone will not do."); *Oetiker v. Jurid Werke*, 556 F.2d 1, 7 (D.C. Cir. 1977) ("[T]he area of per se illegality is carefully limited.    We are reluctant to extend it on the bare pleadings and absent examination of market effect and economic consequences.").

Thus, contrary to Plaintiffs' assertion that the Court may condemn defendants' supply agreement without analysis of the context and nature of that agreement, an essential threshold step in every antitrust inquiry is a determination of the nature of the restraint. *See Cal. Dental Ass'n*, 526 U.S. at 779 ("[C]onsiderable inquiry into market conditions may be required before the application of any so-called *per se* condemnation is justified."); *see also Continental T.V., Inc.*, 433 U.S. at 58-59. Because the characterization of behavior that is alleged to "allocate" or "divide" markets is often ambiguous, the antitrust laws require, at a minimum, that courts conduct a threshold examination of that behavior to understand its implications. Merely labeling conduct as "horizontal" or a "market allocation" thus adds nothing.

Rather, as the Supreme Court has warned, application of such formalistic labels to challenged conduct — as Plaintiffs advocate that the Court do here — simply misses the mark. *See BMI*, 441 U.S. 1. In *BMI*, CBS brought an action against two major performing societies, asserting that the agreements among their members allowing the societies to set royalty rates —

23

*i.e.*, the prices that licensees would pay for performing rights to the members' copyrighted works — constituted horizontal "price fixing." The Court rejected that conclusion, making clear that "easy labels do not always supply ready answers." *Id.* at 8. In so doing, the Court recognized that the society members may have "literally" "fixed" the prices paid for their works, just as Plaintiffs here incorrectly allege that defendants "literally" "divided" the market. But the *BMI* Court stressed that "[l]iteralness is overly simplistic and often overbroad," and that formalistic labels cannot substitute for actual analysis of the conduct in question. *Id.* at 9. As the *BMI* decision makes clear, "it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label *per se* price fixing." *Id.* That process of "characterization" requires an initial understanding of the history, nature, purpose, and competitive effect of a challenged agreement.[12]

In short, as the Supreme Court warned, formalistic labels, such as those that Plaintiffs seek to apply here, "do not [] supply ready answers" and should not be invoked to artificially limit a trial court's examination of the factors necessary to assess the competitive impact of the conduct in question. *BMI*, 441 U.S. at 8-9; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992) ("Legal presumptions based on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law"); *Augusta News Co. v. Hudson News Co.*, 269 F.3d 42, 47 (1st Cir. 2001) (emphasizing that "[t]he categorical descriptions of *per se* offenses are quite misleading.").

---

[12] The Supreme Court's decision in *California Dental* is also instructive. 526 U.S. at 779. *See also infra* III.A. There, the Court rejected application of the *per se* rule to advertising restraints imposed by a trade association on its member dentists. The Court held that despite the horizontal nature of the alleged restraint, an analysis of the pro-competitive benefits of the challenged conduct was required. Thus, the Court held that the Rule of Reason, not the *per se* rule, was required as a matter of law.

Therefore, it simply will not suffice for Plaintiffs to call defendants' behavior a "horizontal market division," and then assert that this is the end of the process. As next discussed, notwithstanding Plaintiffs' (conclusory) labeling of defendants' conduct as a "horizontal market allocation," defendants' conduct does not fall within the narrow categories of conduct the Supreme Court has determined to warrant *per se* treatment.

### B.    Defendants' License And Supply Agreement Was Not "Manifestly Anti-Competitive" Or Lacking Any Redeeming Virtue.

As noted above, the *per se* analysis applies only to well-established conduct that requires virtually no analysis for a pronouncement of illegality, *see, e.g., Dagher*, 547 U.S. at 5, because, by its very nature, such conduct "always or almost always tend[s] to restrict competition and decrease output," *Leegin Creative Leather Prods. V. PSKS, Inc.*, 127 S. Ct. 2705, 2713 (2007). The well publicized — and scrutinized — license and supply agreement challenged here cannot remotely be characterized as a demonstrably and conclusively anti-competitive category of conduct.

As an initial matter, any claim that defendants' license and supply agreement constituted a "naked restraint" with no redeeming virtue is belied by the fact that the Federal Trade Commission — the specialized agency charged with enforcing the antitrust laws — took nearly *two years* to study, investigate, and consider the effects of that agreement. In fact, as discussed above,

**REDACTED**

Only after conducting an extensive investigation involving numerous depositions of defendants and third party witnesses did the FTC conclude —

after two years of study — that it wished to challenge the agreement. Thus, the conduct at issue can hardly be characterized as "manifestly anti-competitive" or a "naked restraint" for which no analysis is required to determine the economic impact.

The FTC's deliberate and fact intensive investigation of the agreement at issue is not surprising: "Exclusive supply contracts have been recognized as having procompetitive benefits and thereby serving legitimate business objections." *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 274 (S.D.N.Y. 2002).[13]  In short, an exclusive license or supply agreement is simply not a "naked restraint" which can be denounced without analysis based on long-standing experience with the particular conduct. *See, e.g., Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

To the contrary, exclusive supply agreements of the sort at issue here have long been judged under the Rule of Reason. *See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 44-45 (1984) (O'Connor, J., concurring) ("Exclusive dealing arrangements are independently subject to scrutiny under § 1 of the Sherman Act, and are also analyzed under the Rule of Reason."), *overruled on other grounds by Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). *See also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 62 (1st Cir. 2004) ("[E]xclusive dealing arrangement[s] . . . [are] not a per se violation of the antitrust laws."); *Satellite T.V. & Assoc. Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 354 (4th Cir. 1983) ("Exclusive dealing contracts which might function to increase interbrand competition have never been held to be a *per se* violation of the antitrust laws by the

---

[13] *See also Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 306-07 (1949) (stating that exclusive supply contracts can assure supply and afford protection against price increases); *Williamson v. Sacred Heart Hosp.*, No. 89-30084-RV, 1993 WL 543002, at *45 (N.D. Fla. 1993) ("[I]t is settled law that the mere existence of an exclusive contract is not evidence of an antitrust conspiracy.").

Supreme Court."); *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1220 (W.D.N.C. 1989) ("Assuming that the supply contracts are exclusive dealing arrangements, the court would analyze them under the rule of reason.").[14]  Indeed, numerous cases have required Rule of Reason analysis, even for conduct facially characterized as a horizontal market division. *See, e.g., Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 976-77 (7th Cir. 1999) (refusing to apply *per se* treatment to arrangement whereby plaintiff and defendant, who were selling the same product, each had exclusivity over certain territories); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514 (E.D.N.Y. 2005) ("*Cipro II*") (applying Rule of Reason to brand-generic supply agreement despite plaintiffs' attempt to characterize it as a "market allocation"); *Anesthesia Advantage, Inc. v. Metz Group*, 759 F. Supp. 638, 646 (D. Colo. 1991) ("Plaintiffs' market allocation allegation likewise does not require per se analysis."); *Greenbrier Cinemas, Inc. v. Attorney Gen. of United States*, 511 F. Supp. 1046, 1059-60 (W.D. Va. 1981) (concluding that motion picture product allocation agreement was not so likely to stifle competition as to deserve *per se* condemnation); *Los Angeles Mem'l. Coliseum Comm'n v. NFL*, 468 F. Supp. 154, 165-66 (C.D. Cal. 1979) (applying Rule of Reason rather than *per se* approach, despite fact that athletic league's bylaws controlling franchise locations allocated territories among member teams), *aff'd*, 726 F.2d 1381, 1387 (9th Cir. 1984).

In re Ciprofloxacin* is instructive. There, purchasers of ciprofloxacin hydrochloride ("Cipro") sued the brand name manufacturer (Bayer), and prospective manufacturers of a generic

---

[14]  *See also Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 660 (8th Cir. 2000) ("Exclusive dealing contracts are analyzed under the rule of reason."); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (finding that agreement between manufacturer and distributor was vertical and subject to the Rule of Reason, even though they competed at distributor level); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984) (holding that exclusive dealing agreements are "judged under the Rule of Reason, and thus condemned only if found to restrain trade unreasonably.").

version of Cipro, claiming that the brand and generic manufacturers' agreement to defer generic

entry into the market in return for payments from Bayer to the generic manufacturers violated

Sherman Act Section 1. *See In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d

188, 192-93 (E.D.N.Y. 2003) ("*Cipro I*"). Plaintiffs, as here, moved for "partial summary

judgment" seeking a ruling as a matter of law that defendants' agreements constituted "a *per se*

illegal market allocation." *Id.* at 230. The *Ciprofloxacin* court observed that although "there

may be some facial appeal to applying the *per se* rule" to defendants' agreement, a "*per se*

analysis is reserved for a small number of cases involving agreements in restraint of trade that

experience teaches have no redeeming value and a pernicious anti-competitive effect." *Id.* at

232-33; *see also Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d

Cir. 1993) (noting that the *per se* rule is reserved for certain "carefully demarcated categories" of

conduct). More directly, because the economic impact of the agreements — involving

settlements of patent litigation suits and a related supply agreement — was not immediately

obvious, the court could not presume that defendants' agreement had "no redeeming virtue" and

no purpose except "stifling competition." Quite simply, the court could *not* find "the

[defendants'] Settlement Agreements and Supply Agreement [] per se illegal" because a "more

elaborate inquiry" into the effects of the challenged conduct was necessary. *Cipro I*, 261 F.

Supp. 2d at 247. Therefore, the Rule of Reason, not *per se*, analysis was appropriate.[15]

*In re Ciprofloxacin* and the foregoing cases thus demonstrate that the *per se* rule is not

warranted here. Indeed, application of the *per se* rule is especially inappropriate here because it

is undisputed that the license and supply agreement allowed Warner Chilcott to continue to

---

[15] *See also Cipro II*, 363 F. Supp. 2d at 547 (granting summary judgment in favor of defendants under Rule of Reason analysis).

promote Ovcon 35. (*See* CVS Pls.' RFA Resp. at 106; Meijer Pls.' RFA Resp. at 123; Walgreen

Pls.' RFA Resp. at 68;        **REDACTED**        Therefore, as a result of the agreement, output

of Ovcon 35 products was higher than it would have been but for the agreement[16] — the

antithesis of anti-competitive harm. *See Leegin*, 127 S. Ct. at 2713 (observing that only those

agreements "that would always or almost always tend to restrict competition and decrease

output" are *per se* unlawful). Thus, far from being "manifestly anti-competitive" and lacking

any redeeming virtue, the undisputed facts demonstrate that the agreement here had the

significant pro-competitive effect of increasing output and fostering inter-brand competition.

(*See*

**REDACTED**


Equally important, defendants' agreement preserved substantial discounting of Ovcon 35,

*i.e.*, as a direct result of defendants' agreement, Warner Chilcott continued to distribute free

samples of Ovcon 35 to physicians and, ultimately, to consumers until Barr's Balziva® entered

the market in October 2006. (*See*        **REDACTED**        As Plaintiffs'

own experts admit,


(*See*

**REDACTED**


---

16   *See*

**REDACTED**

Faced with these undisputed facts, *Plaintiffs' own expert*,

REDACTED

REDACTED

REDACTED

\*     \*     \*

REDACTED

REDACTED

In short,

REDACTED

REDACTED

Therefore, as Plaintiffs' own expert concedes, the agreement at issue is far from "manifestly anti-competitive," and does not warrant *per se* condemnation.

**III.    THE *PER SE* RULE IS NOT TO BE APPLIED TO CASES LIKE THIS WHERE THERE IS PLAUSIBLE EVIDENCE OF PRO-COMPETITIVE BENEFITS OR WHERE THE AGREEMENT AT ISSUE IS A MIXED VERTICAL-HORIZONTAL ARRANGEMENT.**

Because Barr has offered "plausible" evidence of the pro-competitive effects of defendants' license and supply agreement, and because defendants' agreement is a vertical commercial arrangement, the Rule of Reason must be applied. In other words, contrary to Plaintiffs' motion, the *per se* rule has no application here.

**A.    Because Barr Has Offered Plausible Evidence Of The Pro-Competitive Effects Of Defendants' Agreement, *Per Se* Treatment Is Inappropriate.**

As noted above, an essential threshold step in every antitrust inquiry is a determination of the nature of the restraint. Because the characterization of behavior that is alleged to "divide" territories is often ambiguous, the antitrust laws require, at a minimum, that courts conduct a threshold examination of that behavior to understand its implications.

The Supreme Court's discussion of the proper application of the Rule of Reason analysis in *Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999), underscores why Plaintiffs' reliance on mere formalistic labels is in error. In *California Dental*, the respondent association had issued advisory opinions and guidelines limiting advertising by its member dentists. After conducting hearings, the FTC concluded that these restrictions were, alternatively, illegal *per se* or unlawful under an abbreviated (or "quick look") Rule of Reason analysis. The Ninth Circuit upheld the finding of a violation under the latter approach, although it concluded that the FTC erred in applying *per se* analysis to the price advertising restrictions.

31

On appeal, the Supreme Court rejected both *per se* treatment and even the FTC's truncated Rule of Reason approach. In so doing, the Court expressly held that a more expansive analysis of respondent's pro-competitive explanations for its conduct was required. The Court began by emphasizing that the choice of a *per se* versus Rule of Reason approach itself requires an examination of the competitive impact of the conduct in question. *See id.* at 779-80 ("[W]hether the ultimate finding is the product of a presumption [*i.e.*, a *per se* rule] or actual market analysis, the essential inquiry remains the same — whether or not the challenged restraint enhances competition."). Thus, *both* at the stage of deciding whether or not to employ a *per se* standard, and then again to determine the proper scope of the Rule of Reason inquiry, the Court recognized that a preliminary assessment (or "quick look" — which it defined as whether "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anti-competitive effect on customers and markets") was required. *Id.* at 770.

The Court then held that as long as defendants could proffer ***plausible arguments*** that their conduct might have pro-competitive effects, the antitrust laws demanded Rule of Reason analysis rather than a more abbreviated inquiry. *See id.* at 775. As the Court expressly stated in its opinion: "As a matter of economics [the respondent's] view may or may not be correct, ***but it is not implausible***, and neither a court nor the Commission may initially dismiss it as presumptively wrong." *Id.* at 775. *California Dental* thus squarely prohibits *per se* treatment here.

Barr has clearly satisfied this lenient threshold. Indeed, Barr has offered numerous plausible explanations of why the license and supply agreement was pro-competitive, including, *inter alia*:

- the agreement ensured a safe, stable, and reliable supply of Ovcon 35 for consumers;[17]

- the agreement ensured continued, substantial free sampling of Ovcon 35 by Warner Chilcott, resulting in lower net prices to consumers;[18]

- the agreement enabled Ovcon 35 to aggressively compete against the numerous other hormonal contraceptives in the marketplace;[19]

- the agreement enabled Barr to produce Ovcon 35 despite the threat of Ovcon chewable;[20]

- the agreement preserved the market for Ovcon 35; and,[21]

- the agreement resulted in an overall increase in output for Ovcon 35 products.[22]

Individually, each of these explanations satisfies *California Dental*'s standard of "plausibility," thus requiring further examination by this Court and application of the Rule of Reason analysis. In the aggregate, they more than meet the minimal threshold showing that renders *per se* treatment wholly inappropriate.

---

[17]  *See, e.g.,*

**REDACTED**

[18]  *See, e.g.,*

**REDACTED**

[19]  *See, e.g.,*

[20]  *See, e.g.,*

[21]  *See, e.g.,*                    **REDACTED**

[22]  *See, e.g.,*

**B.    Mixed Vertical And Horizontal Commercial Arrangements Are Ill-Suited For *Per Se* Treatment.**

Contrary to Plaintiffs' characterization of defendants' license and supply agreement as purely "horizontal," the agreement at issue here reflects a vertical commercial arrangement. Specifically, Barr and Warner Chilcott entered into a vertical supply arrangement; Barr agreed to supply Warner Chilcott's requirements of Ovcon 35.    Such mixed vertical and horizontal commercial arrangements are far from "naked restraints." Rather, such arrangements, combining both vertical and alleged horizontal elements, are generally evaluated under the Rule of Reason because of the ambiguous economic impact of such agreements.  In other words, they cannot be categorically presumed to be anti-competitive. *See, e.g., Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999); *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 691 (D. Md. 2000) ("This rule [of reason] applies to cases that are not easily classified because they involve aspects of vertical restraints.").[23]  Moreover, when an allocation of territory or customers is made specifically in the context of a relationship between manufacturer and distributor, courts should apply the Rule of Reason. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 (1977).

Further, where, as here, the horizontal aspect of a challenged agreement is ancillary to other efficiency-enhancing elements, the Rule of Reason is appropriate — and required.  This is true even when considering a horizontal agreement to refrain from competition — the crux of

---

[23]  *See also Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904 (6th Cir. 1989); *Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*, 889 F.2d 751 (7th Cir. 1989); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987); *Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366 (10th Cir. 1993); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir. 1984); *Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560 (11th Cir. 1983); *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348 (9th Cir. 1982); *Abadir & Co. v. First Miss. Corp.*, 651 F.2d 422 (5th Cir. 1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir. 1981); *Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405 (2d Cir. 1981).

Plaintiffs' allegations here.  Such restraints may be justified by countervailing pro-competitive virtues, "such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *see also Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294, 1313 n.31 (11th Cir. 2003) ("[A]greements that are anti-competitive when considered in isolation (such as covenants not to compete) can still be lawful if they are ancillary to another agreement and, when viewed in combination, will have the overall effect of enhancing competition.").

Here, Barr agreed to supply Warner Chilcott Ovcon 35 in lieu of introducing yet another oral contraceptive product into the already crowded marketplace.  By virtue of defendants' agreement, Warner Chilcott obtained a reliable supply of the product and, as a result, was able to continue to distribute free samples to physicians and consumers.  This, in turn, allowed Warner Chilcott to more effectively compete in the hormonal contraceptives marketplace — indeed, as Plaintiffs' own experts concede, defendants' agreement permitted Warner Chilcott to compete through the provision of free samples.  (*See*  **REDACTED**

                                        (*See also* CVS Pls.' RFA Resp. at 106; Meijer Pls.' RFA Resp. at 123; Walgreen Pls.' RFA Resp. at 69.)  It is therefore not sufficient for Plaintiffs to assert that defendants' agreement was *per se* unreasonable given their supposedly horizontal character.  *See, e.g., Augusta News Co. v. Hudson News Co.*, 269 F.3d 42, 48 (1st Cir. 2001) (rejecting the argument that restraints were *per se* illegal by virtue of being "horizontal," and noting that "it is commonly understood today that *per se* condemnation is limited to 'naked' market division agreements," not part of a larger pro-competitive activity); *see also Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 52 (1st Cir. 1998); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986); *Rozema v. Marshfield Clinic,*

977 F. Supp. 1362, 1375 (W.D. Wis. 1997) ("Market allocations that accompany and promote the success of larger endeavors are considered ancillary trade restraints and warrant more in-depth analysis under the Rule of Reason.").

In sum, it simply will not suffice for Plaintiffs to label defendants' behavior a "horizontal market allocation," and then assert that this is the end of the process. To the contrary, as the foregoing discussion demonstrates, *per se* treatment is appropriate only in certain narrow circumstances not present here. Indeed, the undisputed facts demonstrate that defendants' license and supply agreement is not "manifestly anti-competitive" and therefore does not fall within the narrow category of conduct for which the Supreme Court has determined that the presumptive Rule of Reason analysis should be abandoned in favor of a categorical *per se* approach.

## IV.  THE CASES THAT PLAINTIFFS CITE TO SUPPORT THEIR "MARKET ALLOCATION" ARGUMENT ARE FACTUALLY AND LEGALLY DISTINGUISHABLE.

Plaintiffs offer no evidence that agreements like defendants' exclusive supply agreement are "always" manifestly anti-competitive and lack any "plausible" pro-competitive justifications. Rather, Plaintiffs spend their entire brief trying to squeeze this agreement into the "*per se* market allocation" mold. To do so, however, Plaintiffs rely on a series of inapposite cases.

As an initial matter — and compounding the deficiencies in Plaintiffs' entire approach — the "rule" making horizontal market allocations unlawful *per se* is far more limited than Plaintiffs would suggest. The *per se* rule actually reaches only certain express or "naked" market allocation agreements between horizontal competitors. Although prohibitions on "naked" market divisions can be traced back to the *Addyston Pipe* case at the end of the nineteenth century, *see United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899), the Supreme Court did not apply a *per se* label to this form of conduct until its

decision in *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972).  And the Court has revisited these kinds of agreements only once thereafter, in a brief per curiam decision in *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990).

It bears emphasis that unlike the present case, none of those decisions involved a vertical supply arrangement like the conduct at issue here.  In *Addyston Pipe*, six manufacturers of cast iron pipe formed an association to orchestrate a cartel, which fixed the price of their products, allocated territories to each member, and provided for the payment of "bonuses" for sales made in designated areas.  In *Topco*, approximately two dozen supermarket chains formed an association that assigned specific, exclusive geographic territories to each member, and gave each member virtual veto power over sales in its territory of Topco-brand products.  In *Palmer*, two providers of bar review courses in Georgia agreed that one would withdraw from that state entirely, in exchange for a promise by the other that it would not offer courses anywhere else in the United States.  In other words, these cases involved "naked restraints," not present here.

Notably, the First Circuit held that, since *Topco*, "it is commonly understood today that *per se* condemnation is limited to 'naked' market division agreements, that is, to those that are not part of a larger pro-competitive joint venture," *Augusta News*, 269 F.3d at 48, and that *Palmer* involved "more or less a sham transaction to disguise a naked market division arrangement . . . ."  *Id.*  Other courts have been similarly wary of *per se* treatment, and have applied the Rule of Reason even where parties reached express market allocation agreements.  *See, e.g., Generac*, 172 F.3d at 976-77.  Thus, rather than support Plaintiffs' position, these cases merely reaffirm that the Supreme Court has long reserved *per se* treatment for purely "naked restraints" of trade.

Plaintiffs' reliance on the *Cardizem* and *Valley Drug/Terazosin* cases is equally misplaced. Neither of these cases involved the type of exclusive supply agreement at issue here. In neither of these cases, moreover, was there a clear (and undisputed) record, as here, of the substantial pro-competitive benefits, such as continued substantial discounting and increased output, of the challenged conduct. *See supra* II.B. Furthermore, any persuasive authority these decisions might have is entirely undermined by the significant factual distinctions between those agreements and the supply agreement here.

*First*, both *Cardizem* and *Terazosin* addressed the narrow question of whether a patent settlement agreement between a brand-name drug manufacturer and a generic manufacturer (involving a payment and agreement not to market a product) exceeded the lawful monopoly afforded by the brand-name manufacturer's patent. In *Cardizem*, the district court held that the interim agreement between a branded drug manufacturer (HMR) and a generic challenger (Andrx), providing for payments from HMR to Andrx, constituted a horizontal market allocation subject to attack under a *per se* standard. *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 908 (6th Cir. 2003). But the agreement at issue before the *Cardizem* court did not just prohibit entry of an allegedly infringing generic product, it provided that Andrx would not market *non*-infringing products that were not subject to the parties' patent litigation. *See id.* at 902, 908 & n.13. In other words, unlike here, the *Cardizem* defendants' agreement was a naked agreement not to compete in markets unrelated to the defendants' patent settlement.

In *Terazosin*, the court was also confronted with a patent litigation settlement. *In re Terazosin Hydrochloride Antitrust Litig.*, 164 F. Supp. 2d 1340, 1346-47 (S.D. Fla. 2000), *rev'd sub nom. Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294 (11th Cir. 2003), *cert. denied*, 125 S. Ct. 308 (2004) ("*Terazosin I*"). There, Abbott, the brand name drug manufacturer of

Hytrin, faced ANDA challenges from two different generic manufacturers, Geneva and Zenith. Both Geneva and Zenith signed settlement agreements (settling their challenge to the validity of Abbott's patents) with Abbott, effectively promising not to introduce generic versions of Hytrin in exchange for cash payments. The district court found that Geneva and Zenith further agreed to undertake efforts to prevent *other* generic manufacturers from making successful ANDA filings. In the face of these facts – none of which are present in the action before this Court – the *Terazosin* court concluded that those agreements constituted "horizontal market allocation agreements" subject to *per se* condemnation. The Eleventh Circuit reversed the district court's *per se* ruling, however. *Valley Drug*, 344 F.3d 1294 at 1304 (rejecting "the district court's characterization of the instant Agreements as illegal *per se*" and indicating that "any such characterization is premature without further analysis."). On remand, the district court again ruled that the agreement was *per se* illegal. *See In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1315 (S.D. Fla. 2005) ("*Terazosin II*"). But that decision was never reviewed by the Eleventh Circuit (because a settlement was reached), and, in any event, was decided on narrow grounds, *i.e.*, that the stay provision in that *patent settlement case* exceeded the scope of the subject patent. 352 F. Supp. 2d at 1318 n.39.

Here, the Ovcon agreement was *not* a patent settlement but a license and supply agreement. Warner Chilcott did not pay Barr for an agreement not to enter the market; rather, Warner Chilcott's payment to Barr related to the parties' exclusive supply agreement whereby Barr did *in fact* exclusively supply Warner Chilcott all its requirements for Ovcon 35 for a significant period of time. As discussed above, courts have consistently held that exclusive supply agreements may be pro-competitive and are *not* subject to *per se* treatment. None of Plaintiffs' cited cases involved an exclusive supply agreement in which a manufacturer, such as

Barr, exclusively supplied product to another manufacturer (Warner Chilcott) who was unable to manufacture the product itself.

Moreover, it is undisputed that Ovcon 35 was not subject to patent protection and thus any manufacturer could introduce a generic at any time. More importantly, it is undisputed that defendants' license and supply agreement created *no* barriers to competition within the marketplace. Simply put, nothing in defendants' license and supply agreement prevented or precluded another generic from entering the marketplace and competing with Ovcon 35. (*See*

REDACTED

In fact,

REDACTED

Because

defendants' exclusive supply agreement did not preclude entry by other manufacturers, and because Barr supplied product to Warner Chilcott, this agreement is unlike the patent settlement agreements discussed. Plaintiffs' reliance on *Cardizem* and *Terazosin* is thus inapt.[24]

---

[24] Indeed, other courts have recognized that *Cardizem* and *Terazosin* are limited to their facts; that is, in each case (unlike the agreement at issue here) the challenged agreements sought to limit competition in a variety of markets and provided no plausible pro-competitive benefits. *See, e.g., In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 197 (2d Cir. 2006) (distinguishing *Cardizem* and *Terazosin*, and concluding that because the brand-generic agreement at issue did not restrain competition beyond the brand manufacturer's patent, and did not limit entry of non-infringing products, the *per se* rule did not apply); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 241 (E.D.N.Y. 2003) ("[T]he courts in *Cardizem* and *Terazosin* found that the agreements at issue covered noninfringing, and potentially noninfringing, generic products; manipulated the 180-day exclusivity period, effectively delaying entry by other generic manufacturers; and perpetuated the (Continued...)

*Second,* in both the *Cardizem* and *Terazosin,* the courts implicitly (and, indeed, explicitly) assumed that the relevant product markets included only the particular branded product (Cardizem CD and Hytrin) at issue and its generic alternatives. *See Cardizem,* 332 F.3d at 911 (finding that litigation settlement payment to generic manufacturer was "per se illegal because it is presumed to have the effect of *reducing competition in the market for Cardizem CD and its generic equivalents* to the detriment of consumers."); *Terazosin,* 352 F. Supp. 2d 1319 n.40 ("Abbot[t] has power in the *relevant market, which is the market for Hytrin and its generic bioequivalent forms of terazosin hydrochloride.*").  Although that assumption may have been appropriate in the context of *Cardizem* and *Terazosin,* it is not, for the reasons stated herein and in Barr's Memorandum in Support of Its Motion for Summary Judgment at 31-35, a legitimate assumption here.

Indeed, Plaintiffs' own experts concede that Ovcon 35 is

**REDACTED**

In fact, Plaintiffs admit that:

---

underlying patent infringement suits.  Thus, those courts concluded that the agreements were per se illegal horizontal market allocation agreements.").

41

- 

- 

**REDACTED**

- 

- several other branded and generic oral contraceptive products, including Aranelle, Leena, Modicon, Brevicon, Necon .5/35, Necon 1/35, Necon 10/11, Necon 7/7/7, Norinyl 1/35, Nortrel 0.5/35, Nortrel 1/35, Nortrel 7/7/7, Ortho Novum 1/35, Ortho Novum 7/7/7, and Tri-Norinyl, contain identical active ingredients as Ovcon 35, and contain similar dosages of these ingredients.[27]

Moreover, all oral contraceptives (with less than 50 mg of estrogen) are equally safe when used properly. *(See*    **REDACTED**    Therefore, here, unlike in *Cardizem* and *Terazosin*, an agreement which delays the introduction of a generic product cannot be presumed to be anti-competitive or to harm consumers because consumers have an array of interchangeable and like-priced products from which to choose.

---

[25] *See also*

**REDACTED**

[26] *See also*

**REDACTED**

[27] *See* CVS Pls.' RFA Resp. at 108-15; Meijer Pls.' RFA Resp. at 125-32; Walgreen Pls.' RFA Resp. at 70-74. *See also*

**REDACTED**

42

## CONCLUSION

For the foregoing reasons, State and Direct Purchaser Plaintiffs' Motion for Partial Summary Judgment should be denied.

Dated: December 19, 2007                    Respectfully submitted,

                                            Karen N. Walker (D.C. Bar # 412137)
                                            Mark L. Kovner (D.C. Bar # 430431)
                                            Patrick M. Bryan (D.C. Bar # 490177)
                                            Eunnice H. Eun (D.C. Bar # 500203)
                                            KIRKLAND & ELLIS LLP
                                            655 Fifteenth Street, N.W., Suite 1200
                                            Washington, DC 20005
                                            Tel.  (202) 879-5000
                                            Fax  (202) 879-5200

                                            *Counsel for Barr Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of December 2007, I caused an unredacted copy of Barr's Notice of Filing Under Seal, Motion to File Under Seal, Barr's Opposition to State Plaintiffs' Motion for Summary Judgment and Direct Purchaser Plaintiffs' Motion for Partial Summary Judgment, Response and Counter-Statement to Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue, and accompanying Exhibits, to be served by e-mail and first-class mail upon the parties listed on the service list below.

_____
Eunnice H. Eun


Devin M. Laiho
STATE OF COLORADO
1525 Sherman Street, 5th Floor
Denver, CO 80203
(303) 866-5079

Scott E. Perwin, Esq.
KENNY NACHWALTER, P.A.
110 Miami Center
201 South Biscayne Blvd.
Miami, FL 33131
(305) 373-1000

Linda P. Nussbaum
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980

Monica Rebuck
HANGLEY ARONCHICK SEGAL
& PUDLIN, P.C.
30 North Third Street
Harrisburg, PA 17101-1701
(717) 364-1030