# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF COLORADO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. Action No. 1:05-CV-02182-CKK |
| v. | ) | |
| | ) | Judge Colleen Kollar-Kotelly |
| WARNER CHILCOTT HOLDINGS | ) | |
| COMPANY III, LTD., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| MEIJER, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. Action No. 1:05-CV-02195-CKK |
| v. | ) | |
| | ) | Judge Colleen Kollar-Kotelly |
| WARNER CHILCOTT HOLDINGS | ) | |
| COMPANY III, LTD., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| WALGREEN CO., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. Action No. 1:06-CV-00494-CKK |
| | ) | |
| v. | ) | Judge Colleen Kollar-Kotelly |
| | ) | |
| WARNER CHILCOTT HOLDINGS | ) | |
| COMPANY III, LTD., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| CVS PHARMACY, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. Action No. 1:06-CV-00795-CKK |
| v. | ) | |
| | ) | Judge Colleen Kollar-Kotelly |
| WARNER CHILCOTT HOLDINGS | ) | |
| COMPANY III, LTD., *et al.*, | ) | **FILED UNDER SEAL PURSUANT TO** |
| | ) | **PROTECTIVE ORDER DATED APRIL 4,** |
| Defendants. | ) | **2006** |

# BARR'S RESPONSE TO PLAINTIFFS' JOINT COUNTER-STATEMENT

Pursuant to Local Civil Rules 7(h) and 56.1, Barr hereby submits its Response to Plaintiffs' Joint Counter-Statement. As an initial matter, however, Barr states that this Court's Local Rules provide that an opposition to a motion for summary judgment "shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." LCvR 7(h). Plaintiffs' Counter-Statement, which totals 78 pages, is not concise, and repeatedly fails to cite references to the record to support its assertions. Barr, therefore, objects to Plaintiffs' use of its Counter-Statement to assert arguments beyond the 45-page limit for opposition briefs imposed by the Local Rules.

Moreover, Barr states that Plaintiffs failed to dispute the facts set forth in Barr's Statement. Instead, plaintiffs often responded with self-serving, conclusory, and/or unsupported statements. Such statements are insufficient to raise a genuine issue of material fact. *See, e.g., Hopps v. WMATA*, 480 F. Supp. 2d 243, 253 (D.D.C. 2007) ("Plaintiff's self serving, unsupported statement is insufficient to raise a genuine issue of material fact to defeat WMATA's motion for summary judgment." (citing *Hastie v. Henderson*, 121 F. Supp. 2d 72, 81 (D.D.C. 2000) (holding that there was no genuine issue of material fact where the only evidence plaintiff proferred was her "own self-serving and conclusory statement.")). *See also Grumbine v. United States*, 586 F. Supp. 1144 (D.D.C. 1984) (stating that a "bare suggestion, unsupported by any evidence, is plainly insufficient to create a genuine issue of material fact.").

Finally, many of the Counter-Statements proferred by Plaintiffs are ***completely immaterial***, *i.e.*, they do not dispute any fact upon which Barr relied.

**Plaintiffs' Counter-Statement ¶ 38:**

> The product at issue in this case — Ovcon 35 ("Ovcon") — is a branded oral contraceptive containing 35 micrograms of ethinyl estradiol and 0.4 micrograms norethindrone; it was approved for marketing by the United States Food and Drug Administration ("FDA") in 1976, and is not presently subject to patent protection. *See* Barr Answer (*Meijer*) ¶ 32 (D.I. # 36); Warner Chilcott Answer (*Meijer*) ¶ 32 (D.I. #32).

**Barr's Response to ¶ 38:**

Barr does not dispute the allegations set forth in Paragraph 38 but states that they are immaterial.

Barr states, however, that to the extent Plaintiffs purport to allege that Ovcon 35 is the only product relevant to this case, the documents cited by Plaintiffs fail to support their assertions. In addition to Ovcon 35's generic counterparts, Balziva and Zenchent, *see* Barr's 7(h) Stmnt. ¶ 37[1], Barr states that Ovcon 35 is virtually identical to numerous other oral contraceptives in terms of both active ingredients and dosage. (*See, e.g.*,

<strong>REDACTED</strong>

---

[1] For the convenience of the Court, all brief and tab references herein refer to Barr's Statement of Material Facts Not in Dispute ("Barr's 7(h) Stmnt.") and Amended Appendix of Exhibits ("Am. App.") submitted in connection with Barr's Motion for Summary Judgment on State and Direct Purchasers Federal Claims on Nov. 14, 2007, and Barr's Response and Counter-Statements to Plaintiffs' Statement of Purportedly Material and Undisputed Facts ("Barr's Resp. to Pls.' Stmnt.") submitted in connection with Barr's Opposition to Plaintiffs' Motion for Summary Judgment on Dec. 19, 2007. In addition, Plaintiffs' brief and tab references herein refer to Plaintiffs' Appendix of Exhibits ("Pls.' App.") submitted in connection with State Plaintiffs' Motion for Summary Judgment and Direct Purchaser Plaintiffs' Motion for Partial Summary Judgment on Nov. 14, 207, and Plaintiffs' Appendix of Exhibits to their Oppositions to Barr's Motion for Summary Judgment ("Pls.' Opp'n App.") submitted on Dec. 19, 2007.

**REDACTED**

Barr also states that there are dozens of other oral contraceptive products on the market today that are reasonably interchangeable with Ovcon 35.  (*See* Barr's 7(h) Stmnt. ¶¶ 20-21.)

**Plaintiffs' Counter-Statement ¶ 39:**

>  Defendant Warner Chilcott acquired the Ovcon brand in January 2000 from Bristol-Myers Squibb Company ("BMS").  *Id.* ¶ 34; :

**REDACTED**

**Barr's Response to ¶ 39:**

Barr does not dispute that Warner Chilcott purchased Ovcon 35 from BMS in January 2000 and that BMS agreed to supply Warner Chilcott's requirements of Ovcon 35 as part of the purchaser agreement.  (*See, e.g.*, Barr's 7(h) Stmnt. ¶ 6.)

**Plaintiffs' Counter-Statement ¶ 40:**

>  For years, Ovcon was the pharmaceutical company Warner Chilcott's highest revenue-generating, flagship product.  Warner Chilcott Answer (*Meijer*) ¶ 36 (D.I. #32).  Ovcon had been

**REDACTED**

3

**Barr's Response to ¶ 40:**

Barr does not dispute that "Ovcon is, and has been, one of Warner Chilcott's highest revenue-producing products . . . ," *see* Warner Chilcott's Answer to Meijer Compl. (Pls.' App. Tab 1) ¶ 36), but states that this statement is immaterial. Barr lacks knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegation that Ovcon was Warner Chilcott's "flagship" product, but states that this statement is also immaterial.

**Plaintiffs' Counter-Statement ¶ 41:**

> Prior to 2006 when Warner Chilcott waived the contractual provision effectuating the horizontal market allocation at issue in this litigation by preventing defendant Barr Pharmaceuticals, Inc. ("Barr") from introducing a generic version of Ovcon, Ovcon was the only 35 microgram oral contraceptive pill actively promoted without a generic equivalent. *See*

**REDACTED**

**Barr's Response to ¶ 41:**

Barr states that Plaintiffs' argumentative characterizations of the issues in this litigation are immaterial and fail to create a genuine material fact in dispute. Barr further states that Plaintiffs' allegation that "Ovcon was the only 35 microgram oral contraceptive pill actively promoted *without a generic equivalent*" is immaterial.

Moreover, Barr states that the documents cited by Plaintiffs do not support their assertions. Specifically, Barr states that prior to 2006, there were numerous other 35 microgram oral contraceptive pills on the market, including, but not necessarily limited to, Brevicon, Demulen 1/35, Modicon, Necon 0.5/35, Necon 1/35, Norethin 1/35, Norinyl 1/35, Nortrel 0.5/35, Nortrel 1/35, Ortho-Cyclen, Ortho-Novum 1/35, Sprintec, Zovia 1/35, Estrostep, Necon 10/11, Nelova 10/11, Nortrel 7/7/7, Ortho-Novum 7/7/7, Ortho-Novum 10/11, Ortho Tri-Cyclen, and Tri-Norinyl. (*See, e.g.,*          **REDACTED**          In addition, there are dozens of

other oral contraceptive products that have been on the market since 2004, and Ovcon 35 is considered to be interchangeable with a variety of them. (*See supra* Barr's Resp. to ¶ 38.)

**Plaintiffs' Counter-Statement ¶ 42:**

> Defendant Barr develops, manufactures, markets and distributes branded and generic pharmaceutical products, including at least 24 generic and three branded oral contraceptives. *See* Barr 10-KT for Transition Period Ending Dec. 31, 2006 at 3, 12 (Pl. Appx. Ex. 58); *See also* Barr Answer (*Meijer*) ¶ 14 (D.I. #36). Sales of Barr's different generic oral contraceptive formulations comprised $399.4 million of revenues for Barr for the fiscal year ending June 30, 2006. *See* Barr 2006 Annual Report to Shareholders at 21 (Pl. Appx. Ex. 59). By its own admission, Barr pursues a strategy of marketing generic drugs that possess significant barriers to market entry by competing formulations. *See* Barr Website Excerpt (Gov't Ex. 1626) ("The Company focuses on products that have one or more characteristics that make it difficult for other competitors to develop competing generics") (Pl. Appx. Ex. 62).

**Barr's Response to ¶ 42:**

Barr disputes Plaintiffs' characterization of Barr's strategy but states that, in any regard, each allegation contained in Paragraph 42 is immaterial.

**Plaintiffs' Counter-Statement ¶ 43:**

> There is an extensive body of published research concerning the effects of generic competition in pharmaceutical markets. *See, e.g.*, Congressional Budget Office, *How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry*, July 1998 ("CBO Study") (Pl. Appx. Ex. 128); *see also* Leitzinger Report (5/18/07) at 18-23 (Pl. Appx. Ex. 73). The principal conclusions of this research are that AB-rated generic products enter the market at substantially lower prices than their branded counterparts, and capture a significant share of the combined product (brand and generic) unit sales. *Id.* The CBO found the savings to consumers to be enormous. "CBO estimates that in 1994, purchasers saved a total of $8 billion to $10 billion on prescriptions at retail pharmacies by substituting generic drugs for their brand-name counterparts." *Id.* (Pl. Appx. Ex. 73).

**Barr's Response to ¶ 43:**

Barr states that the allegations set forth in Paragraph 43 are not directed or related to the facts relied upon in Barr's motion and are thus immaterial. Specifically, Barr states that

generalizations regarding generic products in pharmaceutical markets have no bearing on the actual competitive effects of the agreement at issue in this case.

Barr further states that the documents cited by Plaintiffs do not support their assertions. The actual data demonstrates that WAC pricing for Ovcon 35 was $199.29 at the time that Barr launched a generic version of Ovcon, Balziva (which was invoiced at $179.34) which confirms that Barr did not launch Balziva at a 30% discount to the price of branded Ovcon 35. (*See, e.g.,* Barr's Resp. to Pls.' Stmnt. ¶ 8.) (*Compare*                  **REDACTED**

.) Moreover, because Warner Chilcott stopped distributing free samples of Ovcon 35 upon the introduction of Balziva, many consumers paid more to purchase Ovcon 35 and its AB-rated generic alternatives; in other words, Balziva did not enter at a discount to the net price of Ovcon 35 at all. (*See, e.g.,* Barr's Resp. to Pls.' Stmnt. ¶ 8;

**REDACTED**

**REDACTED**

**Plaintiffs' Counter-Statement ¶ 44:**

As Barr's Chief Operating Officer explained at deposition, AB-rated generic versions of brand pharmaceutical products generally cost

**REDACTED**

6

REDACTED

Testimony of Bruce Downey, President and CEO Barr Laboratories, May 21, 1998, Hearing Before the House Subcommittee on Courts and Intellectual Property at 2 ("[b]ecause of generic competition, consumers have saved literally billions of dollars by having access to generic pharmaceuticals that are priced as much as 70% below their brand counterparts") (Pl. Appx. Ex. 70).

**Barr's Response to ¶ 44:**

Barr states that the allegations set forth in Paragraph 44 are immaterial to Barr's motion. Specifically, Barr states that generalizations regarding generic products in pharmaceutical markets have no bearing on the actual competitive effects of the agreement at issue in this case.

Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr CEO Bruce Downey in fact testified in 2005 that generic pharmaceutical products, in general, can be less expensive as compare to their AB-rated brands, but that it's a

REDACTED

REDACTED

7

**REDACTED**      Barr further incorporates its response to Paragraph 43 of Plaintiffs'

Counter-Statement.

**Plaintiffs' Counter-Statement ¶ 45:**

**REDACTED**

Thus, as Barr proclaims on its website, "[g]eneric pharmaceuticals can cost 30 to 80 percent less than the equivalent brand product. For every healthcare dollar spent on medicines, American consumer [sic] spend less than eight cents on generic drugs versus 92 cents on brand drugs. This is despite the fact that generic drugs are dispensed for nearly half of all prescriptions." *Id.* 32:23-33:8. *See also* http:/www.barrlabs.com/generic/faq.php (Pl. Appx. Ex. 136).

**Barr's Response to ¶ 45:**

Barr states that the allegations set forth in Paragraph 45 are not directed or related to the

facts relied upon in Barr's motion and are thus immaterial. Specifically, Barr states that

generalizations regarding generic products in pharmaceutical markets have no bearing on the

actual competitive effects of the agreement at issue in this case.

Barr further states that the documents cited by Plaintiffs do not support their assertions.

As Barr CEO Bruce Downey testified, Barr takes into account

**REDACTED**

Barr further incorporates its responses to Paragraphs 43

and 44 of Plaintiffs' Counter-Statement.

**Plaintiffs' Counter-Statement ¶ 46:**

The generic substitution rate (the rate at which sales of branded pharmaceutical products are switched to chemically equivalent generic versions) for many of Barr's generic oral contraceptive products reached 60-70% by the end of the first

8

year following launch, meaning that 30-40% of prescriptions for a particular product would be filled with a brand product and 60-70% with a generic product. *See* Barr 2004 Annual Report at 20, 39 (Pl. Appx. Ex. 60); *see also*

**REDACTED**

### Barr's Response to ¶ 46:

Barr states that the allegations set forth in Paragraph 46 are not directed or related to the facts relevant to Barr's motion and are thus immaterial. Specifically, Barr states that generalizations regarding generic products in pharmaceutical markets have no bearing on the actual competitive effects of the agreement at issue in this case.

Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr's 2004 Annual Report actually states that the generic substitution rate, or "the percentage of prescriptions filled with a generic version," reached 60-70% by the end of fiscal year 2004 "for many of our oral contraceptives." (*See* Barr 2004 Annual Report (Pls.' Opp'n App. Tab 60) at 20.) (*See also*

**REDACTED**

) Moreover, Mr. Bisaro testified in 2006 that he did not know whether the generic substitution rate in fact reached 80 percent after the 2004 Annual Report was published. (*See*

**REDACTED**

").)

9

**Plaintiffs' Counter-Statement ¶ 47:**

REDACTED

**Barr's Response to ¶ 47:**

Barr states that the allegations set forth in Paragraph 47 are not directed or related to the facts relevant to Barr's motion and are thus immaterial. Specifically, Barr states that generalizations regarding generic products in pharmaceutical markets have no bearing on the actual competitive effects of the agreement at issue in this case.

Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr CEO Bruce Downey actually testified that, in the pharmaceutical industry in general,

REDACTED

Barr further incorporates its response to Paragraphs 43 and 45 of Plaintiffs' Counter-Statement.

**Plaintiffs' Counter-Statement ¶ 48:**

Before a manufacturer can market a new drug in the United States, it must obtain approval from the United States Food and Drug Administration ("FDA"). Barr (*Meijer*) Answer ¶ 24 (D.I. #36). A manufacturer seeking to market a new drug must file a New Drug Application ("NDA") demonstrating the safety and efficacy of its product, which is an expensive and time consuming process. *Id.* at ¶ 25; 21 U.S.C. § 355(b). A manufacturer seeking FDA approval for a generic drug may file an Abbreviated New Drug Application ("ANDA") which may rely on the safety and efficacy data previously provided by the manufacturer in its NDA for the branded counterpart. *Id.* at ¶ 27.

10

**Barr's Response to ¶ 48:**

Barr does not dispute that, "among other things, a drug manufacturer must file a New Drug Application with the FDA and demonstrate that a new drug is safe and effective for its intended use." (*See* Barr's Answer to Meijer Compl. ¶ 26.) Barr also does not dispute that "the FDA has specific procedures for approval of an ANDA that may, among other things, allow an ANDA filer to use the safety and efficacy data previously provided for a specific Reference Listed Drug." (*See id.* ¶ 27.) Barr states that the remaining allegations and characterizations contained in Paragraph 48 are immaterial.

**Plaintiffs' Counter-Statement ¶ 49:**

> Barr had been pursuing FDA approval to market generic Ovcon since 2001 and eventually received FDA approval to do so on April 22, 2004. *See* Barr Answer ¶ 42 (D.I. #36); BARR-13-00042-043 (Pl. Appx. Ex. 4). Thus, Barr and Warner Chilcott were potential competitors in the market for Ovcon 35 Products when Barr and Warner Chilcott entered into the Agreement that is the subject of this litigation, which prevented Barr from marketing a generic version of Ovcon in exchange for a payment from Warner Chilcott to Barr. Due to the Agreement, which effectuated a horizontal market allocation between Barr and Warner Chilcott, Barr did not launch its generic version of Ovcon in the United States until October 2006 when Warner Chilcott, as a result of FTC litigation, waived the provision contained in the agreement between the parties that prevented such a launch. *See* News Release, *Barr Announces Warner Chilcott Waives Exclusive License for Ovcon 35* (Sept. 26, 2006) (Barr Appx. Ex. 90).

**Barr's Response to ¶ 49:**

Barr states that Plaintiffs' argumentative characterizations of the issues in this litigation are immaterial and fail to create a genuine material fact in dispute, but that, in any regard, the documents cited by Plaintiffs do not support their assertions.

**Plaintiffs' Counter-Statement ¶ 50:**

> Consumers, wholesalers and retailers pay less to acquire a drug when they buy the generic version rather than the branded version. *See*
> 
>                                     Barr and Warner Chilcott's agreement to

delay market entry of a generic version of Ovcon resulted in purchasers overpaying for Ovcon during the period that Barr's generic version was diverted from the marketplace.

**Barr's Response to ¶ 50:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, and further states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr states that because Warner Chilcott stopped distributing free samples of Ovcon 35 upon the introduction of Balziva, *many consumers paid more* to purchase Ovcon 35 and its AB-rated generic alternatives; in other words, Balziva did not enter at a discount to the net price of Ovcon 35 at all. (*See, e.g.,* Barr's Resp. to Pls.' Stmnt. ¶ 8;

REDACTED

REDACTED

**Plaintiffs' Counter-Statement ¶ 51:**

REDACTED

**REDACTED**

**Barr's Response to ¶ 51:**

      Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, and further states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr further disputes Plaintiffs' characterization of and legal conclusions regarding the provisions of the agreement between BMS and Warner Chilcott and states that the agreement speaks for itself.

**Plaintiffs' Counter-Statement ¶ 52:**

**REDACTED**

**Barr's Response to ¶ 52:**

      Barr disputes Plaintiffs' characterization of and legal conclusions regarding the provisions of the BMS Supply Agreement and states that the agreement speaks for itself.

      Barr further states that the documents cited by Plaintiffs do not support their assertions. Specifically, Barr states that the agreement actually provides that:

**REDACTED**

(See                REDACTED

                                    The agreement further provides that


                              REDACTED




**Plaintiffs' Counter-Statement ¶ 53:**




                              REDACTED




**Barr's Response to ¶ 53:**

        Barr states that the allegations and characterizations contained in Paragraph 53 are

immaterial.

        Barr further states that the documents cited by Plaintiffs do not support their assertions.

In particular, Barr disputes that WC00403855-60 demonstrates the number of Ovcon compacts

that Warner Chilcott sold. Barr states that this document appears to be a "planning card" that is

meant to calculate inventory levels of Ovcon 35. *(See*

                              REDACTED

**Plaintiffs' Counter-Statement ¶ 54:**

Despite the significant increase in Warner Chilcott's requested Ovcon supply, BMS always ensured that Warner Chilcott had "multi-month inventory" the entire time that it supplied Warner Chilcott with Ovcon.  *See* :

<strong>REDACTED</strong>

**Barr's Response to ¶ 54:**

Barr states that the documents cited by Plaintiffs do not support their assertions. Contrary to Plaintiffs' assertions, and as Plaintiffs' own expert concedes, BMS was not only

<strong>REDACTED</strong>

<strong>REDACTED</strong>

. BMS's repeated delays in supplying Ovcon 35 to Warner Chilcott resulted in Warner Chilcott often running out of supply.  (*See, e.g.*, Barr's 7(h) Stmnt. ¶¶ 8-12.)

**Plaintiffs' Counter-Statement ¶ 55:**

During the time period that BMS supplied Warner Chilcott with Ovcon, BMS never failed to deliver Ovcon and Warner Chilcott never failed to supply its customers or meet market needs as a result of any supply issues.  *See* :

<strong>REDACTED</strong>

**Barr's Response to ¶ 55:**

Barr states that the documents cited by Plaintiffs do not support their assertions.  As demonstrated in Barr's Response to ¶ 54 above, BMS often failed to timely and consistently meet Warner Chilcott's Ovcon 35 inventory needs.  (*See supra* Barr's Resp. to ¶ 54;     **REDACTED**

**REDACTED**

Moreover, BMS was fully aware that the supply delays were affecting Warner Chilcott customers. (*See, e.g.,*

**REDACTED**

Warner Chilcott has also stated that had BMS consistently supplied Ovcon 35 product, in particular, **REDACTED**

**Plaintiffs' Counter-Statement ¶ 56:**

Warner Chilcott repeatedly confirmed the adequacy of BMS's Ovcon supply, stating in multiple public filings submitted to the Securities and Exchange Commission ("SEC") during the years 2001-2004 that it considered BMS's supply of Ovcon, then Warner Chilcott's flagship product, entirely adequate and trouble-free. *See* Form 20-F, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Fiscal Year Ended September 30, 2001 at 12 (Pl. Appx. Ex. 53). *See also* Pl. Appx. Ex. 54, at 13 (same for 2002); Pl. Appx. Ex. 55, at 17-18 (same for 2003). Specifically, in each of the years

**REDACTED**

**Barr's Response to ¶ 56:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, and further states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr states that while Warner Chilcott reported to the SEC that its source of Ovcon supply was adequate, that BMS was

**REDACTED**

In fact, Warner Chilcott, referring specifically to the products that BMS supplied, including Ovcon, reported to the SEC that "[w]e cannot assure you that our contract manufacturers will be able to manufacture our products without interruption, that they will comply with their obligations under our various supply arrangements, or that we will have adequate remedies for any breach. In the event that a supplier suffers an event that caused it to be unable to manufacture our product requirements for a sustained period, the resulting shortages of inventory could have a material adverse effect on our business." (*See* Warner Chilcott Form 20-F for Fiscal Year Ended September 30, 2001 at 11 (Pls.' Opp'n App. Tab 53).)

**Plaintiffs' Counter-Statement ¶ 57:**

Because of the benefits purchasers and consumers receive when a generic enters the market, generic competition poses grave risks to the profits of branded pharmaceutical products that are not protected by patents. Since the 2000 acquisition of Ovcon, Warner Chilcott's senior executives and directors agreed

**REDACTED**

17

**REDACTED**

**Barr's Response to ¶ 57:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, and further states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions.

**Plaintiffs' Counter-Statement ¶ 58:**

Warner Chilcott recognized and publicly disclosed these risk[s] of generic entry. *See* Warner Chilcott's 2002 20-F submission to the SEC (listing "competition from generic equivalents" as the first, and foremost risk factor facing their business); ("Increased competition from the sale of competing generic pharmaceutical products may cause a material decrease in revenue from our branded pharmaceutical products.") Warner Chilcott 2002 20-F at C "Reasons for the Offer and Use of Proceeds. Risk Factors" (Pl. Appx. Ex. 54).

**Barr's Response to ¶ 58:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, and further states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr states that Warner Chilcott reported many "risk factors" in its 2002 Form 20-F SEC filing, including, *inter alia*: (1) "If *any* products are approved that compete with *any* of our branded pharmaceutical products, sales of our products may be adversely affected."; (2) "rapid product development and technological change" that could render Warner Chilcott's products "obsolete or . . . uneconomical"; (3) "[d]elays and uncertainties in the government approval process for new products," and ; (4) "Our suppliers of certain pharmaceutical products must be approved by the FDA and the MCA and the need to replace a current supplier with another approved supplier

18

may delay manufacture of the drug involved or increase costs." (*See* Warner Chilcott Form 20-F

for Fiscal Year Ended September 30, 2002 at 17-18 (Pls.' Opp'n App. Tab 54).)

**Plaintiffs' Counter-Statement ¶ 59:**

> Warner Chilcott noted, in this same regulatory submission, the unique competitive threat that an FDA-approved generically-equivalent version of a branded pharmaceutical product presented to its corresponding branded version:

>> Our branded pharmaceutical products also are or may become subject to competition from generic equivalents because there is no proprietary protection for most of the branded pharmaceutical products we sell. For instance, Estrace tablets are in direct competition with generic products. Generic substitutes for some of our branded pharmaceutical products are also sold by other pharmaceutical companies that claim that their products provide equivalent therapeutic benefits at a lower cost. In addition, governmental and other pressure to reduce pharmaceutical costs may result in physicians prescribing products for which there are generic substitutes. Increased competition from the sale of generic pharmaceutical products may cause a decrease in revenue from our branded products and could have a material adverse effect on our business, financial condition and results of operations.

> Warner Chilcott 2002 20-F at B. ("Business Overview. Competition." (Pl. Appx. Ex. 54).

**Barr's Response to ¶ 59:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation,

and further states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions, in

particular their characterization of the so-called "unique competitive threat" that an FDA-

approved generically equivalent drug purportedly possesses.

**Plaintiffs' Counter-Statement ¶ 60:**

> Given that Ovcon was not protected by a patent, Warner Chilcott feared the entry of a generic version would decimate its steadily-increasing and substantial Ovcon profits. According to January 2003 company projections,
> i.
> i. **REDACTED**

**REDACTED**

**Barr's Response to ¶ 60:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, and further states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions. In particular, Barr disputes that WC00125915 (Pls.' Opp'n App. Tab 23), can be characterized as "January 2003 company projections." As William Poll, the author of the e-mail cited by plaintiffs, testified,

**REDACTED**

**REDACTED**

**Plaintiffs' Counter-Statement ¶ 61:**

The company created a plan to develop a chewable version of Ovcon in order to

**REDACTED**

20

REDACTED

**Barr's Response to ¶ 61:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, and further states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions. In particular, Plaintiffs' theory that Warner Chilcott planned to develop a chewable version of Ovcon in order to "delay generic entry" and "protect Ovcon" is untenable; the very document that Plaintiffs cite to support their assertion states that Warner Chilcott had

REDACTED

**Plaintiffs' Counter-Statement ¶ 62:**

By virtue of its patent protection, and generic Ovcon's lack of AB-rating to it, the chewable version of Ovcon would not be vulnerable to generic substitution; as former Warner Chilcott Product Manager Mitchell Lazar testified, '

REDACTED

**Barr's Response to ¶ 62:**

Barr states that the allegations contained in Paragraph 62 are immaterial. Barr further states that the documents cited by Plaintiffs do not support their assertions. Specifically,

21

Plaintiffs' theory that Warner Chilcott planned to develop a chewable version of Ovcon in order to "delay generic entry" and "protect Ovcon" is untenable; the very document that Plaintiffs cite to support their assertion states that Warner Chilcott had

**REDACTED**

## Plaintiffs' Counter-Statement ¶ 63:

Outside analysts also considered generic Ovcon to be a potential threat to Warner Chilcott's revenues, raising the issue repeatedly in a 2003 earnings call. *See* August 6, 2003, Earnings Conference Call (Pl. Appx. Ex. 61). Warner Chilcott explained that its anticipated introduction of a chewable version of Ovcon would allow "less exposure to generic versions of Ovcon." *Id.* Warner Chilcott Chairman, John King, elaborated:

The primary lever is the line extension. Obviously once you pull the line extension you cannibalize the existing Ovcon business so there's less exposure to the generics . . . .

*Id.* at 6. In other words, Warner Chilcott planned to introduce a chewable Ovcon formulation and switch patients to that new formulation prior to the FDA's approval of Barr's generic. At the same time, Warner Chilcott planned to stop selling the old regular Ovcon formulation. Because a pharmacist would be unable to fill a prescription for Ovcon Chewable with the generic version of the older formulation absent physician approval, Warner Chilcott expected that this strategy would impede generic substitution at the pharmacy level.

## Barr's Response to ¶ 63:

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr states that Mr. Boissonneault stated that '

**REDACTED**

**REDACTED**

.)  Furthermore, Warner Chilcott did not have the ability to "switch patients to

the new formulation"; it could only count on the efforts of its sales force to convince physicians

to prescribe its new product.

**REDACTED**

**Plaintiffs' Counter-Statement ¶ 64:**

> As early as 2001, Warner Chilcott expected that chewable Ovcon would replace
> the existing Ovcon and, thereby, protect against generic competition.  *See*

**REDACTED**

~~regular Ovcon out all.   WC 0000001 (Pl.'s Appx. Ex. 9).~~

**Barr's Response to ¶ 64:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation,

but states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions.

Barr states that Warner Chilcott did not in fact "replace the present [regular Ovcon]" with a

chewable version of Ovcon.  Indeed, it is currently selling both a chewable version of Ovcon, or

Femcon FE, as well as the original Ovcon 35.  (*See* Nov. 9, 2007 Press Release, *Warner Chilcott

Reports Operating Results for the Quarter Ended September 30, 2007* (Pls.' Opp'n App. Tab 67)

("We introduced and began commercial sales of FEMCON FE in the second half of 2006, but did not initiate promotional efforts in support of the product until April 2007.");

REDACTED

**Plaintiffs' Counter-Statement ¶ 65:**

Ovcon Chewable's launch was closely linked to its concerns about generic competition. *See*

REDACTED

**Barr's Response to ¶ 65:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions. As demonstrated above, Plaintiffs' theory that Warner Chilcott planned to develop a chewable version of Ovcon in order to "delay generic entry" and "protect Ovcon" is untenable; the very document that Plaintiffs cite to support their assertion states that Warner Chilcott had

REDACTED

**Plaintiffs' Counter-Statement ¶ 66:**

Warner Chilcott predicted that if a competing generic version of Ovcon launched in mid-2003 without chewable Ovcon on the market, the results would be a "total

**REDACTED**

**Barr's Response to ¶ 66:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that the allegations set forth in Paragraph 66 are immaterial to the extent that they have no bearing on the actual competitive effects of the agreement at issue in this case.

Barr further states that the documents cited by Plaintiffs do not support their assertions. As the author of the document cited by Plaintiffs testified, the chart was simply one forecast that reflected certain assumptions, which were based on "pure guesses."

**REDACTED**

**Plaintiffs' Counter-Statement ¶ 67:**

The launch date of Chewable Ovcon was delayed several times. In September 2002, internal Warner Chilcott documents reveal that they expected it would be launched in May 2003, following an anticipated FDA approval of its New Drug Application ("NDA") in the first quarter of 2003. In January 2003, Warner Chilcott believed that, in a "best case" scenario, Chewable Ovcon would be introduced in May 2003. *See* WC00104350 (Pl. Appx. Ex. 10). By August 2003, Warner Chilcott was telling analysts that it felt "relatively comfortable that we should have the line extension by the end of the year." *See* August 6, 2003 Galen Holdings PLC Earnings Conference Call, p.3 (Pl. Appx. Ex. 61).

25

**Barr's Response to ¶ 67:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 68:**

**REDACTED**

**Barr's Response to ¶ 68:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions. Specifically, Barr states that, sometime after 2001, it

**REDACTED**

but that this strategy did not prevent other generic drug manufacturers from similar efforts to launch generic versions of off-patent branded oral contraceptives.

**Plaintiffs' Counter-Statement ¶ 69:**

On or about September 2001, Barr filed an Abbreviated New Drug Application (ANDA) with the FDA seeking approval to market [a] generic version of Ovcon.

**REDACTED**

When Barr filed its ANDA, no company had received FDA approval to sell a generic version of Ovcon.

**Barr's Response to ¶ 69:**

Barr does not dispute that it filed an ANDA with the FDA for approval to market an AB-rated generic version of Ovcon. (*See, e.g.*, Barr's Answer to Meijer Compl. ¶ 37.) Barr lacks knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegation that "no company had received FDA approval to sell a generic version of Ovcon," but states that this statement is immaterial. Ovcon has not been subject to patent protection for many years. (*See, e.g.*, CVS Pls.' RFA Resp. at 6-7; Meijer Pls.' RFA Resp. at 5-7; Walgreen Pls.' RFA Resp. at 5-6.) Therefore, other manufacturers have never been precluded from entering the market with a generic version of Ovcon. (*See, e.g.*,

**REDACTED**

**REDACTED**

**REDACTED**

**Plaintiffs' Counter-Statement ¶ 70:**

**REDACTED**

27

**REDACTED**

3).

**Barr's Response to ¶ 70:**

Barr states that the allegations set forth in Paragraph 70 are immaterial to the extent that they have no bearing on the actual competitive effects of the agreement at issue in this case.

Barr further states that the documents cited by Plaintiffs do not support their assertions. In particular, Barr states that the documents that Plaintiffs selectively cited are two of many different forecast models, based on historical IMS data, that Barr regularly constructed in order to prepare estimates for the manufacture, production, and sale of a generic Ovcon. (*See* Barr's Resp. to Pls.' Stmnt. ¶ 6.) The documents that Plaintiffs cite, therefore, are just two examples of forecasts that Barr generated at two points in time, making certain estimates and considering certain assumptions over a projected period of time. (*See id.*)

Barr further states that the particular models that Plaintiffs cite actually state that Barr, at one point in time, considering certain assumptions over a projected period of time, estimated that by month twelve it could potentially expect to *ship* 62% of the quantity of Ovcon 35 units sold in a month to its customers. (*See id.*) However, under a different iteration of the same model, (*i.e.*, if the assumptions were altered) the forecasted amount of product that Barr could potentially ship in a given month would change. (*See id.*)

**Plaintiffs' Counter-Statement ¶ 71:**

**REDACTED**

28

**Barr's Response to ¶ 71:**

Barr states that the allegations set forth in Paragraph 71 are immaterial to the extent that they have no bearing on the actual competitive effects of the agreement at issue in this case. Barr further states that the documents cited by Plaintiffs do not support their assertions. Specifically, Barr states that its ANDA was not approved until April 22, 2004, *see* Apr. 22, 2004 Letter from G. Buehler to N. Tantillo (Pls.' Opp'n App. Tab 4), so it would not have been able to launch a generic version of Ovcon in May 2003.

**Plaintiffs' Counter-Statement ¶ 72:**

**REDACTED**

**Barr's Response to ¶ 72:**

Barr states that the allegations set forth in Paragraph 72 are immaterial to the extent that they have no bearing on the actual competitive effects of the agreement at issue in this case.

Barr further states that the documents cited by Plaintiffs do not support their assertions. As explained in its response to Paragraph 70 above, Barr states that the documents that Plaintiffs selectively cited are two of many different forecast models, based on historical IMS data, that Barr regularly constructed in order to prepare estimates for the manufacture, production, and sale of a generic Ovcon. (*See, e.g.*, Barr's Resp. to Pls.' Stmnt. ¶ 6.) The documents that Plaintiffs cite, therefore, are just two examples of forecasts that Barr generated at two points in time,

making certain estimates and considering certain assumptions over a projected period of time. (*See id.*)

Barr also states that the particular models that Plaintiffs cite actually state that Barr, at one point in time, considering certain assumptions over a projected period of time, estimated that by month twelve it could potentially expect to ***ship*** 62% of the quantity of Ovcon 35 units sold in a month to its customers. (*See id.*)  However, under a different iteration of the same model, (*i.e.*, if the assumptions were altered) the forecasted amount of product that Barr could potentially ship in a given month would change. (*See id.*)

In addition, and as his deposition testimony plainly states, Roger Boissonneault merely testified that Warner Chilcott estimated that it '

**REDACTED**

**Plaintiffs' Counter-Statement ¶ 73:**

**REDACTED**

**Barr's Response to ¶ 73:**

Barr states that the allegations and characterizations contained in Paragraph 73 are immaterial.  But Barr does not dispute that it and Warner Chilcott had some preliminary conversations about the possibility of a merger or an acquisition in the summer of 2003.

30

**Plaintiffs' Counter-Statement ¶ 74:**


**REDACTED**


**Barr's Response to ¶ 74:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 75:**


**REDACTED**


**Barr's Response to ¶ 75:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.  Barr further states that the documents cited by Plaintiffs do not support their assertions.  Specifically, Barr states that Mr. Boissonneault testified (prior to the launch of generic versions of Ovcon) that

**REDACTED**

**Plaintiffs' Counter-Statement ¶ 76:**

REDACTED

**Barr's Response to ¶ 76:**

Barr states that the allegations and characterizations contained in Paragraph 73 are immaterial. Barr further states that Warner Chilcott is currently selling both a chewable version of Ovcon, or Femcon FE, as well as the original Ovcon 35. (*See* Nov. 9, 2007 Press Release, *Warner Chilcott Reports Operating Results for the Quarter Ended September 30, 2007* (Pls.' Opp'n App. Tab 67) ("We introduced and began commercial sales of FEMCON FE in the second half of 2006, but did not initiate promotional efforts in support of the product until April 2007.");

REDACTED

**Plaintiffs' Counter-Statement ¶ 77:**

REDACTED

**Barr's Response to ¶ 77:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 78:**

On September 10, 2003, Warner Chilcott and Barr signed a Letter of Intent ("LOI"), to enter into an agreement under which Warner Chilcott had the option to pay Barr $20 million in exchange for, among other things, Barr's agreement not to launch a generic version of Ovcon for five years following receipt of FDA approval of its generic version of Ovcon.  Warner Chilcott (*Meijer*) Answer ¶ 49 (D.I. # 32); Barr (*Meijer*) Answer ¶ 49 (D.I. # 36); *see also* BARR-29-00003-007 (Pl. Appx. Ex. 6).

**REDACTED**

provide that:

- **REDACTED**

-

-

-

- **REDACTED**

**Barr's Response to ¶ 78:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation but states that they are immaterial.  However, Barr states that it does not dispute that "[o]n September 10, 2003, Warner Chilcott and Barr executed a letter of intent to negotiate an agreement in which Barr would grant Warner Chilcott an option to acquire a five-year exclusive license to its rights under its Abbreviated New Drug Application ("ANDA") for a generic version of Ovcon 35 as well as supply Warner Chilcott's requirements of Ovcon 35. (*See* Barr's 7(h) Stmnt. ¶ 13.)  Barr also states that it was paid $1 million in consideration for the

33

option by Warner Chilcott, *see* Barr's 7(h) Stmnt. ¶ 16; Barr's Resp. to Pls.' Stmnt. ¶ 3, and that it was paid $19 million for the rights to its ANDA when Warner Chilcott exercised its option. (*See* Barr's 7(h) Stmnt. ¶ 19; Barr's Resp. to Pls.' Stmnt. ¶ 3.)  Barr further states that the remaining allegations contained in Paragraph 78 are immaterial and that it disputes Plaintiffs' characterization of and legal conclusions regarding the provisions of the BMS Supply Agreement and states that the agreement speaks for itself.

**Plaintiffs' Counter-Statement ¶ 79:**

**REDACTED**

**Barr's Response to ¶ 79:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions. Specifically, Barr states that BMS admittedly                **REDACTED**

**Plaintiffs' Counter-Statement ¶ 80:**

Warner Chilcott eventually obtained a patent on its chewable Ovcon product in November 2003, and planned "a late Spring 2004 launch." *See* 2003 Galen Holdings PLC Form 20-F, p. 13 (Pl. Appx. Ex. 55).  FDA approved Ovcon

Chewable in December 2003. December 21 Press Release, "FDA Approves Ovcon 35 birth control tablets" (Pl. Appx. Ex. 132).

**Barr's Response to ¶ 80:**

Barr states that the allegations and characterizations contained in Paragraph 80 are immaterial.

**Plaintiffs' Counter-Statement ¶ 81:**

On March 24, 2004, Barr and Warner Chilcott signed the Agreement that would effectuate the horizontal market allocation out of which this lawsuit arises. Warner Chilcott paid $1 million to Barr at that time. Barr (*Meijer*) Answer ¶ 50 (D.I. # 36).

**Barr's Response to ¶ 81:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial. Barr also states that Warner Chilcott and Barr executed the final License and Supply Agreement in March 2004. (*See* Barr's 7(h) Stmnt. ¶ 14.) Barr also states that, pursuant to the terms of the parties' agreements, Warner Chilcott paid Barr $1 million as consideration for the option to acquire the rights to Barr's Ovcon 35 ANDA. (*See id.* ¶ 16.)

**Plaintiffs' Counter-Statement ¶ 82:**

On April 22, 2004, the FDA granted final approval of Barr's ANDA for generic Ovcon. Barr (*Meijer*) Answer ¶ 52 (D.I. # 36).

**Barr's Response to ¶ 82:**

Barr does not dispute that it received FDA approval for its Ovcon 35 ANDA in April 2004. (*See* Barr's 7(h) Stmnt. ¶ 18.)

**Plaintiffs' Counter-Statement ¶ 83:**

The next day, on April 23, 2004, Barr announced its intention to begin immediately marketing generic Ovcon under the trade name Balziva if Warner

Chilcott chose not to exercise its option under the LOI agreement. *See* News Release, Barr's Generic Ovcon-35 Tablets Approved (April 23, 2004) (Pl. Appx. Ex. 63).

**Barr's Response to ¶ 83:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial. Barr also states that in April 2004 it publicly contemplated launching a generic version of Ovcon if Warner Chilcott did not exercise its option, subject to certain risks and uncertainties in making a generic Ovcon commercially available. (*See, e.g.*, Barr's Answer to Meijer Compl. ¶ 38.)

**Plaintiffs' Counter-Statement ¶ 84:**

On May 6, 2004, Warner Chilcott exercised its option under the Agreement and paid Barr $19 million in exchange for Barr's agreement not to compete with Warner Chilcott by introducing generic Ovcon into the market. Barr Answer (*Meijer*) ¶ 54 (D.I. # 36); BARR-29-00068-72 (Pl. Appx. Ex. 7); BARR-29-00073-77 (Pl. Appx. Ex. 8). Once Warner Chilcott exercised its option, Barr was

**REDACTED**

**Barr's Response to ¶ 84:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial. Barr also states that in May 2004 Warner Chilcott exercised its option on Barr's Ovcon 35 ANDA and, per the terms of the License and Supply Agreement, paid Barr $19 million for the rights to its ANDA. (*See, e.g.*, Barr's 7(h) Stmnt. ¶ 19.) Barr also disputes Plaintiffs' characterization of and legal conclusions regarding the provisions of the License and Supply Agreement and states that the agreement speaks for itself. Barr further states that the remaining allegations and characterizations contained in Paragraph 80 are immaterial.

36

**Plaintiffs' Counter-Statement ¶ 85:**

**REDACTED**

**Barr's Response to ¶ 85:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues

in this litigation, but states that they are immaterial and fail to create a genuine material fact in

dispute.

**Plaintiffs' Counter-Statement ¶ 86:**

> BMS continued to supply WC with Ovcon 35 until May 2005; Warner Chilcott
> did not begin purchasing Ovcon supply from Barr until that time.  Barr's (*Meijer*)
> Answer ¶ 55 (D.I. # 36).  This was over 18 months after the letter of intent and
> about a year after the Option and License Agreement and the Finished Product
> Supply Agreement.  *See id.*

**Barr's Response to ¶ 86:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues

in this litigation, but states that they are immaterial and fail to create a genuine material fact in

dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions.

Barr states that after Warner Chilcott exercised its option, Barr was not in a position to

immediately manufacture Ovcon for Warner Chilcott, as the regulatory approval of its

manufacturing process was not yet complete. (*See*

**REDACTED**

For that reason, Warner Chilcott continued to rely on BMS for its Ovcon

supply until the spring of 2005, when BMS announced it could no longer produce Ovcon under

37

its current manufacturing process. Barr further states that in February 2005, BMS communicated to Warner Chilcott that it would not produce any additional Ovcon without first satisfying Federal Drug Administration ("FDA") requirements. (*See* CVS Pls.' RFA Resp. (Am. App. Tab 24) at 93; Meijer Pls.' RFA Resp. (Am. App. Tab 25) at 108; Walgreen Pls.' RFA Resp. (Am. App. Tab 26) at 61 (admitting that "BMS would need to resolve any issues that the FDA required BMS to resolve").)

**Plaintiffs' Counter-Statement ¶ 87:**

REDACTED

**Barr's Response to ¶ 87:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further incorporates its response to Paragraph 86 above.

**Plaintiffs' Counter-Statement ¶ 88:**

REDACTED

**Barr's Response to ¶ 88:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions.

38

As alleged by Plaintiffs themselves in Paragraphs 73 and 74 above, "Warner Chilcott personnel reviewed Barr's ANDA filings as part of their due diligence." *(See supra* ¶¶ 73-74; Boissonneault Tr. (Pls.' Opp'n App. Tab 89) at 301 (acknowledging that the parties engaged in due diligence).)

**Plaintiffs' Counter-Statement ¶ 89:**

**REDACTED**

**Barr's Response to ¶ 89:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 90:**

**REDACTED**

**Barr's Response to ¶ 90:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 91:**

- 
- **REDACTED**
- 
- 

**Barr's Response to ¶ 91:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 92:**

**REDACTED**

**Barr's Response to ¶ 92:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 93:**

In November 2005, the Plaintiff States, the FTC and Direct Purchaser Plaintiffs separately filed suit against Warner Chilcott and Barr, alleging that the Agreement, which effectuated a horizontal allocation of the market for Ovcon 35 Products, constituted an antitrust violation.

**Barr's Response to ¶ 93:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr does not, however, dispute that Plaintiffs filed complaints against Warner Chilcott and Barr in November 2005. (*See, e.g.*, Barr's Resp. to Pls.' Stmnt. ¶ 7.)

**Plaintiffs' Counter-Statement ¶ 94:**

On September 25, 2006, the FTC filed a motion for preliminary injunction to prevent Warner Chilcott from withdrawing regular Ovcon from the marketplace as it prepared to introduce Ovcon Chewable. *See* www.ftc.gov/opa2006/10/chilcott.shtm. The FTC alleged that Warner Chilcott was planning to launch a chewable version of Ovcon and then stop selling regular Ovcon in order to convert consumers to the new product. *Id.* The strategy would have destroyed the market for generic Ovcon before it came to market, because, if regular Ovcon was no longer being prescribed by doctors (who would be prescribing Ovcon Chewable), pharmacists would not be able to dispense generic Ovcon (since generic Ovcon would not be automatically substitutable for branded Ovcon Chewable). *Id.*

**Barr's Response to ¶ 94:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in

dispute. Barr does not, however, dispute that the FTC filed a motion for preliminary injunction

on September 25, 2006 (*See, e.g.*, Barr's Resp. to Pls.' Stmnt. ¶ 7.)

**Plaintiffs' Counter-Statement ¶ 95:**

> In response to the FDA's motion, on that same date, Warner Chilcott signed a
> waiver that terminated the exclusivity provisions of its Supply Agreement with
> Barr. *See* News Release, Barr Announces Warner Chilcott Waives Exclusive
> License for Ovcon 35 (Sept. 26, 2006) (Barr Appx. Ex. 90); Downey Tr.
> (10/17/06) at 188:23-25 (Pl. Appx. Ex. 96). As a result of the waiver, Barr was
> free to market its FDA-approved generic version of Ovcon in the Untied States
> and, indeed, Barr promptly launched its product. *Id.*

**Barr's Response to ¶ 95:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues

in this litigation, but states that they are immaterial and fail to create a genuine material fact in

dispute. Barr does not, however, dispute that in September 2006 Warner Chilcott permanently

waived all exclusivity provisions in its License and Supply Agreement with Barr. (*See, e.g.*,

Barr's 7(h) Stmnt. ¶ 35; Barr's Resp. to Pls.' Stmnt. ¶ 7.) Barr also does not dispute that it was,

therefore, free to manufacture and market a generic version of Ovcon 35, and that, upon Warner

Chilcott's waiver of exclusivity, Barr immediately launched its AB-rated generic version of

Ovcon 35, Balziva®, in October 2006. (*See, e.g.*, Barr's 7(h) Stmnt. ¶¶ 36-37; Barr's Resp. to

Pls.' Stmnt. ¶ 7.)

**Plaintiffs' Counter-Statement ¶ 96:**

> Barr launched its generic version of Ovcon, which it called "Balziva," on October
> 16, 2006. Barr Press Release, Barr Announces Warner Chilcott Waives Exclusive
> License for Ovcon 35 (Barr Appx. Ex. 90); Downey Tr. (10/17/06) at 24:21-26:04

**REDACTED**

**Barr's Response to ¶ 96:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial. Barr also states that it launched a generic version of Ovcon 35, Balziva®, in October 2006. (*See, e.g.*, Barr's 7(h) Stmnt. ¶¶ 36-37; Barr's Resp. to Pls.' Stmnt. ¶ 7.) Barr further states that the documents cited by Plaintiffs do not support their assertions. Specifically, KGR 0003 and BRK 000086-87, demonstrated that Barr launched Balziva at approximately a 30% discount to the price of branded Ovcon 35. Barr states that the actual data demonstrates WAC pricing for Ovcon 35 was $199.29 at the time that Barr launched a generic version of Ovcon, Balziva, which was invoiced at $179.34, which confirms that Barr did not launch Balziva at a 30% discount to the price of branded Ovcon 35. (*See, e.g.*, Barr's Resp. to Pls.' Stmnt. ¶ 8.)

**REDACTED**

**Plaintiffs' Counter-Statement ¶ 97:**

> The introduction of Barr's lower priced generic competitor to branded Ovcon resulted in a rapid and substantial shift in sales from branded Ovcon to the cheaper generic alternative. Warner Chilcott reported losing more than 80% of its branded Ovcon sales to the less expensive generic product in a matter of months. News Release, Warner Chilcott Reports Operating Results for the Quarter Ended March 31, 2007 and Raises 2007 Full Year Guidance, p.2 (May 11, 2007) ("The decline in Ovcon revenue was due to the introduction of a generic version of Ovcon 35 in late October 2006, which led to an 80.4% decline in filled prescriptions for Ovcon 35 compared to the same quarter last year") (Pl. Appx. Ex. 66).

**Barr's Response to ¶ 97:**

Barr disputes Plaintiffs' argumentative and immaterial characterizations of the issues in this litigation, but respectfully refers the Court to its response to Paragraph 9 of Plaintiffs' Statement of Facts.

**Plaintiffs' Counter-Statement ¶ 98:**

REDACTED

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**Barr's Response to ¶ 98:**

Barr states that the allegations and characterizations contained in Paragraph 98 are immaterial, but states that Warner Chilcott is currently selling both a chewable version of Ovcon, or Femcon FE, as well as the original Ovcon 35. (*See* Nov. 9, 2007 Press Release, *Warner Chilcott Reports Operating Results for the Quarter Ended September 30, 2007* (Pls.' Opp'n App. Tab 67) ("We introduced and began commercial sales of FEMCON FE in the second half of 2006, but did not initiate promotional efforts in support of the product until April 2007.");

<center>REDACTED</center>

**Plaintiffs' Counter-Statement ¶ 99:**

On August 29, 2007, Watson Pharmaceuticals, Inc. ("Watson"), under a license from Warner Chilcott, launched Zenchent, an authorized generic form of Ovcon. *See* January 29, 2007 Warner Chilcott press release, Warner Chilcott and Watson Pharmaceuticals Launch of Zenchent (Pl. Appx. Ex. 65). An authorized generic is a pharmaceutical product that a brand name manufacturer sells pursuant to an approved NDA (new drug application) in competition with one or more AB-rated generic drugs that are being sold pursuant to approved ANDAs (Abbreviated New Drug Applications). Authorized generics are typically sold at prices that are competitive with the available AB-rated generics. By selling an authorized generic, the brand-name company can capture some of the sales that would otherwise go to its generic competitors.

<center>44</center>

**Barr's Response to ¶ 99:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr, however, does not dispute that Watson, under a supply agreement between it and Warner Chilcott, launched Zenchent™, a generic version of Ovcon 35®. (*See* Jan. 29, 2007 Press Release, *Warner Chilcott and Watson Pharmaceuticals Announce Launch of Zenchent*™ (Pls.' Opp'n App. Tab 65).)

**Plaintiffs' Counter-Statement ¶ 100:**

<div align="center">

**REDACTED**

</div>

**Barr's Response to ¶ 100:**

Barr states that the allegations and characterizations contained in Paragraph 100 are immaterial.

**Plaintiffs' Counter-Statement ¶ 101:**

Both Barr and Watson have filed ANDAs with the FDA in an effort to launch generic versions of Chewable Ovcon (now called "Femcon Fe" by Warner Chilcott). *See* 8/19/07 Barr Press Release, "Barr Confirms Filing an Application with a Paragraph IV Certification for Femcon FE Chewable Oral Contraceptive Product" (Pl. Appx. Ex. 133); 10/3/07 Watson Press Release, "Watson Files Application for Generic Femcon FE." (Pl. Appx. Ex. 134).

**Barr's Response to ¶ 101:**

Barr states that the allegations and characterizations contained in Paragraph 101 are immaterial.

**Plaintiffs' Counter-Statement ¶ 102:**

**REDACTED**

**REDACTED**

**REDACTED**

**Barr's Response to ¶ 102:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr respectfully refers the Court, however, to Paragraphs 24-34 of its Statement of Material Facts.

**Plaintiffs' Counter-Statement ¶ 103:**

**REDACTED**

**Barr's Response to ¶ 103:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions. In particular, Barr states that Dr. Bell stated that,                **REDACTED**

47

**REDACTED**

Barr also

respectfully refers the Court to Paragraphs 24-34 of its Statement of Material Facts.

**Plaintiffs' Counter-Statement ¶ 104:**

**REDACTED**

**Barr's Response to ¶ 104:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues

in this litigation, but states that they are immaterial and fail to create a genuine material fact in

dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions.

In particular, Barr states that the testimony of Dr. Bell cited by Plaintiffs actually was made in

answer to a question by Plaintiffs asking whether his answer to a hypothetical about brand-brand

competition included generic entry, to which Dr. Bell replied, ' **REDACTED**

REDACTED

**Plaintiffs' Counter-Statement ¶ 105:**

REDACTED

**Barr's Response to ¶ 105:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 106:**

REDACTED

**Barr's Response to ¶ 106:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 107:**

REDACTED

REDACTED

**Barr's Response to ¶ 107:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 108:**

REDACTED

**Barr's Response to ¶ 108:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions.

**Plaintiffs' Counter-Statement ¶ 109:**

REDACTED

**REDACTED**

**REDACTED**

51

**Barr's Response to ¶ 109:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 110:**

REDACTED

**Barr's Response to ¶ 110:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr respectfully refers the Court, however, to Paragraphs 1-5, 20-22 of its Statement of Material Facts.

**Plaintiffs' Counter-Statement ¶ 111:**

REDACTED

**Barr's Response to ¶ 111:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 112:**

REDACTED

**Barr's Response to ¶ 112:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions. Specifically, Barr states that Dr. Bell actually testified that

REDACTED

**Plaintiffs' Counter-Statement ¶ 113:**

REDACTED

**REDACTED**

**REDACTED**

**Barr's Response to ¶ 113:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 114:**

REDACTED

REDACTED

**Barr's Response to ¶ 114:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that the documents cited by Plaintiffs do not support their assertions. Barr further respectfully refers the Court, however, to Paragraphs 1-5, 20-22 of its Statement of Material Facts.

**Plaintiffs' Counter-Statement ¶ 115:**

REDACTED

**Barr's Response to ¶ 115:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 116:**

REDACTED

limited to Ovcon 35 Products.   *E.g.,*

**REDACTED**

**Barr's Response to ¶ 116:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 117:**

Fourth, Plaintiffs have shown that Ovcon 35 is unique and *not* reasonably interchangeable with non-Ovcon oral contraceptive products.   *E.g.,*

**REDACTED**

**REDACTED**

**REDACTED**

**Barr's Response to ¶ 117:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr further respectfully refers the Court, however, to Paragraphs 1-5, 20-22 of its Statement of Material Facts.

**Plaintiffs' Counter-Statement ¶ 118:**

Warner Chilcott considered Ovcon to be unique, and marketed it for particular types of patients.

**REDACTED**

REDACTED

**Barr's Response to ¶ 118:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 119:**

> Even Barr's experts concede that Ovcon 35 is not reasonably interchangeable with other oral contraceptive products.

REDACTED

**Barr's Response to ¶ 119:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions.

**Plaintiffs' Counter-Statement ¶ 120:**

Fifth, Barr itself considered the market in which its generic Ovcon 35 product competed was limited to Ovcon 35 products.  *See*

**REDACTED**

**Barr's Response to ¶ 120:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.  Barr further states that the documents cited by Plaintiffs do not support their assertions.

**Plaintiffs' Counter-Statement ¶ 121:**

Whatever supply difficulties arose between Warner Chilcott and BMS, they never materially adversely affected Warner Chilcott.    **REDACTED**

- Ovcon supply issues did not have a material effect on Warner Chilcott's revenues during the 2000-2004 time period.  *See*
  **REDACTED**

- Senior executives at Warner Chilcott confirmed that their company's public filings accurately described BMS's performance as a supplier during that period. *See*    **REDACTED**

- Lee Cross, a Warner Chilcott official in charge of supply chain management, informed Boissonneault and the Warner Chilcott Board of Directors that, in his opinion issues related to a potential delay in shipments by BMS were not material events. *See*    **REDACTED**

- There was no decline in sales of Ovcon 35 as a result of any BMS-related supply problems. *See*    **REDACTED**

- Warner Chilcott was never without adequate product to supply patients. *See*

   **REDACTED**

- BMS was never unable to supply WC with enough Ovcon 35 to fill prescriptions. (*Id.* ¶ 24).

**Barr's Response to ¶ 121:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr respectfully refers the Court to its responses to Paragraphs 54-56 above, and Paragraphs 8-12 of Barr's 7(h) Stmnt..

**Plaintiffs' Counter-Statement ¶ 122:**

It is not unusual for issues to arise during a contractual supply relationship involving pharmaceutical products. *See* **REDACTED** Delays in delivery of Ovcon, to the extent any occurred, were similar to the kinds of delivery delays that periodically occur in pharmaceutical contract supply relationships.

**REDACTED**

**Barr's Response to ¶ 122:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 123:**

Warner Chilcott did not threaten to terminate its supply contract with BMS, seek an alternative source of supply for Ovcon 35, or sue BMS concerning any supply issues, nor did Warner Chilcott ever notify BMS that it needed a back-up supplier, as per the terms of their Supply Agreement. *See* **REDACTED**

61

**Barr's Response to ¶ 123:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 124:**

Many of the issues that arose between BMS and Warner Chilcott were of Warner Chilcott's own making due to its own inventory management decisions.

**REDACTED**

**Barr's Response to ¶ 124:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions. BMS had difficulty supplying Warner Chilcott's requirements for Ovcon for various reasons, including, but not limited to,

**REDACTED**

**REDACTED**

**Plaintiffs' Counter-Statement ¶ 125:**

In particular, during the 2002-03 time frame, Warner Chilcott anticipated receiving final approval of its Ovcon Chewable line extension and launching the product in 2003. As a result, Warner Chilcott reduced its Ovcon 35 trade inventory to minimize, or "bleed down," its Ovcon 35 inventory when it launched Ovcon Chewable.

**REDACTED**

**Barr's Response to ¶ 125:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

Barr further states that the documents cited by Plaintiffs do not support their assertions. BMS's problem meeting Warner Chilcott's Ovcon requirements was further exacerbated by the

fact that BMS's capacity at its manufacturing facility, Mayaguez — the facility that manufactured and packaged both Ovcon 35 and Ovcon Chewable — was "limited." (*See*

**REDACTED**

Because of BMS's capacity restraints, Warner Chilcott was faced with "an either/or scenario," *i.e.*, BMS could produce either Ovcon Chewable or Ovcon 35, but not both simultaneously. (*See*

**Plaintiffs' Counter-Statement ¶ 126:**

In managing inventory consistent with the plan at the time, Warner Chilcott reduced its orders of [Ovcon] 35.

**REDACTED**

When final approval and launch of Ovcon Chewable was delayed, Warner Chilcott needed more Ovcon 35 than it had planned for and requested from BMS.

**REDACTED**

Thus, Warner Chilcott's failure to order the proper amounts with sufficient lead time caused some difficulties.

**Barr's Response to ¶ 126:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that the documents cited by Plaintiffs do not support their assertions. Barr respectfully refers the Court to its response to Paragraph 125 above.

**Plaintiffs' Counter-Statement ¶ 127:**

The BMS Supply Agreement required Warner Chilcott to

**REDACTED**

Yet, Warner Chilcott did

64

not contact any supplier to discuss an alternative source of supply for Ovcon other than Barr. As Barr's CEO admitted,      **REDACTED**

Nevertheless, Warner Chilcott never investigated or pursued a supply arrangement with well-known contract suppliers such as Valiant [sic], Patheon, PII, or Gideon Richter, or any generic product manufacturers other than Barr.

**REDACTED**

**Barr's Response to ¶ 127:**

Barr disputes Plaintiffs' argumentative (and unsupported) characterizations of the issues in this litigation, and that the documents cited by Plaintiffs support their assertions, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 128:**

**REDACTED**

**Barr's Response to ¶ 128:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that the allegations set forth in Paragraph 128 are not directed or related to the facts and circumstances of this case and are thus immaterial. Specifically, Barr states that generalizations regarding the manufacture of contraceptive products by others have no bearing on the actual competitive effects of the agreement at issue in this case.

**Plaintiffs' Counter-Statement ¶ 129:**

**REDACTED**

65

**REDACTED**

**Barr's Response to ¶ 129:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that the allegations set forth in Paragraph 129 are not directed or related to the facts and circumstances of this case and are thus immaterial. Specifically, Barr states that generalizations regarding the manufacture of contraceptive products by others have no bearing on the actual competitive effects of the agreement at issue in this case.

**Plaintiffs' Counter-Statement ¶ 130:**

**REDACTED**

**Barr's Response to ¶ 130:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that the allegations set forth in Paragraph 130 are not directed or related to the facts and circumstances of this case and are thus immaterial. Specifically, Barr states that generalizations regarding the manufacture of contraceptive products by others have no bearing on the actual competitive effects of the agreement at issue in this case.

**Plaintiffs' Counter-Statement ¶ 131:**

<div align="center">

**REDACTED**

</div>

**Barr's Response to ¶ 131:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that the allegations set forth in Paragraph 131 are not directed or related to the facts and circumstances of this case and are thus immaterial. Specifically, Barr states that generalizations regarding the manufacture of contraceptive products by others have no bearing on the actual competitive effects of the agreement at issue in this case.

**Plaintiffs' Counter-Statement ¶ 132:**

<div align="center">

**REDACTED**

</div>

**Barr's Response to ¶ 132:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that the allegations set forth in Paragraph 132 are not directed or related to the facts and circumstances of this case and are thus immaterial. Specifically, Barr states that generalizations regarding the manufacture of contraceptive products by others have no bearing on the actual competitive effects of the agreement at issue in this case.

**Plaintiffs' Counter-Statement ¶ 133:**

## REDACTED

**Barr's Response to ¶ 133:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that the allegations set forth in Paragraph 133 are not directed or related to the facts and circumstances of this case and are thus immaterial. Specifically, Barr states that generalizations regarding another manufacturer's supply arrangements have no bearing on the actual competitive effects of the agreement at issue in this case.

**Plaintiffs' Counter-Statement ¶ 134:**

## REDACTED

**Barr's Response to ¶ 134:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that the allegations set forth in Paragraph 134 are not directed or related to the facts and circumstances of this case and are thus immaterial. Specifically, Barr states that generalizations regarding the manufacture of contraceptive products by others have no bearing on the actual competitive effects of the agreement at issue in this case.

**Plaintiffs' Counter-Statement ¶ 135:**

<div align="center">

REDACTED

</div>

**Barr's Response to ¶ 135:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that the allegations set forth in Paragraph 135 are not directed or related to the facts and circumstances of this case and are thus immaterial. Specifically, Barr states that generalizations regarding the manufacture of contraceptive products by others have no bearing on the actual competitive effects of the agreement at issue in this case.

**Plaintiffs' Counter-Statement ¶ 136:**

On February 14, 2004, the FTC informed Barr's counsel that it had

<div align="center">

REDACTED   The letter, sent more than a

</div>

month before the date of Barr's Supply Agreement with Warner Chilcott, explained that the FTC was     REDACTED

**Barr's Response to ¶ 136:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr also states that, prior to the parties' execution of the letter of intent, the FTC and the DOJ were

<div align="center">

REDACTED

</div>

*e.g.*, Barr's Resp. to Pls.' Stmnt. ¶ 3.) Moreover,

<div align="center">

REDACTED          (*See id.*)

</div>

<div align="right">

(*See id.*) And although

</div>

another office of the FTC

**REDACTED**

that office did not file

suit until two years later. (*See* Nov. 2005 FTC Compl.)

**Plaintiffs' Counter-Statement ¶ 137:**

> The FTC state to this Court in June 2006 that it never made or communicated any decision not challenge [sic] the Barr Supply Agreement, or that it was lawful. *See* FTC Statement to Correct Misrepresentations in Defendants' Opposition to Plaintiff States' Motion for Leave to File Summary Judgment Motion, at 1 (Pl. Appx. Ex. 51).

**Barr's Response to ¶ 137:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr respectfully refers the Court to its response to Paragraph 136 above. Moreover, Barr did not assert in its motion that the FTC's inaction or two-year delay constituted notification of a lawfulness determination, only that it would be incredible to believe that the agreement could have been a "naked" *per se* restraint under those conditions.

**Plaintiffs' Counter-Statement ¶ 138:**

> The October 1, 2003 letter from Barr's counsel to an attorney at the FTC Barr submitted with its summary judgment papers concerned Barr Laboratories' Acquisition of Certain Assets from Galen (Chemicals) Ltd — a drug called Estrostep — and not the parties' Ovcon transaction. Barr Appx. Ex. 65. The letter does not mention an agreement to license Barr's ANDA for generic Ovcon, nor does it mention the Barr Supply Agreement or its anticompetitive exclusivity provision. *Id.*

**Barr's Response to ¶ 138:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute.

**Plaintiffs' Counter-Statement ¶ 139:**

Likewise, the other letter Barr cites in its summary judgment papers — from Barr to Warner Chilcott, dated September 10, 2003 — is neither addressed nor copied to the FTC and does not notify the FTC of the terms of the Ovcon transaction. Barr Appx. Ex. 63. The letter from Barr to Warner Chilcott, dated September 10, 2003, does not contain any statement to indicate that it was

**REDACTED**

**Barr's Response to ¶ 139:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Barr further states that its April 30, 2003 letter was addressed to and notified both the FTC and the DOJ of the letter of intent (which was attached to the letter), and further stated that " "

**REDACTED**

**REDACTED**

**Plaintiffs' Counter-Statement ¶ 140:**

**REDACTED**

The FTC chose to charge Barr with a *per se* violations [sic] of the Sherman Act, a charge that Barr has now settled.

**Barr's Response to ¶ 140:**

Barr disputes Plaintiffs' argumentative characterizations of the issues in this litigation, but states that they are immaterial and fail to create a genuine material fact in dispute. Moreover, the fact that the FTC indicated that **REDACTED**

71

**REDACTED**, and subsequently required a two-year investigation, belies any notion that the agreement was so "obviously" anticompetitive that *per se* treatment should be warranted.


Dated: February 1, 2008

*Karen N. Walker /ee*

Karen N. Walker (D.C. Bar # 412137)
Mark L. Kovner (D.C. Bar # 430431)
Patrick M. Bryan (D.C. Bar # 490177)
Eunnice H. Eun (D.C. Bar # 500203)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC 20005
Tel. (202) 879-5000
Fax (202) 879-5200

*Counsel for Barr Pharmaceuticals, Inc.*